OFFICE OF THE CITY ATTORNEY
CITY OF PORTLAND
TRACY REEVE, OR SBN 891123
City Attorney
*Pro Hac Vice* Application Forthcoming
ROBERT TAYLOR, OR SBN 044287
Chief Deputy City Attorney
*Pro Hac Vice* Application Forthcoming
DENIS VANNIER, OR SBN 044406
Senior Deputy City Attorney
*Pro Hac Vice* Application Forthcoming
NAOMI SHEFFIELD, OR SBN 170601
Deputy City Attorney
*Pro Hac Vice* Application Forthcoming
1221 SW 4th Avenue, Suite 430
Portland, Oregon 97204
T: (503) 823-4047; F: (503) 823-3089
Email: robert.taylor@portlandoregon.gov
*Attorneys for Plaintiff City of Portland*

OFFICE OF THE CITY ATTORNEY
CITY OF OAKLAND
BARBARA J. PARKER, CA SBN 069722
City Attorney
MARIA BEE, CA SBN 167716
Chief Assistant City Attorney
ZOE M. SAVITSKY, CA SBN 281616
Supervising Deputy City Attorney
MALIA MCPHERSON, CA SBN 313918
Deputy City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
T: (510) 238-3601; F: (510) 238-6500
Email: zsavitsky@oaklandcityattorney.org
*Attorneys for Plaintiff City of Oakland*

JILL HABIG, President, CA SBN 268770 (Admission Pending)
JONATHAN B. MILLER, Legal Director, MA SBN 663012
*Pro Hac Vice* Application Forthcoming
LIJIA GONG, Counsel, CA SBN 294268
VICTORIA STILWELL, Staff Attorney, CA SBN 330397 (Admission Pending)
4096 Piedmont Avenue #149
Oakland, California 94611
T: (301) 335-3828
Email: lijia@publicrightsproject.org
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CITY OF PORTLAND AND THE CITY OF OAKLAND,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM BARR, in his official capacity as United States Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Civil Action No. 20-cv-7184<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**[Administrative Procedure Act Case]** |

## **INTRODUCTION**

1.      This lawsuit challenges the unlawful and unconstitutional overreach of federal law enforcement in response to and in anticipation of civil protests in progressive United States cities. In particular, the lawsuit challenges the federal government's new policy authorizing the expanded and unbounded jurisdiction of federal law enforcement under the guise of protecting federal property, and the federal government's related and unconstitutional practice of commandeering local law enforcement officers for similar ends.

2.      Plaintiffs are the cities of Portland, Oregon, and Oakland, California—cities that, like others across the United States, have primary responsibility for the health, safety, and welfare of their residents, including the protection and oversight of general public safety during protests. Plaintiffs have police departments, fire departments, and other local governmental departments whose purposes and responsibilities are to reduce and address violence and/or support public safety in their communities. In conducting these important functions, Plaintiffs aim to respect, honor, and protect the First Amendment rights, among other rights, of their residents and visitors, so that those residents and visitors can demonstrate, march, and protest. Plaintiffs also have obligations under local and state law to respond, as necessary, to threats of violence and community harm. Outside of the exceptional actions taken by Defendants as described in this Complaint, Plaintiffs have long operated with this understanding of their duties and authority.

3.      Defendants are the Department of Justice ("DOJ") and the United States Department of Homeland Security ("DHS"), and the leaders of both departments. In response to directives from President Donald J. Trump beginning in or around June 2020, Defendants unilaterally, unlawfully, and unconstitutionally began instituting a policy that authorized the deployment and operation of federal agents in United States cities, allegedly for the purpose of assuring domestic "law and order" and "tak[ing] over cities."

4.      The full scope and parameters of the policy authorizing these actions are currently unknown, as no ordinary public process was followed in its creation. However, for the first known time, Defendants are using 40 U.S.C. § 1315—a statute which authorizes federal agents to protect *federal* property and personnel—as the basis for, at a minimum: (a) deploying federal law

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

enforcement to quash civil protests in United States cities; (b) authorizing the engagement, surveillance, and operations of these deployments to include non-federal property and virtually limitless jurisdiction; and (c) erecting a fence around the Hatfield Federal Courthouse in Portland, without a permit or City consent, that encroaches on the City's right-of-way (the "Policy").

5.      Using that authority or other, unknown authorities, Defendants have also instituted an unlawful practice in Portland of commandeering control of local law enforcement officers in direct contravention of the City's express revocation of consent, and for unknown or pretextual ends (the "Practice").

6.      Based on information and belief, the Policy is a response to, incorporates, and/or is guided by, the June 26, 2020 Executive Order 13933, *Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence* (the "Executive Order"), signed by President Trump following nationwide protests—quite possibly the largest social justice protests in our nation's history—over police brutality and systemic racism. The Executive Order prescribes a set of directives aimed at punishing and responding to "State and local governments" that had allegedly "lost the ability to distinguish between the lawful exercise of rights to free speech and assembly and unvarnished vandalism," or otherwise "failed to protect public monuments, memorials, and statues."

7.      Based on information and belief, the Practice is similarly in response to, incorporates, and/or is guided by, the Executive Order.

8.      Armed with this Executive Order, Defendants instituted and/or continued refining and executing the Policy, which concerns the broad deployment and operation of federal law enforcement in United States cities without the consent, request, or authorization from the states or local leaders; without using any known and non-pretextual legal authority to do so; and with the purpose and/or effect of taking on quintessential general policing powers granted to other governments.

9.      Federal law enforcement agents have, under the Policy, been deployed to United States cities, either secretly or with little warning, under at least three separate operations or

programs: Operation Legend; Operation Diligent Valor, which includes the recent deployment of agents in Portland, Oregon; and the Protecting American Communities Task Force ("PACT").

10.     Although Defendants and/or their agents or employees have publicly claimed that certain operations are for the purpose of protecting federal property under 40 U.S.C. § 1315, internal memoranda, continuing public statements, and activities in cities such as Portland instead reveal a distinct and meaningful policy shift to use federal law enforcement to unilaterally step in or replace local law enforcement departments that do not subscribe to the President's view of domestic "law and order."

11.     Among other things, reported non-public memos from DHS reveal that, under the Policy and in response to the Executive Order, federal law enforcement agents are now authorized to engage in surveillance activities for threats to *any* public monument, memorial, or statue—which in major cities like Plaintiff jurisdictions, could constitute surveillance within the *entire* jurisdiction regardless of federal interests or harms at stake.

12.     In addition, DOJ and/or DHS have engaged in a variety of unauthorized activities under the Policy. Such activities in Portland have included surveilling the text messages of protesters and building a fence that blocks the right-of-way on City property and refusing to remove it upon request of City officials.

13.     Defendants, as well as President Trump, have expressed an intent to expand or at least continue the Policy. President Trump has stated: "We're going to have more federal law enforcement. That I can tell you."—while threatening to send federal agents into major cities "run by liberal Democrats." For instance, he said: "We're not going to let New York and Chicago, and Philadelphia and Detroit and Baltimore and all of these—Oakland is a mess. We're not going to let this happen in our country."

14.     These threats are not new. President Trump has long threatened American cities led by Democrats. But as recently as April 2020, Defendants did not purport to have, or act in accordance with, the authority they now assert under the Policy. In April, numerous public monuments, memorials, and statues were equally or more under threat from armed and uncivil protesters who opposed public health measures to control COVID-19. But those protesters

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

expressed a different set of political views than the majority of those protesting after May 25, 2020, and no policy was then in effect to allow or require the type of federal operations now occurring or allowed to occur under the Policy.

15.     The Policy threatens to upend the current federalism structure and working relationships between local and federal law enforcement agencies. Section 1315 has never before been interpreted to permit the actions taken by Defendants under its auspices.

16.     Defendants have not and did not publicly rely on any of the limited authorities, as described below, that would lawfully allow deployments of federal agents within the parameters defined in such laws.

17.     The Policy is not merely a change in Defendants' interpretation of their own enforcement authority. The Policy is based on a misunderstanding, misinterpretation, error, and/or disregard for the scope of Defendants' legal authority.

18.     In addition, no constitutional authority has been offered for the related Practice of commandeering Portland's law enforcement by refusing to release Portland law enforcement officers from their temporary deputation as federal agents, conscripting them without consent and against Portland's express wishes into ongoing deputation.

19.     This monumental policy change and new commandeering practice harms Plaintiffs' and other cities' abilities to safely govern and police in ways aligned with and responsive to community goals and racial equity reforms. As local governments, Plaintiffs have independent police forces; community relationships; and locally-determined policing policies, practices, and procedures. Plaintiffs' police forces have always been able to expect when and how federal law enforcement agents could assert federal powers within their jurisdictions. The use of deployments and operations violating established constitutional parameters, politically motivated interventions, and lawless commandeering of local law enforcement are unconstitutional and unauthorized in part because of the havoc such actions impose on local jurisdictions and the innumerable ways in which these deployments run roughshod over the longstanding federalist balance of the general policing power.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

20.     Plaintiffs are further harmed by the Policy and Practice because they threaten, intimidate, chill and/or discourage the exercise of constitutional or civil rights of their residents, leaders, and/or the jurisdictions themselves.

21.     The Policy and Practice also harm Plaintiffs to the extent they have and will continue to incite violence and make it more difficult for Plaintiffs to fulfill their core public safety missions.

22.     Plaintiffs are additionally harmed by their increased costs, expenditures, and resources devoted to responding to actions taken by Defendants under the Policy and Practice.

23.     Plaintiffs therefore bring this action to enjoin Defendants' new Policy and new Practice, which are unconstitutional, arbitrary and capricious, in excess of Defendants' legal authority, and/or wholly pretextual.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; and other federal statutes.

25.     This Court has the authority to issue declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the APA, 5 U.S.C. § 706.

26.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States officers or agencies sued in their official capacities, a substantial part of the events or omissions giving rise to this action have occurred or will occur in this district, and one Plaintiff resides in this district.

## INTRADISTRICT ASSIGNMENT

27.     Pursuant to the Northern District Civil Local Rule 3-2(c)-(d), the intradistrict assignment should be to the Oakland or San Francisco Division because a substantial part of the acts or omissions that give rise to this action are occurring in the County of Alameda.

## PARTIES

28.     The CITY OF PORTLAND is a municipal corporation governed by charter, located in the District of Oregon, and existing under the laws and constitution of the State of Oregon.

- 6 -
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Portland is home to more than 650,000 residents, and the City's leadership has committed to significant reforms to local policing and other policies, with an aim toward promoting racial justice.

29.     The CITY of OAKLAND is a municipal corporation and charter city located in the Northern District of California, organized and existing under and by virtue of the laws of the State of California. The City of Oakland is home to over 420,000 people and consistently ranks as one of the most ethnically and racially diverse major cities in the United States. Approximately 23% of Oakland's residents identify as Black or African American, 26% as Hispanic or Latinx, 15% as Asian or Asian-American, and 5.5% as multi-racial. The City's leadership is engaged in significant reforms to local policing and other policies, with an aim toward promoting racial justice.

30.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the Policy and its implementation and the Practice harm Plaintiffs' independent and constitutionally recognized economic, dignitary, and proprietary interests and will continue to cause injury unless and until the Policy is vacated and Defendants' practices are permanently enjoined.

31.     WILLIAM BARR is the United States Attorney General. He is sued in his official capacity.

32.     The UNITED STATES DEPARTMENT OF JUSTICE is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).

33.     CHAD F. WOLF is the purported Acting Secretary of Homeland Security. He is sued in his official capacity.

34.     The UNITED STATES DEPARTMENT OF HOMELAND SECURITY is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f). Its stated missions involve anti-terrorism, border security, immigration and customs. It was created in 2002 by combining 22 different federal departments and agencies into a single Cabinet agency.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## FACTUAL ALLEGATIONS

### *Background*

35.     Adherence to the Constitution is the bedrock of American democracy. Regardless of any changes to the interpretation of the Constitution over time, certain structures endure.

36.     One such foundational structure is the separation of federal powers: the division of authority and responsibility that guides all legal action taken in the United States. Under the separation of powers, the Congress makes law, the Executive Branch implements that law, and the Judiciary assesses the legality of those laws and actions.

37.     Another foundational structure is federalism: the division or sharing of legal power between the national government and other government units, including states, counties, cities, parishes, commonwealths, territories, and tribal governments (hereafter "other governments"). Other governments, including cities, "ensure[] that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' [are] held by governments more local and more accountable than a distant federal bureaucracy." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45 at 293 (J. Madison)).

38.     A federalist system's division of power evolves, but in expected ways, such as through Congress passing new laws to further regulate other governments, or other governments using the courts to push back on laws or rules made by the Congress or the Executive Branch.

39.     Within this federalism framework and under the Tenth Amendment to the United States Constitution, the general police powers are left to the states, who in turn often delegate such plenary authority to cities like Plaintiffs. *See, e.g.*, Cal. Const., art. 11, § 7; Or. Const., art XI, § 2. As the Supreme Court has long held, "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 536.

40.     Accordingly, the federal government has never created a federal domestic police force with broad powers. The general policing power, including over most violent crime, is left to other governments. As courts have repeatedly held, "We can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than

the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

41.     Instead, where Congress has authorized, the Executive Branch has executed, and the Judiciary approved, the federal government has created a constellation of different law enforcement agencies, each of which has a specific domain of authority as defined by federal statutes. For the most part, those domains of authority are not coextensive with other governments' general policing power.

42.     Within the scope of those federal statutes, such federal law enforcement activities have been limited to: (a) the enforcement of a direct federal interest (*e.g.*, enforcement of a federal law); or (b) assisting other governments, which constitutes the enforcement of an indirect federal interest.

43.     Whether enforcing a direct federal interest or assisting other governments, federal law enforcement acts within prescribed legal bounds. Either federal law enforcement is invited by other governments to participate in any number of lawful collaborative activities or federal law enforcement may intervene without invitation in the circumstances where federal law permits.

44.     In the former category of invited collaboration, Plaintiffs have, like many other cities, frequently engaged in lawful partnerships with federal law enforcement. From subject-specific task forces to investigating borderless crimes, other governments often depend on and engage with federal law enforcement to help protect residents and visitors. Plaintiffs have, for example, partnered with the Federal Bureau of Investigation on child exploitation task forces; with the Drug Enforcement Administration to combat illegal drug trafficking; with the Bureau of Alcohol, Tobacco, Firearms and Explosives to proactively identify the source of guns used for crimes; with the United States Marshals Service ("USMS") to apprehend those fleeing the justice system; and with the United States Secret Service to tackle identity theft.

45.     These past and present local-federal relationships are voluntary and consensual. Federal law enforcement and local law enforcement agencies generally work together in Plaintiffs' communities with a mutual understanding of the mission, clear directives regarding jurisdictional functions, and specific agreements (*e.g.*, via Memoranda of Understanding or Agreement) that

inform both sides of their respective obligations. Such partnerships were and are authorized by law, typically memorialized by mutual agreement, and not the subject of this lawsuit.

46.     In the latter category of uninvited intervention, the federal government has certain powers that are superior to those of other governments, made so by the Supremacy Clause.

47.     Such powers include federal enforcement of crucial fundamental federal rights, including civil rights. Throughout the nation's history, federal enforcement authorities have at times overridden other governments' ignorant or bigoted refusals to grant or defend constitutionally protected rights. Whether desegregating schools or extending the voting franchise to Black people, federal enforcement—without invitation or local approval—has been at times both lawful and vital.

48.     Such intervention powers may also, in extraordinary circumstances, permit the deployment of federal forces domestically, in which federal law enforcement temporarily takes over the general police powers otherwise reserved to other governments. Such circumstances are constitutionally delineated by Article I, Section 8, one of the Militia Clauses (allowing Congress to "call[] forth the Militia to execute the Laws of the Union") and by Article IV, Section 4 (the obligation to protect the states against invasion and against "domestic violence").

49.     The Constitution reserves both of those described powers for the Legislative Branch, either exclusively or principally. The cited Militia Clause only gives power to Congress. The Article IV Republican Form of Government Clause gives power first to the Legislature, and then only to the Executive "when the Legislature cannot be convened."

50.     Under these authorities, Congress has, among other things, passed the Insurrection Act of 1807, now codified as amended at 10 U.S.C. §§ 251-255, which allows domestic military intervention when circumstances make it impracticable to enforce the law by any other means, and the complementary Posse Comitatus Act of 1876, now codified at 18 U.S.C. § 1385, eliminating virtually any use of the military to regulate American civilians.

51.     These laws represent some key legal guardrails constitutionally implemented by the Legislative Branch to limit and define where the Executive Branch may, without permission and while overriding other governments' prerogatives, nonetheless enforce federal law.

52.     Specifically, the Insurrection Act empowers the President to call into service the United States Armed Forces and the National Guard: (a) when formally requested by a state; (b) to address an insurrection in any state, when that insurrection makes it impracticable to otherwise enforce the law; or (c) to address an insurrection, domestic violence, unlawful combination or conspiracy, in any state, which results in the deprivation of constitutionally secured rights, and where the state is unable, fails, or refuses to protect those rights. 10 U.S.C. §§ 251-253.

53.     There is a set legal process for invoking the Insurrection Act that is neither clandestine nor equivocal. To invoke the Act, a president must issue a "proclamation to disperse": that is, "by proclamation, immediately order the insurgents to disperse and retire peaceably to their abodes within a limited time." 10 U.S.C. § 254. Such proclamations have been issued as Executive Orders and/or as Proclamations published in the Federal Register.

54.     The Insurrection Act has never been invoked in the 21st century. In its limited usage in the 20th century, the federal government often invoked the Act to protect civil rights, particularly the rights of Black children to attend desegregated schools.

55.     When the Act was most recently invoked, in 1992, then-President George H.W. Bush issued a general Proclamation and an operationalizing Executive Order. *See* Proclamation No. 6427, 57 Fed. Reg. 19,359 (May 1, 1992); Exec. Order No. 12804, 57 Fed. Reg. 19,361 (May 1, 1992). Executive Order 12804 provided detailed instructions for Cabinet officials to respond to the alleged insurrection in California. Among other things, it directed the Attorney General: "(1) to coordinate the activities of all Federal agencies assisting in the suppression of violence and in the administration of justice in and about the City and County of Los Angeles, and other districts of California, and (2) to coordinate the activities of all such agencies with those of State and local agencies similarly engaged."

56.     DOJ and Defendant Barr are aware of the legal process for invoking the Insurrection Act. As an agency, DOJ has typically been involved when the Insurrection Act is invoked. As an individual, Defendant Barr was serving in an official capacity as Attorney General in 1992.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

57. The Executive Branch's authority under the Act, or under other such extraordinary emergency powers, does not undergird the Policy.

58. Any invocations of emergency powers or interventions under those powers are rare, reserved for extraordinary circumstances, and are not the subject of this lawsuit.

59. Finally, Executive Branch agencies, endowed by Congress or the Constitution with particular powers, must, per Article II, Section 3, "take care" to execute their duties under those authorities. Sometimes, those authorities are clearly defined by statute or a provision of the Constitution. At other times, those authorities are further crystalized and concretized by Executive Branch interpretations of the authority so granted. Those interpretations come in forms such as regulations, rules, and myriad types of sub-regulatory guidance.

60. The legality of such Executive Branch interpretations of its authority is easily tested, commonly through the APA, which governs how the Executive Branch creates and acts on those interpretations, and what those interpretations are. Stated simply, the APA is a key method by which the Judiciary may assess the legality of the Executive Branch's interpretation of its powers, including whether such interpretations are "arbitrary and capricious," "contrary to constitutional right[s]," or "in excess of statutory authority." 5 U.S.C. § 706.

61. Such Executive Branch interpretations of its authority may also be tested through other legal means, such as by questioning their constitutionality directly in federal court.

62. Such Executive Branch interpretations are or may be the subject of this lawsuit.

63. As these recitations reflect, the federal government has lawful tools to intervene—voluntarily or involuntarily—in other governments' exercise of their police powers. These recitations also reflect that those tools are either used with mutual agreement, or without agreement in circumstances, such as those enumerated, rooted in the Constitution. Finally, these recitations reflect that the federal government follows lawful and expected paths to exercise authority over other governments.

//

//

//

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*Policy Change Regarding Deployment and Operation of Federal Forces*

64.     Consistent with the above framework, until recently, Plaintiffs believed that they understood the structure, procedures, and basis for both the invited and the uninvited deployment and operations of federal law enforcement agents into their communities.

65.     However, in recent months, following the direction of President Trump, Defendants have instituted this new Policy, whose full parameters are unknown, but that, at minimum, unlawfully expands the unilateral deployment and operations of federal law enforcement to quell protests and broadly assert general police powers.

66.     The Policy and each and every instance where Defendants, through their officers, employees, and/or agents, unlawfully deployed or commanded federal law enforcement to act in excess of or contrary to 40 U.S.C. § 1315 or the Constitution constitutes "final agency action" under the APA.

*Prior Status Quo*

67.     President Trump has long issued threats against cities he views as progressive or racially diverse, including Plaintiffs. In 2017, he threatened to "send in the feds" to Chicago if their mayor did not fix the "carnage," and compared the city unfavorably to Afghanistan. In 2019, in describing Los Angeles, New York, and San Francisco, he referred to these "sanctuary cities run by liberal people" as places where "people living there are living in hell," and threatened that he might "intercede" or "may do something to get that whole thing cleaned up." In 2020, he repeatedly threatened Plaintiffs Portland and Oakland.

68.     Separately, since President Trump took office, Americans have engaged in some of the largest protests in our nation's history. The day after his inauguration, between 3.2 million and 5.2 million people marched in the streets to protest for women's rights and against the President. Hundreds of thousands protested again for the same reason on the same day in the following years. Since January 2017, millions of people have participated in protests across the country, including protests at federal property, monuments, memorials, and statues, as well as at state and local property, monuments, memorials, and statues.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

69.     Despite President Trump's repeated threats, and despite thousands of protests by millions of Americans, Defendants never previously asserted or exercised the authority they are now asserting and exercising under the Policy, nor, on information and belief, engaged in the related Practice.

70.     An alleged source of the authority for the Policy is 40 U.S.C. § 1315. Under subsection (a) of that statute, the Secretary of Homeland Security protects the buildings, grounds, and property that are owned, occupied, or secured by the federal government.

71.     Although the Federal Protective Service ("FPS"), a division of DHS, is typically the main provider of security and law enforcement services at federal government facilities, the Secretary of Homeland Security may transfer DHS officers or agents specifically "for duty in connection with the protection of" that federal property. 40 U.S.C. § 1315(b)(1).

72.     The scope of 40 U.S.C. § 1315 is clear. The statute states that the Secretary of Homeland Security: "shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government (including any agency, instrumentality, or wholly owned or mixed-ownership corporation thereof) and the persons on the property." *Id.* § 1315(a).

73.     The authority granted off federal property is limited—section 1315 only allows designated employees to perform authorized duties outside of federal property "to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1). Further, in the statute's six specifically enumerated powers, only one power, § 1315(b)(2)(E), allows for activity "on and off the property in question." Per the canon of *expressio unius est exclusio alterius*, including that these powers extend "on and off" federal property in one subsection implies that the five other enumerated powers do not likewise extend "on and off" the property, unless they are to advance the specific goal articulated in subsection (b)(1).

74.     Outside of federal property, the Secretary of Homeland Security *may enter into agreement*s with federal agencies and with state and local governments for officers and agents designated under section 1315 "to enforce Federal laws and State and local laws concurrently with other Federal law enforcement officers and with State and local law enforcement officers." *Id.* § 1315(e). Similarly, the Secretary "may utilize the facilities and services of Federal, State, and

local law enforcement agencies, *with the consent of the agencies*." *Id.* § 1315(d)(3)(emphasis added).

75.     Based on information and belief and on publicly available facts such as those recited here, until as recently as May 2020, there had been no policy or practice through which Defendants unilaterally deployed or commanded federal law enforcement under 40 U.S.C. § 1315 for general police purposes; to respond to or quash civil protests; to protect and surveil non-federal property, monuments, memorials, or statues; or to unilaterally take over non-federal property.

76.     For example, as recently as April 2020, hundreds of protestors gathered at the Michigan State Capitol in Lansing to protest executive orders and shelter-in-place orders in light of the COVID-19 pandemic.

77.     The Michigan State Capitol was completed in 1878, has been listed on the National Register of Historic Places since 1971, and was designated as a National Historic Landmark in 1992. The Capitol and its grounds contain at least one monument, three memorials, and several statues. The Capitol is 0.1 miles from the Charles E. Chamberlain Federal Building and Post Office.

78.     During these so-called "lockdown protests," many protestors openly carried firearms in or around the Capitol, forcibly entered the Michigan State Capitol, issued threats against Michigan Governor Gretchen Whitmer, and verbally assaulted Michigan state police.

79.     As another example, as recently as May 2020, hundreds of protesters gathered at the California State Capitol in Sacramento to protest executive orders and shelter-in-place orders in light of the COVID-19 pandemic.

80.     The California State Capitol was completed in 1874, has been listed on the National Register of Historic Places since 1973, and was designated as a California Historical Landmark in 1974. The Capitol and its park are home to numerous monuments, memorials, and statues, including the World Peace Rose Garden, the California Peace Officers' Memorial, the Vietnam Veterans Memorial, and the Thomas Starr King Memorial. The Capitol is one mile from the local federal courthouse and under one mile from the local DHS office.

81.     During these so-called "lockdown protests," protesters gathered at the Capitol in violation of stay-at-home orders, confronted California Highway Patrol officers, and displayed depictions of California Governor Gavin Newsom as a Nazi in front of a Swastika banner.

82.     In April and May, protestors also gathered outside the State Capitol in Salem, Oregon. At least one protestor appears to be open carrying a rifle in news footage. Members of the far-right militia groups the "Three Percenters" and "Proud Boys" also attended the protests. Several of the protests were allegedly organized by militia groups in violation of Oregon Governor Kate Brown's stay-at-home orders.

83.     Based on information and belief, federal law enforcement officers were not deployed in response to any of these so-called "lockdown protests"; not to surveil the protestors or public officials; not to assess threats to public buildings, monuments, memorials, or statues; not to protect against civil unrest; and not to otherwise engage in general policing.

***Existing Framework for Local Law Enforcement Mutual Aid or Cross Designation with Other Government Agencies***

84.     As described above, there are numerous examples of how local law enforcement, including Plaintiffs' police departments, collaborate with or receive assistance from other law enforcement agencies, including federal law enforcement agencies such as Defendants and their subcomponents.

85.     Coordinating with local law enforcement has, outside of the Policy and Practice, been fundamental to how federal law enforcement agencies interact with their local counterparts.

86.     Even in circumstances where the local jurisdiction has policies that are directly in opposition to the federal law enforcement agency's activities, the federal agencies, including Defendants, have nonetheless coordinated with local agencies in some fashion, given the longstanding recognition of the importance of such coordination.

87.     For example, 28 C.F.R. § 0.112 governs special deputation powers of the USMS, which is a bureau within DOJ. Pursuant to this section, the USMS Director is authorized to deputize, in relevant part, "[s]elected federal, state, or local law enforcement officers whenever the law enforcement needs of the U.S. Marshals Service so require." 28 C.F.R. § 0.112(b).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

88.     The duties of the USMS include protecting the federal judiciary, apprehending federal fugitives, managing and selling seized assets illegally acquired by criminals, housing and transporting federal prisoners, and operating the Witness Security Program.

89.     Separately, Plaintiffs have also long entered into and relied on "mutual aid" agreements with fellow local governments, such as other city and county governments. These mutual aid agreements set forth the circumstances under which mutual aid partners will come to the assistance of a member of the agreement. For example, Oakland has requested assistance from its mutual aid partners, such as Alameda County and surrounding cities, in responding to natural disasters or to certain violent "Occupy" protests a decade ago. It is not uncommon for mutual aid partners to request dozens or even hundreds of officers to assist with significant needs. Indeed, in response to the recent demonstrations, Portland has sought and received mutual aid from numerous other local law enforcement agencies.

90.     No matter the originating source of the mutual aid, Plaintiffs' police departments follow specific procedures when any outside law enforcement participate in their operations, or when outside law enforcement perform operations in their cities.

91.     Those procedures typically include that, when any outside law enforcement agency comes to assist Plaintiffs' police departments, those outside agents or officers first check in at the local staging center or emergency operations center, learn of the operation plan, and are connected in some manner to the department's communications systems. These universal steps are designed to protect all law enforcement officers and ensure they are operating with similar information and shared means of communication.

### *Nationwide Protests for Racial Justice and Police Reform*

92.     On May 25, 2020, George Floyd was tragically killed by Minneapolis police and a video of his death was widely circulated in the media. On May 26, 2020, people gathered in Minneapolis in protest. Shortly thereafter, people gathered throughout the nation, including in Plaintiffs' jurisdictions, to advocate for police reform and racial justice.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

93.     Polls have suggested that between 15 million and 26 million people participated in these protests, making them the largest demonstrations in American history. Between May 22 and August 22, approximately 93% of protests were peaceful.

94.     Incidents of property damage and violence, however, were reported in many jurisdictions in the country. Incidents of property damage occurred in suburban California, and armed civilians and other non-state actors committed acts of violence in states including Florida, Indiana, and Tennessee.

95.     People began to gather in Downtown Portland on or around May 29, 2020, including at an event titled "A Eulogy for Black America" organized by the Portland chapter of the NAACP.

96.     On May 29, 2020, Portland Mayor Ted Wheeler issued a statement that he stood "in solidarity with those who grieve for the senseless death of George Floyd" and committed to standing alongside "our black community and not just call out racism when we see it, but meaningfully take a stand against it."

97.     In Portland, protests continued in June. The first few days of June were identified as having the largest crowds of the Portland George Floyd protests, with numbers exceeding 10,000 people each day. During this time, a much smaller group of people engaged in significant property damage and violence directed at police. Notwithstanding some criminal activity, the majority of the protests remained peaceful, and toward the end of June, the scale of protests began to decrease. The focal points of protests during June were the Justice Center (which houses the Portland Police Bureau's ("PPB's") Central Precinct and primary offices, as well as the Multnomah County Detention Center) and other PPB and Multnomah County buildings.

98.     At this time, President Trump continued his past practice of frequent and repeated threats to deploy uninvited federal law enforcement and/or military power to progressive cities.

99.     Protests continued nationally throughout June 2020, along with the President's threatening rhetoric.

//

//

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*__President Trump Issues the Executive Order; Defendants Institute the Policy__*

100.   On June 26, 2020, President Trump signed Executive Order 13933, entitled *Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence.*

101.   The Executive Order announced that the federal government would: (a) prosecute anyone vandalizing or desecrating public monuments, memorials, and statues; government property; or religious property; (b) prosecute anyone inciting related violence; and (c) withhold federal support from local and state governments that failed to protect such structures from vandalism.

102.   The Executive Order further stated that if the Secretary of the Interior, the Secretary of Homeland Security, or the Administrator of General Services requested federal personnel "to assist with the protection of Federal monuments, memorials, statues, or property," they shall be provided by the Department of Defense, DOJ, and/or DHS.

103.   Defendants rapidly began to implement this Executive Order, in light of the President's perceived motivation of quelling protests, targeting Democratic cities, and establishing broad federal police presence in certain cities.

104.   Based on information and belief, such implementation constitutes all of or is a substantial part of the Policy.

105.   First, on July 1, 2020, Defendant Wolf announced—pursuant to the Executive Order—the formation of PACT within DHS. PACT was charged with "conduct[ing] *ongoing* assessments of potential civil unrest or destruction and allocat[ing] resources to protect people and property," including "potential surge activity to ensure the continuing protection of critical locations."

106.   Second, Defendants began changing or continuing to change guidance regarding the lawful scope of federal activity under 40 U.S.C. § 1315. Rather than limiting federal involvement under that statute to federal laws or property, Defendants expanded the ability of federal agents to address threats to *any* public monument, memorial, or statue, regardless of its federal nature.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

107.    For example, a July 2020 leaked, unclassified document entitled "Job Aid: DHS Office of Intelligence & Analysis (I&A) Activities in Furtherance of Protecting American Monuments, Memorials, Statues, and Combatting Recent Criminal Violence" ("Job Aid") shows that parts of the Defendants' intelligence community were now authorized to monitor and collect information regarding protest activities beyond suspected or planned attacks on federal facilities, including threats to damage or destroy *any* public monument, memorial, or statue.

108.    The "Job Aid" was intended to "expand[] intelligence activities necessary to mitigate the significant threat to homeland security articulated in the President's executive order of June 26, 2020."

109.    Finally, Defendants began deploying, cross-designating, and/or commanding federal law enforcement agents pursuant to the Executive Order and the Policy.

110.    Specifically, Defendant Wolf announced the deployment and pre-position of Rapid Deployment Teams across the country ahead of the July 4th holiday. Defendant Wolf stated that the task force would not "stand idly by while violent anarchists and rioters seek not only to vandalize and destroy the symbols of our nation, but to disrupt law and order and sow chaos in our communities."

111.    Taken together, the Executive Order, the creation or amendment of internal guidance documents, the creation of the PACT, the creation of other cross-designated federal law enforcement teams, and the deployment and operations of such teams, are, form part of, or are results of, the Policy.

112.    The Policy constitutes "final agency action."

### *Deployment and Other Activities in Portland*

113.    The following recitations are merely limited examples of why the Policy and/or specific acts in furtherance of the Policy constitute final agency action under which rights and obligations have been determined and from which legal consequences have flowed.

114.    It is unclear how many deployments of federal agents were made in July pursuant to the Policy.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

115.     In the days before Defendants deployed federal personnel to Portland, the crowds attending demonstrations had shrunk. By early July 2020, only about 150 people could be seen gathering in downtown Portland on any given night.

116.     On or about July 2, 2020, Defendant Wolf ordered the deployment of DHS, USMS, U.S. Customs and Border Protection ("CBP"), and the FPS to Portland in response to civil protests as part of Operation Diligent Valor.

117.     Defendants did not seek Portland's consent. Defendants did not act at the direction of PPB incident command that had been policing nightly protests for over a month.

118.     The federal forces deployed to Portland from CBP included members of BORTAC, a paramilitary unit of the United States Border Patrol. BORTAC troops wear military-type uniforms and armament, are trained for tactical raids on organized gangs smuggling persons or drugs into the United States, and have in the past been deployed to such places as Afghanistan and Iraq.

119.     On information and belief, BORTAC troops have no training in civilian crowd control.

120.     Through Operation Diligent Valor, Defendants sent teams of agents—untrained in crowd control and wearing military fatigues—onto Portland's streets. Their uniforms bore no governmental, administrative or personal names, just the word "police" in tape. Federal agents used tactics and munitions that escalated violence in Portland.

121.     On or about July 11, 2020, federal agents allegedly fired impact munitions into an unarmed crowd. One of the bullets struck a protestor and fractured his skull.

122.     Starting on or about July 14, 2020, federal agents drove around Portland in unmarked vans and detained individuals associated with the protests. Federal agents were patrolling and detaining individuals far beyond the immediate vicinity of the federal courthouse. Agents allegedly seized at least one individual who was more than two blocks from the courthouse and not engaged in any activity related to federal property.

123.     Upon information and belief, federal agents seized multiple protestors and held them for hours before releasing them for lack of probable cause. The federal agents gave no

justification for why they detained particular residents, searched their belongings, and placed residents in cells for hours before reading them their *Miranda* rights.

124.     Far from imposing peace in the City's streets, the tactics and munitions used by federal agents antagonized demonstrators, escalated the protests, and caused further unrest.

125.     On July 22, 2020, federal agents fired tear gas into a crowd that included Portland Mayor Wheeler.

126.     Later reports of internal DHS documents showed that the Office of Intelligence Analysis also collected and analyzed messages between protesters in Portland, specifically surveilling protesters' communications via the Telegram messaging app, discussing where to take the protests and how to avoid officers. The purpose of this monitoring is still unknown. It is also unknown whether the surveillance was limited to the protection of federal property or gathered on federal property.

127.     On July 29, 2020, the Governor Brown reached a negotiated agreement with the federal government. Defendants agreed to withdraw federal agents from Portland with assurance that Oregon State Police would take on additional duties guarding the safety of the federal courthouse in Portland.

### *Justifications for the Policy Are Pretextual*

128.     Although the purported purpose of the deployment was to protect federal property that had been vandalized or threatened during protests, anonymous statements from White House Officials indicate such purpose was mere pretext. The sources alleged that President Trump became interested in federal operations against protestors in Portland as a way to convey a "law-and-order message" and to "amplify strife in cities."

129.     As stated above, DHS has cited 40 U.S.C. § 1315 as the legal basis for Operation Diligent Valor and the general practice of deploying federal troops to Portland, despite the observed scope and operations of agents being well beyond the purpose or function of protecting federal persons or property.

130.     The U.S. Crisis Monitor found that prior to that deployment, "over 83% of demonstrations in Oregon were non-violent. Post-deployment, the percentage of violent

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

demonstrations [rose] from under 17% to over 42% [in Oregon], suggesting that the federal response has only aggravated unrest."

131. Despite statements justifying deployments as responses to crime or "anarchy," crime rates in Plaintiffs' communities have been decreasing overall; neither city is in the list of top 10 United States cities with the largest number of violent crimes per 100,000 residents. Moreover, Plaintiffs' crime rates do not differ dramatically from those in other, Republican-run cities. For example, violent crime rates in Fresno, Jacksonville, Oklahoma City, and Tulsa—cities with Republican mayors—far exceed the violent crime rates in Portland. These cities also have murder rates at twice that of Portland.

132. A comprehensive review by the Armed Conflict Location and Event Data ("ACLED") Project and the Princeton University Bridging Divides Initiative underscores the overall peaceful nature of the social justice-related protests in summer 2020. Between May 25, 2020, and August 22, 2020, there were 7,750 Black Lives Matter-related demonstrations in 2,440 locations in all 50 states and Washington, D.C. Overall, in summer 2020, there were at least 10,600 demonstrations across the United States. Of those, more than 93% involved only peaceful protests. And according to ACLED, violence occurred at around 220 locations.

133. President Trump and Defendants have repeatedly made public comments revealing that the officially stated goal of operations such as those in Portland is not protecting federal property. Instead, their statements suggest that the animating and invidious purpose for these actions—that is, for the Policy—is to punish progressive cities and leaders and violently quell the exercise of constitutionally protected activity. Specifically, the President's, Defendants', and Policy's purpose is to further the view that diverse and/or progressive cities and their leaders, and movements for racial justice and police reform, are dangerous and extreme circumstances that should be suppressed.

134. President Trump has also repeatedly commented that the purpose of deployment under the Policy of federal agents to Portland was to "quell" the protests, and that the goal was to "clean out this beehive of terrorists." He has stated that protesters are "anarchists" who "hate our country." And in describing the deployment to Portland under the Policy, President Trump stated:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

"We've done a great job in Portland . . . . Portland was totally out of control, and they went in, and I guess we have many people right now in jail. We very much quelled it, and if it starts again, we'll quell it again very easily. It's not hard to do, if you know what you're doing."

135.    In addition, Defendant Wolf affirmed that actions taken under the Policy were without other governments' consent, asserting: "The city of Portland has been under siege for 47 straight days by a violent mob while local political leaders refuse to restore order to protect their city . . . . I reiterate the Department's offer to assist local and state leaders to bring an end to the violence perpetuated by anarchists."

136.    Local and state leaders have not accepted that offer.

137.    Local and state officials have repeatedly and vehemently stated their opposition to the federal deployment in Portland. Oregon Attorney General Ellen Rosenblum filed a lawsuit against the federal government to stop its deployment and tactics. Oregon Governor Brown stated: "This political theater from President Trump has nothing to do with public safety. The President is failing to lead this nation. Now he is deploying federal officers to patrol the streets of Portland in a blatant abuse of power by the federal government."

138.    From the outset, the City of Portland has expressed its opposition to the deployment of federal agents under Operation Diligent Valor without its consent.

139.    Only a few days after the federal agents were deployed, on July 8, 2020, Portland's Deputy Police Chief Chris Davis made a public statement that the presence of federal agents, who are "governed by their own policies and procedures," only "complicates things" for PPB.

140.    On July 19, 2020, Mayor Wheeler stated the following:

What's happening here is, we have dozens, if not hundreds of federal troops descending upon our city. And what they're doing is, they are sharply escalating the situation . . . our local and state law enforcement officials had contained the situation . . . The tactics that the Trump administration are using on the streets of Portland are abhorrent . . . this is completely unconstitutional.

141.    In response to the tactics and munitions used by federal agents, and consequent public outcry, on July 22, 2020, Portland's City Council adopted Resolution 37496, which prohibits PPB cooperation with any federal agents deployed to Portland under an executive order.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

In response to Defendants' actions under the Policy, on July 28, 2020, Oakland's City Council adopted Resolution No. 88276 ("Directing And Authorizing The City Attorney And The City Administrator To Take Any And All Lawful Necessary Steps To Protect The Rights Of The People And The City Of Oakland Against President Trump's Threats To Take Actions That Result In Harm To The People Of Oakland Or The City Of Oakland, And Against Any Related Actions Federal Officers Take That Result In Harm To The People Of Oakland Or The City Of Oakland").

142.     The actions taken by Defendants in Portland under the Policy were and are not taken pursuant to any known lawful federal authority.

***Plaintiffs Remain at Risk Under the Policy***

143.     Rather than retreat from the activities in Portland, Defendants have expressed an intent to expand the presence of federal law enforcement throughout the United States.

144.     President Trump has indicated that, under the Policy, Defendants will continue to target cities he views as progressive, stating in early September: "They'll make every city look like frankly, a Portland, or you look at other Democrat-run cities. Look at what's happened in New York, as high as 300% increase in crime. Chicago, Baltimore, take a look at Oakland. All Democrat-run top 10 cities in the country and long beyond that, all Democrat-run."

145.     As recently as September 21, 2020, President Trump continued to propagate disinformation about Plaintiffs. He stated: "What they're talking about, you look at Portland, you look at Chicago, you look at New York, you look at Baltimore and Oakland and all—these are Democrat-run cities that are horrible on crime, there's no law and order, no cash bail, no anything."

146.     Though most federal agents were temporarily pulled out of Portland, President Trump has threatened that they can return at any time. The President also has stated the federal government will further escalate any conflict if local law enforcement does not rein in "anarchists and agitators." He has consistently stated that he will not hesitate to send in federal authorities if the local government could not stop "crime and violence" from breaking out.

147.     The President's threats and warnings are not limited to federal property. He recently announced a plan to send law enforcement to polling places on election day, stating: "We're going

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

to have sheriffs, and we're going to have law enforcement. And we're going to have hopefully U.S. attorneys, and we're going to have everybody and attorney generals."

148.    The President's provocations continue. He recently issued a memorandum purporting to direct Defendants to review federal funding provided to "anarchist" cities, including Portland, and to withdraw such funding to punish these cities.

149.    Defendants continue to take new or continuing unlawful actions under the Policy. For instance, DHS has erected and refused to remove a fence and barriers around the Hatfield Federal Courthouse in Portland, which are in the City-controlled public right-of-way. The fence and barriers, which extend into adjacent Main Street, effectively block an entire bike lane without Portland's permission. The fence and barriers also extend onto Third Avenue and effectively block vehicular travel in one lane.

150.    The only statutory authority DHS has offered to Portland to justify the fence is 40 U.S.C. § 1315.

151.    The fence was first erected by FPS on July 18, 2020. According to a statement from U.S. Attorney Billy J. Williams, the federal government's stated purpose of the fence was "to de-escalate tensions between protesters and federal law enforcement officers, and to allow much-needed building repairs to begin."

152.    The fence is not on federal property, and FPS did not seek permission before erecting the fence. In order to lawfully erect the fence, Portland City Code Chapter 17.24 requires a permit to be obtained from the Portland Bureau of Transportation ("PBOT"). FPS obtained no such permit.

153.    Portland has asked FPS multiple times to move its fence out of the right-of-way and onto the sidewalk adjacent to the Courthouse. FPS has not yet done so and has taken the position that they are permitted to install the fence and associated barriers pursuant to 40 U.S.C. § 1315.

154.    In an October 7, 2020, email to Portland officials, FPS indicated its contractor had moved the fence to allow access to the storm drain and expected to move the fence back from the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    bike lane "in the next few weeks." This is merely the latest assurance by FPS that it will move its

2    fence.

3           155.    A July 14, 2020, document obtained by Oregon Public Broadcasting indicated that

4    the federal government intended to rent the fence from its contractor for three to six months.

5           156.    Defendants continue to have a presence and activities in Portland, and there is a

6    continued dispute regarding the scope of their authority under 40 U.S.C. § 1315, including the

7    ability to unilaterally take over City-controlled or -owned property under a pretext of securing

8    federal property.

9    ***Defendant Wolf Was and Is Unlawfully Acting as Secretary of Homeland Security, and Any***
***Aspects of the Policy Promulgated or Implemented Under His Purported Authority Must Be Set***
10   ***Aside***

11          157.    Federal service in Senate-confirmed positions is governed by, among other statutes,

12   the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.* If a person is acting

13   unlawfully under the FVRA, their actions and their policies are "without force and effect." 5 U.S.C.

14   § 3348(d)(1). An action promulgated "without force and effect" "may not be ratified." *Id.*

15   § 3348(d)(2).

16          158.    Congress has delegated the U.S. Government Accountability Office ("GAO") to

17   play a core role in FVRA compliance: namely, per the FVRA, the GAO must collect information

18   about vacancies, and if the GAO "makes a determination that an officer is serving longer than the

19   210-day period including the applicable exceptions to such period under section 3346 or section

20   3349a, the Comptroller General shall report such determination immediately" to various

21   authorities, including Congress. 5 U.S.C. § 3349.

22          159.    On August 14, 2020, the GAO issued a report under its FVRA duties and authority,

23   entitled "Department of Homeland Security—Legality of Service of Acting Secretary of

24   Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of

25   Homeland Security." In sum, the report finds that Acting Secretaries "Wolf and [Ken] Cuccinelli

26   were named to their respective positions of Acting Secretary and Senior Official Performing the

27   Duties of Deputy Secretary by reference to an invalid order of succession" and that "[b]ecause Mr.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Wolf draws his authority to serve as Acting Secretary from [an invalid] Delegation, Mr. Wolf cannot, therefore, rely upon it to serve as the Acting Secretary."

160.    The GAO report also analyzed whether Defendant Wolf could be lawfully serving under the succession provisions of the Homeland Security Act ("HSA"), 6 U.S.C. § 113(g)(2), and found that he could not.

161.    In addition to these findings from the GAO, numerous lawsuits have raised the same or similar questions about Defendant Wolf's authority, and have asked courts—under the FVRA, the HSA, or other laws regarding agency authority—to set aside various policies promulgated under that purported authority. *See, e.g.*, *Immigrant Legal Resource Ctr. v. Wolf*, 2020 WL 5798269, at *9 (N.D. Cal. 2020) (holding that "[p]laintiffs have shown that they are likely to succeed on the merits of their claim that Mr. Wolf was not validly serving in office" and enjoining enforcement of the challenged rule); *Casa de Maryland, Inc. v. Wolf*, 2020 WL 5500165, at *23 (D. Md. 2020) (holding that "because Wolf filled the role of Acting Secretary without authority, he promulgated the challenged rules also 'in excess of . . . authority'" and enjoining the rules' enforcement); *see also Bullock v. U.S. Bureau of Land Mgmt.*, 2020 WL 5746836 (D. Mont. 2020) (holding that William Perry Pendley, the person exercising authority of the Director of the Bureau of Land Management, served unlawfully for 424 days and enjoining him from exercising that authority); *L.M.-M.*, *v. Cuccinelli*, 442 F.Supp.3d 1, 29, 34 (D.D.C. 2020) (holding that Acting U.S. Citizenship and Immigration Services ("USCIS") Director Cuccinelli "was designated to serve as the acting Director of USCIS in violation of the FVRA" and "because Cuccinelli was exercising the authority of the USCIS Director in violation of the FVRA, the directives were not issued 'in accordance with law,' and must, accordingly, be set aside under the APA").

162.    The lawsuits, like the GAO report, generally explain that because the FVRA generally bars acting officials from serving for more than 210 days in a position that requires Presidential appointment and Senate confirmation, 5 U.S.C. § 3346, and because the last Senate-confirmed DHS Secretary resigned on April 10, 2019, no one could have lawfully acted in that role under the FVRA, without appointment and confirmation, after November 6, 2019. Defendant Wolf assumed his office on November 13, 2019.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

163.     The lawsuits, also like the GAO report, generally further explain that the HSA sets an order of succession in the event of a vacancy, 6 U.S.C. §§ 113(a)(1)(A), (a)(1)(F) and (g)(1), and if certain enumerated positions are vacant, the Secretary may designate a "further order of succession," *id*. § 113(g)(2), but that because the Acting DHS Secretary *prior* to Defendant Wolf unlawfully changed the order of DHS succession, Defendant Wolf cannot lawfully serve in his role.

164.     Finally, the lawsuits generally ask courts to set aside and/or enjoin actions by officials acting unlawfully in federal agency roles, because those actions are "without force and effect," 5 U.S.C. § 3348(d)(1), "may not be ratified," *id*. § 3348(d)(2), and were therefore promulgated "in excess of statutory authority" and not "in accordance with law," *id*. §§ 706(2)(C), (2)(A).

165.     These lawsuits have been largely successful.

166.     On information and belief, Defendant Wolf promulgated and/or implemented all, some, or part of the Policy challenged in this lawsuit, and any aspects of the Policy promulgated and/or implemented under his authority must be set aside and/or enjoined.

### *Related Practice of Unlawfully Commandeering Portland's Law Enforcement Officers*

167.     In addition and related to the Policy, Defendants continue to engage in a related Practice that also asserts authority not delegated to them under the Constitution or under other legal authority.

168.     On or about September 21, 2020, the City of Portland, Oregon State Police, and several federal law enforcement agencies, including the USMS, began logistics planning for an anticipated rally of the Proud Boys in Portland on Saturday, September 26, 2020.

169.     The Proud Boys are an extremist pro-White hate group. Members of the Proud Boys, which appeared at the 2017 "Unite the Right" rally in Charlottesville, Virginia, "regularly spout white nationalist memes and maintain affiliations with known extremists" and "are known for anti-Muslim and misogynistic rhetoric."

170.     In anticipation of the Proud Boys rally, on September 25, 2020, Governor Brown declared a state of emergency and issued an executive order for the purpose of implementing a

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

coordinated law enforcement response. As part of the order, Governor Brown temporarily assumed control of local law enforcement, including PPB, the Multnomah County Sheriff's Office, the Gresham Police Department, and the Port of Portland Police.

171.    Governor Brown appointed Multnomah County Sheriff Michael Reese and Oregon State Police Superintendent Travis Hampton to serve as incident commanders in the law enforcement coordination area, and they therefore assumed control of PPB, Multnomah County Sheriff's Office, Gresham Police Department, and Port of Portland Police.

172.    The Governor's executive order, by its own terms, became effective at 12:01 A.M. Pacific Time on Saturday, September 26, 2020, and expired at 12:01 AM Pacific Time on Monday, September 28, 2020. Governor Brown's executive order and state of emergency were then terminated at 6:00 AM on September 27, 2020.

173.    Pursuant to a direction given by Superintendent Hampton, on September 25, 2020, PPB Chief Charles Lovell authorized fifty-six officers, sergeants, and lieutenants from PPB's Rapid Response Team, which typically handles protests, to be deputized as federal agents for the purposes of tactical response to the anticipated rally and disturbance of the peace caused by the Proud Boys.

174.    Because of the Governor's executive order and over the course of dealing with Oregon State Police, PPB anticipated that the deputation would be limited to the weekend surrounding the Proud Boys hate-related event or so long as the state of emergency remained in effect.

175.    After the expiration of the state executive order, the federal deputation was in fact no longer needed.

176.    On September 29, 2020, Portland City Attorney Tracy Reeve wrote to the U.S. Attorney's Office in Portland to clearly and expressly communicate the City's withdrawal of consent to the federal deputation of the fifty-six PPB officers.

177.    City Attorney Reeve explained that the Governor's executive order had terminated, and PPB "was back under the control and direction of the City of Portland, and specifically Police Commissioner and Mayor Ted Wheeler and the Portland City Council." Because the executive

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

order terminated, "[t]he City of Portland [did] not consent to the continuing federal deputization of PPB officers and hereby formally withdr[e]w[] its consent to this deputization effective immediately."

178.    Neither the U.S. Attorney's Office nor any other federal agency, including the USMS, responded to City Attorney Reeve's communication.

179.    Instead, on September 30, 2020, U.S. Attorney Williams and United States Marshal for the District of Oregon Russ Burger issued a press release regarding the deputation of the PPB officers.

180.    The release stated that the "U.S. Marshal will not cancel the cross-deputation of local and state law enforcement officers." In defense of their decision to commandeer Portland's police force, U.S. Attorney Williams and United States Marshal for the District of Oregon Burger stated that continued deputation would provide "accountability and deterrence" for "criminal acts" and would support "front line law enforcement officers and their families in a way that they have not seen from City Hall."

181.    Despite Defendant agencies' purported desire to hold individuals accountable for and deter criminal acts, it is the responsibility of PPB and other local law enforcement to generally address criminal activity in Portland. It is the responsibility of the State of Oregon and City of Portland to enact laws and enforce laws that strike the proper balance between deterring criminal activity and supporting First Amendment expression. And it is the responsibility of Portland, as the employer of PPB officers, to support and protect local law enforcement.

182.    On October 2, 2020, Mayor Wheeler, as Police Commissioner, directed PPB officers to take no further action of any kind pursuant to the federal deputation, including the enforcement of any federal law.

183.    Nonetheless, because the federal government has refused to recognize Portland's withdrawal of consent to deputation, Portland remains concerned about public confusion over the chain of command for the deputized PPB officers and the appearance that the officers could be ordered to respond to a federal chain of command, including by being ordered to enforce federal law.

184.    The practice of continued deputation of Portland's officers limits the City's law enforcement discretion, creates potential conflict between Defendants and Portland over the use and tactics of Portland's own officers and other law enforcement personnel, and unlawfully usurps the legislative and governance prerogative of local officials.

185.    The Practice of continued, non-consensual deputation of Portland's law enforcement officers unconstitutionally infringes on Portland's authority to end the deputation and unconstitutionally compels local officers to continue to serve as federal law enforcement officials, whether in name or in scope of authority.

### *Harm to Plaintiffs*

#### *Economic Injury*

186.    Plaintiffs have already suffered economic harms and will continue to suffer such harms under the Policy and Practice.

Portland's Economic Harms

187.    At the time of the federal government's deployment into Portland, protests in the City were growing more peaceful and were more easily managed on a day-to-day basis by PPB.

188.    As a direct result of the unlawful intervention by Defendants, Portland experienced a significant increase in violent protests and civil disturbance. Dr. Robert Pape and his team of researchers at the University of Chicago examined 122 protest events in Portland between May 28, 2020, and August 6, 2020, and found that violence behavior increased and peaceful protests decreased during the 25 days when federal agents were present.

189.    Following the removal of federal agents from the streets of Portland, PPB was required to expend additional resources on crowd management and maintaining peace.

190.    As a direct result of the unlawful intervention of Defendants, PPB was required to spend additional money on overtime for patrol officers and other resources in response to the heightened tensions within Portland.

191.    Since July 2020 and continuing to the present, Portland's elected leadership and other city officials have spent hundreds of hours in meetings, discussions, and other planning

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

efforts to respond to the presence of federal agents and to plan for possible additional federal intervention under the Policy.

Oakland's Economic Harms

192.    Although Plaintiff City of Oakland has not yet been subject to direct federal intervention under the Policy, it has nonetheless already suffered and will continue to suffer economic harms.

193.    In response to the Policy, Oakland has also engaged in new outreach through the departments that are members of its Emergency Operations Center, activities that would not have been necessary and resources that would not have been required but for the Policy.

194.    Oakland's elected leadership has devoted time since July 2020 preparing for possible federal intervention under the Policy.

195.    Oakland's economic harms will significantly increase if the City becomes a target of deployment under the Policy, for many reasons. One such reason is the City's "mutual aid" agreements, as described above. The City's mutual aid agreements with other governments have never contemplated coming to the assistance of a sister government in the event of unprecedented federal intervention, such as the interventions that have occurred and may occur under the Policy.

196.    Oakland has had mutual aid requests rejected when the aid sought does not comport with the agreements or conflicts with their partners' policies.

197.    Oakland will suffer significant economic harm if it cannot rely on mutual aid. In the limited instances in which mutual aid has been unavailable, for instance, the Oakland Police Department has been forced to cancel days off, pay substantial additional overtime, and divert officers from their assigned duties.

198.    Defendants did not take either Portland or Oakland's economic harms into account in enacting the Policy.

//

//

//

//

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

***Budgetary and Other Uncertainty; Impairment of Ability to Provide Services***

199.    Plaintiffs depend on the clear delineation of and communication about federal, state, and local police authority to safely govern and police their communities.

200.    Plaintiffs must know or reasonably expect when federal law enforcement agents will be or could be deployed in their cities, both as a constitutional and safety matter.

201.    Plaintiffs have historically worked closely with Defendants' local representatives to ensure the safety of the federal property Defendants have authority to protect.

202.    Even when the federal government has, in the past, intervened involuntarily in cities, counties, or states, it has done so using lawful processes, such as by filing enforcement actions in court or, in extreme and rare circumstances, formally invoking powers such as the Insurrection Act and following such statutes' requirements for a declaration. The Act is not invoked secretly or ambiguously. 10 U.S.C. § 254.

203.    The current Policy represents an entirely new process by which cities may find federal law enforcement in the midst of civil protests, throughout their jurisdictions, and surveilling their residents well beyond federal crimes or properties.

204.    Plaintiffs' uncertainty about whether, when, and with what parameters federal agents may be deployed to their cities under the Policy prevents them from appropriately advising their police departments and fire departments, among others, and from fully planning their budgets.

205.    Further, Plaintiffs' police departments, among other departments, have a strong and abiding interest in the community relationships they have formed, often over many years, with advocates, faith leaders, youth groups, and others in their jurisdictions. These relationships are crucial to addressing racial justice issues, de-escalating and interrupting violence, and engaging in successful long-term reform efforts. These relationships are also premised on Plaintiffs' police departments being able to fulfill the terms of their agreements, both formal and informal, with their community partners. Uncertainty regarding whether, when, and why federal law enforcement authorities, who lack any knowledge of these crucial agreements and understandings, may intervene in Plaintiffs' streets, harms Plaintiffs' capacity to honor their commitments to their residents and reduce violence in their communities.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

206.     Finally, because the full scope of the Policy is vague and unknown, Plaintiffs' city officials have no certainty about whether any particular decision they might make will lead to federal intervention under the Policy.

207.     Together, these injuries perceptibly impair Plaintiffs' ability to provide the services they were formed to provide, and frustrate Plaintiffs' goals and values.

208.     Under the Policy, federal enforcement actions are likely to violate or contravene Plaintiffs' otherwise lawful policies and values.

### *Activity Considered Impermissible by Local Policy Permitted Under the Policy*

209.     Plaintiffs have specific policies, practices, and procedures for activities such as the use of force or use of surveillance by law enforcement authorities.

210.     The City of Portland has a use of force policy, Directive 1010.00, and a crowd control policy, Directive 0635.10. These policies govern a number of PPB policies, practices, and procedures in responding to demonstrations, including PPB's use of impact munitions and chemical agents. The use of chemical agents has been further restricted by order of Portland's Police Commissioner, consistent with the City's values on policing.

211.     The City of Oakland has a use of force policy, DGO K-3, and a crowd control policy, Training Bulletin III-G. Those documents govern a number of Oakland Police Department policies, practices, and procedures, including its use of nonlethal impact weapons and chemical agents, as well as video and photographic recording of protesters engaged in protected First Amendment activity.

212.     These policies and trainings are intended to govern Plaintiffs' police departments' interactions with their communities. Based on those policies and trainings, in Plaintiffs' communities, residents have expectations for their interactions with local law enforcement. Federal law enforcement officers have not been trained in municipal community policing, critical civilian crowd management, and/or de-escalation techniques. The unconstrained actions of federal forces undermine the work of local law enforcement, including ongoing violence prevention programs and community engagement.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

213.   Under the Policy, Plaintiff City of Portland has been unable to adhere to its local policies favoring de-escalation of potentially volatile situations because Defendants' actions under the Policy have inflamed local passions, encouraged violence, and generated the need for PPB response where it otherwise would not have been needed.

214.   Under the Practice, PPB officers have a reasonable likelihood of being commandeered into engaging in activity that violates their local policies via their unconsented-to deputation by Defendants. Defendants' unlawful deputation of PPB officers also presently harms the City's public-accountability and community-engagement policies by propagating the false narrative that City police are operating under Defendants' authority and not under the direction and control of the City of Portland's elected officials.

### *Frustration of Federal Court Orders; Separation of Powers*

215.   Plaintiffs are each, separately, under federal court orders that govern the activities of their police departments in various ways.

216.   Plaintiff City of Portland's police department operates in part under a Negotiated Settlement Agreement in *United States v. City of Portland*, Case No. 3:12-cv-02265-SI (D. Or. 2012), as well as recent injunctions in *Don't Shoot Portland v. City of Portland*, Case No. 3:20-cv-00917-HZ (D. Or. 2020) and *Index Newspapers LLC v. City of Portland*, Case No. 3:20-cv-01035-SI (D. Or. 2020).

217.   Plaintiff City of Oakland's police department operates under a longstanding Negotiated Settlement Agreement in *Delphine Allen. v. City of Oakland*, Master Case File No. C00-4599-TEH (N.D. Cal. 2012), as well as under a recent injunction in *Anti Police-Terror Project v. City of Oakland*, Case No. 20-cv-03866-JCS (N.D. Cal. 2020).

218.   Collectively, these various court orders bind Plaintiffs' police departments' activities, including governing many of their policies, practices, and procedures, and limiting their use of various forms of force.

219.   Under the Policy, as carried out in, at a minimum, Portland, Defendants used arrest techniques, force, and surveillance that would facially violate Plaintiffs' federal court orders.

220.     Plaintiff City of Oakland would face the same bind if any deployments are sent to Oakland under the Policy.

221.     There is a reasonable likelihood that Defendants will, under the Policy, deploy federal agents to Plaintiff Cities, either for the first known time or again to Plaintiffs already having experienced or experiencing such deployments, as Defendants and President Trump continue and are increasing such threats.

### Loss of Use and Enjoyment of Public Facilities

222.     Portland has provided bike and vehicle lanes in its right-of-way on Main Street.

223.     FPS's fence and barriers, erected without permission, prevent the use of enjoyment of this public land by Portland and its residents. *See Gingery v. City of Glendale*, 831 F.3d 1222, 1227 (9th Cir. 2016).

### Loss of Legislative Prerogative

224.     Plaintiff City of Portland shares in Oregon's sovereign general police power to provide for the health and safety of its residents.

225.     The federal government's commandeering of Portland law enforcement, complete once Defendants DOJ and Barr refused to cancel the deputation of the PPB officers, presses these officers into service in disregard of the City's own legislative and enforcement priorities.

**CLAIMS FOR RELIEF**

**<u>FIRST CLAIM FOR RELIEF</u>**

**(Administrative Procedure Act—Action Not in Accordance with the Law)**

**(Against All Defendants)**

**(5 U.S.C. § 706)**

226.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

227.     Under the APA, courts must "hold unlawful and set aside agency action" that is not in accordance with law, in excess of statutory authority, contrary to constitutional right, or without observance of procedure required by law. 5 U.S.C. § 706(2).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

228.    Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

229.    Defendants' Policy is "final agency action" under the APA because it is fairly characterized as Defendants' final word on the matter and has legal consequences for Plaintiffs' resident protestors during civil protests, as well as, independently, for Plaintiffs facing economic harms and federal encroachment on police powers and the "take over" of their jurisdictions. *See U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)); *see also New York v. U.S. Immigration & Customs Enforcement*, 431 F. Supp. 3d 377, 386-88 (S.D.N.Y. 2019).

230.    Agency action need not be in writing, or ever known to the public, to be judicially reviewable as "final" action. *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138-39 (D.D.C. 2018); *Wagafe v. Trump*, 2017 WL 2671254, at *1, *10 (W.D. Wash. 2017); *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (concluding that "the record" as a whole "leaves no doubt" that a policy exists, even though "the details ... are still unclear").

231.    Furthermore, each instance where Defendants, through their officers, employees, and agents, directly or constructively, unlawfully deployed or commanded federal law enforcement to act in excess of or contrary to law constitutes "final agency action" under the APA.

232.    40 U.S.C. § 1315(b)(1) allows the Secretary of DHS to designate certain federal employees "as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." These authorized duties include enforcing federal laws, making arrests if federal crimes are committed in the presence of an officer, and conducting investigations on and off the property for crimes against the property or persons on the property.

233.    40 U.S.C. § 1315(d)(3) further allows the Secretary to "utilize the facilities and services of Federal, State, and local law enforcement agencies, with the consent of the agencies."

234.    40 U.S.C. § 1315(e) also allows the Secretary to "enter into agreements with Federal agencies and with State and local governments to obtain authority for officers and agents

designated under this section to enforce Federal laws and State and local laws concurrently with other Federal law enforcement officers and with State and local law enforcement officers" "[]for the protection of property owned or occupied by the Federal Government and persons on the property."

235.    These statutory provisions do not authorize the designation of employees for general law enforcement purposes in domestic United States cities where the intent, mission, and purpose of the designation is not reasonably connected to such federally stated interests. Significantly, 40 U.S.C. § 1315 does not represent Congressional authorization to suppress insurrections under the Militia Clause.  *See* U.S. Const. art. I, § 8, cl. 15.

236.    Further, these statutory provisions do not authorize the expansion of federal property into City- or State-owned rights-of-way, or the takeover of City property for federal purposes, without the consent of the non-federal agencies, as Defendants assert.

237.    The Policy therefore oversteps the constitutional limitations on the federal police powers, including as enumerated in the Militia Clause, the Republican Form of Government Clause, and the Tenth Amendment, and is not in accordance with and exceeds Defendants' authority under 40 U.S.C. § 1315 because it (a) authorizes the designation of such agents to quell civil protests and surveil and engage with threats to damage or destroy *any* public monument, memorial, or statue, and (b) authorizes the expansion of federal physical boundaries and the take-over of City rights-of-way for the purposes of securing federal property, without the express consent of the City.

238.    Defendants' unlawful actions have caused, are causing, and will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

//

//

//

//

//

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## SECOND CLAIM FOR RELIEF

**(Administrative Procedure Act—Arbitrary and Capricious)**

**(Against All Defendants)**

**(5 U.S.C. § 706(2)(A))**

239.   Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

240.   5 U.S.C. § 706(2)(A) provides that a court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

241.   Long-established principles of federalism, paired with congressional limitations, restrict the ability of the federal government to unilaterally deploy domestic military or police interventions.

242.   Defendants have adopted a Policy to circumvent these limitations and deploy federal agents to quash civil protests, while publicly justifying the actions in the name of federal property protection. The motivation animating Defendants' Policy is the "takeover" of City police forces and powers, and is untethered to strictly federal interests or activities.

243.   Defendants' purported justification for the Policy is wholly pretextual and, thus, arbitrary and capricious under the Administrative Procedure Act.

244.   In enacting the Policy, Defendants have also acted arbitrarily and capriciously because Defendants did not fully consider the foreseeable harms of their policy and did not adequately explain the decision-making rationale behind the policy change, beyond a pretextual rationale.

245.   In implementing the Policy, Defendants failed to consider, among many things, the direct and destructive impacts on local governments in their administration of general public safety, and the aforementioned harms that have and will flow to Plaintiffs.

246.   Defendants' unlawful action has caused, is causing, and will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

1

2

3

4

### THIRD CLAIM FOR RELIEF

**(Federal Vacancies Reform Act; Homeland Security Act)**

**(Against Defendant Wolf)**

**(5 U.S.C. § 3345 *et seq.*; 6 U.S.C. § 113)**

5

6

247.　Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

7

8

9

248.　The Secretary of Homeland Security may be appointed by the President only with the advice and consent of the Senate, 6 U.S.C. § 112(a)(1), and when the Office of the Secretary is vacant, the order of succession is governed by the FVRA and/or the HSA.

10

11

249.　Under those authorities, Defendant Wolf is not legally authorized to hold the position of Acting Secretary.

12

13

250.　Under those authorities, Defendant Wolf is not legally authorized to perform the duties and functions of the Secretary of Homeland Security.

14

15

16

17

251.　Because Defendant Wolf is without legal authority to hold his position or to perform its duties or functions, any contributions he made to the Policy or steps he took or is taking to enact or enforce the Policy "shall have no force or effect," 5 U.S.C. § 3348(d)(1), "may not be ratified," *id.* § 3348(d)(2), and must be set aside.

18

19

20

21

### FOURTH CLAIM FOR RELIEF

**(Administrative Procedure Act—In Excess of Authority)**

**(Against Defendant Wolf)**

**(5 U.S.C. § 706(2)(C))**

22

23

252.　Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

24

25

26

27

253.　Because Defendant Wolf is not legally authorized to hold the position of Acting Secretary, any action he took to contribute to, direct, revise, promulgate, enact, or enforce the Policy is "in excess of authority" under the APA and therefore must be held to be unlawful and set aside.

28

//

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**FIFTH CLAIM FOR RELIEF**

**(Administrative Procedure Act—Not in Accordance with Law)**

**(Against Defendant Wolf)**

**(5 U.S.C. § 706(2)(C))**

254.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

255.    Because Defendant Wolf is not legally authorized to hold the position of Acting Secretary, any action he took to contribute to, direct, revise, promulgate, enact, or enforce the Policy is "not in accordance with law" under the APA and therefore must be held to be unlawful and set aside.

**SIXTH CLAIM FOR RELIEF**

**(Anti-Commandeering)**

**(Plaintiff City of Portland Against Defendants Barr and DOJ)**

**(U.S. Const., amend. X)**

256.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

257.    The Tenth Amendment to the United States Constitution preserves the states' historic, sovereign, and fundamental autonomy to regulate their own affairs, including and especially the operations of their state and local governments.

258.    General police powers are among those reserved to the States. "A state's ability to regulate its internal law enforcement activities is a quintessential police power." *United States v. California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019), *cert. denied*, 2020 WL 3146844 (June 15, 2020).

259.    States are permitted to delegate their police powers to their municipalities. "[T]he delegated power of municipalities is as broad as the police power of the state, except as that power may be restricted by terms of the grant or by the state constitution." *D.C. v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

260.     Oregon has so delegated its police power to its municipalities, which include the City of Portland. Article XI, section 2 of the Oregon Constitution grants the "legal voters of every city and town . . . power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon." Portland's charter identifies its power and authority to exercise within the City and City-owned property "all the powers commonly known as the police power to the same extent as the State of Oregon has or could exercise said power within said areas, and to make and enforce within said areas all necessary or appropriate . . . police . . . and safety laws and regulations." Portland City Charter § 2-105.

261.     The USMS's refusal to honor the cancellation of the deputation of PPB's officers, by and through Defendants Barr and DOJ, commandeers a key Portland law enforcement agency and unduly interferes with Portland's police functions as delegated to it by the State of Oregon, in violation of the Tenth Amendment. This Practice unconstitutionally infringes on Portland's authority to determine the status and deputation of PPB's officers, and unconstitutionally compels PPB's officers to continue to serve under the force and guise of federal law.

262.     Defendants DOJ and Barr have violated the authority of Portland to control and direct its own police officers and, in doing so, have caused confusion regarding the role and authority of deputized PPB officers and any legal obligations of these officers to execute orders issued under the authority of the United States.

263.     The violation caused by Defendants DOJ and Barr causes ongoing harm to Portland and its residents.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Judgment Act)

### (Against All Defendants)

### (28 U.S.C. §§ 2201-2202)

264.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

265.     The Policy oversteps the constitutional limitations on the federal police powers, including as enumerated in the Militia Clause, the Republican Form of Government Clause, and

the Tenth Amendment, and is not in accordance with and exceeds Defendants' authority under 40 U.S.C. § 1315 because it: (a) authorizes the designation of such agents to quell civil protests and surveil and engage with threats to damage or destroy *any* public monument, memorial, or statue; and (b) authorizes the expansion of federal physical boundaries and the take-over of City rights-of-way for the purposes of securing federal property, without the express consent of the City.

266.    Defendants' purported justification for the Policy is wholly pretextual and, thus, arbitrary and capricious under the Administrative Procedure Act.

267.    In enacting the Policy, Defendants have also acted arbitrarily and capriciously because Defendants did not fully consider the foreseeable harms of their policy and did not adequately explain the decision-making rationale behind the policy change, beyond a pretextual rationale.

268.    Because Defendant Wolf is without legal authority to hold his position or to perform its duties or functions, any contributions he made to the Policy or steps he took or is taking to enact or enforce the Policy "shall have no force or effect," 5 U.S.C. § 3348(d)(1), "may not be ratified," *id.* § 3348(d)(2), and must be set aside.

269.    Because Defendant Wolf is not legally authorized to hold the position of Acting Secretary, any action he took to contribute to, direct, revise, promulgate, enact, or enforce the Policy is "in excess of authority" under the APA and therefore must be held to be unlawful and set aside.

270.    Because Defendant Wolf is not legally authorized to hold the position of Acting Secretary, any action he took to contribute to, direct, revise, promulgate, enact, or enforce the Policy is "not in accordance with law" under the APA and therefore must be held to be unlawful and set aside.

271.    An actual, present, and justiciable controversy exists between Plaintiffs and Defendants concerning the legality of the Policy and regarding whether Defendant Wolf has legal authority to hold his position or perform its duties or functions.

272.    Plaintiffs seeks a declaratory judgment from this Court that the Policy is not in accordance with law, in excess of statutory authority, contrary to constitutional right, or without

observance of procedure required by law pursuant to 5 U.S.C. § 706(2); that the Policy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A); that Defendant Wolf is without legal authority to hold his position or to perform its duties or functions; and that aspects of the Policy promulgated under the purported authority of Defendant Wolf must be set aside and/or enjoined.

273.   Defendants DOJ and Barr have unduly interfered with Portland's police functions as delegated to it by the State of Oregon, in violation of the Tenth Amendment, by refusing to cancel the deputation of the PPB officers at Portland's request.

274.   An actual, present, and justiciable controversy exists between Portland and Defendants DOJ and Barr concerning the constitutionality of Defendants' refusal to cancel the deputation.

275.   Portland seeks a declaratory judgment from this Court that Defendant DOJ's and Defendant Barr's refusal to cancel the deputation of PPB officers is violative of the Tenth Amendment and the anti-commandeering doctrine.

### **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1.   Issue an order holding unlawful, vacating, and setting aside Defendants' Policy;

2.   Declare that the Policy is not in accordance with law, in excess of statutory authority, contrary to constitutional right, or without observance of procedure required by law pursuant to 5 U.S.C. § 706(2);

3.   Declare that the Policy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

4.   Declare that aspects of the Policy promulgated under the purported authority of Defendant Wolf must be set aside and/or enjoined;

5.   Declare that Defendant DOJ's and Defendant Barr's commandeering of local law enforcement is unlawful under the Tenth Amendment and order them to immediately cancel the at-issue deputation of PPB officers;

6.      Award Plaintiffs costs, expenses, and reasonable attorneys' fees; and

7.      Award any other relief the Court deems just and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1 DATED: October 14, 2020     Respectfully submitted,

2                  **OFFICE OF THE CITY ATTORNEY**
                   **CITY OF OAKLAND**

3

4                  By: */s/ Barbara J. Parker*
                   Barbara J. Parker, City Attorney

5                  Maria Bee, Chief Assistant City Attorney
                   Zoe Savitsky, Supervising Deputy City Attorney

6                  Malia McPherson, Deputy City Attorney
                   One Frank H. Ogawa Plaza, 6th Floor

7                  Oakland, California 94612

8                  Telephone: (510) 238-3601; Fax: (510) 238-6500
                   bparker@oaklandcityattorney.org

9                  mbee@oaklandcityattorney.org
                   zsavitsky@oaklandcityattorney.org

10                 mmcpherson@oaklandcityattorney.org

11                 *Counsel for the City of Oakland*

12                 **OFFICE OF THE CITY ATTORNEY**
                   **CITY OF PORTLAND**

13

14                 By: */s/ Tracy Reeve*
                   Tracy Reeve, City Attorney

15                 Robert Taylor, Chief Deputy City Attorney
                   Denis Vannier, Senior Deputy City Attorney

16                 Naomi Sheffield, Deputy City Attorney
                   1221 SW 4th Avenue, Suite 430

17                 Portland, Oregon 97204

18                 Telephone: (503) 823-4047; Fax: (503) 823-3089
                   robert.taylor@portlandoregon.gov

19                 *Counsel for the City of Portland*

20                 By: */s/ LiJia Gong*
                   Jill Habig, President

21                 Jonathan B. Miller, Legal Director

22                 LiJia Gong, Counsel
                   Victoria Stilwell, Staff Attorney

23                 4096 Piedmont Avenue #149
                   Oakland, California 94611

24                 Telephone: (301) 335-3828
                   jill@publicrightsproject.org

25                 jon@publicrightsproject.org

26                 lijia@publicrightsproject.org
                   tori@publicrightsproject.org

27

                 *Counsel for the Cities of Oakland and Portland*

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

## **FILER'S ATTESTATION**

2

3   Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, Malia McPherson, hereby attests that

4   concurrence in the filing of this document has been obtained from all the signatories above.

5

6   DATED:  October 14, 2020                                    /s/ Malia McPherson
                                                                      Malia McPherson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28