JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
DAVID L. ANDERSON
United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Branch Director
JASON C. LYNCH (D.C. Bar No. 1016319)
MICHAEL P. CLENDENEN (D.C. Bar No. 1660091)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

    1100 L Street NW
    Washington, DC 20530
    Tel: (202) 514-1359
    Fax: (202) 616-8460
    Email: jason.lynch@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CITY OF PORTLAND AND THE CITY OF OAKLAND,<br><br>        Plaintiffs,<br><br>   v.<br><br>WILLIAM BARR, in his official capacity as United States Attorney General, *et al.*,<br><br>        Defendants. | Case No. 3:20-cv-7184-SK<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE**<br><br>Honorable Edward M. Chen<br><br>Date: January 28, 2021<br>Time: 1:30 p.m.<br>Location: Videoconference |

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO
TRANSFER VENUE
Case No. 3:20-cv-7184-SK

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

LEGAL STANDARD......................................................................................................... 4

ARGUMENT ..................................................................................................................... 5

I.    The Cities Lack Standing to Obtain Prospective Equitable Relief for Most Claims.......... 5

    A.    Legal Standard for Standing to Obtain Prospective Equitable Relief..................... 5

    B.    Oakland Lacks Standing for All Claims ................................................................. 9

    C.    Portland Lacks Standing to Challenge Federal Law Enforcement Deployment .. 11

    D.    Because the Cities Lack Standing for Injunctive Relief, They Also Cannot Obtain a Declaratory Judgment for Those Claims................................................. 13

II.    The Northern District of California Is Not a Proper Venue............................................... 14

III.    The Cities' Programmatic Challenge to the Alleged "Policy" Is Not Cognizable .......... 16

IV.    The Cities Have Failed to State Plausible Claims for Relief. ........................................... 19

    A.    "The Policy" is not Contrary to Law (Count 1). .................................................... 19

    B.    "The Policy" is not Arbitrary and Capricious (Count 2). ...................................... 27

    C.    Defendants Have Not Commandeered the Portland Police Bureau (Count 6). .... 29

    D.    Because Mr. Wolf served lawfully as Acting Secretary under the HSA, Plaintiffs' claims (Counts 3–5) challenging his service fail as a matter of law.... 32

        1.    Mr. Wolf has served lawfully as Acting Secretary since November 2019 under an order of succession designated pursuant to the HSA........ 32

        2.    Even if Mr. Wolf's acting service was improper when he performed the challenged actions, the actions have been ratified by the lawfully serving Acting Secretary, curing any service-related defects. .................. 38

CONCLUSION...................................................................................................................... 40

i

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Afifi v. Lynch*,
  101 F. Supp. 3d 90 (D.D.C. 2015) ................................................................... 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................... 3, 5, 27

*Austin v. Univ. of Or.*,
  925 F.3d 1133 (9th Cir. 2019) ............................................................................. 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 5

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................... 18, 20

*Blair v. Shanahan*,
  38 F.3d 1514 (9th Cir. 1994) ............................................................................. 7

*Camp v. Pitts*,
  411 U.S. 138 (1973) ............................................................................................ 30

*Casa de Md. v. Trump*, No. 8:20-cv-02118-PX,
  2020 WL 5500165 (D. Md. Sept. 11, 2020) ............................................. 35, 37, 38

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................................. 6, 7, 8, 1

*City of Olmstead Falls v. FAA*,
  292 F.3d 261 (D.C. Cir. 2002) ...................................................................... 13

*City of Rome v. United States*,
  472 F. Supp. 221 (D.D.C. 1976), *aff'd*, 446 U.S. 156 (1980) ................................. 13

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................... *passim*

*Colo. River Indian Tribes v. Town of Parker*,
  776 F.2d 846 (9th Cir. 1985) ........................................................................ 13

*Consumer Fin. Prot. Bureau v. Gordon*,
  819 F.3d 1179 (9th Cir. 2016) ........................................................................ 40

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE,
TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

*Domenico Garufi v. United States*,
   238 F.3d 1324 (Fed. Cir. 2001) ............................................................ 30

*Eggar v. City of Livingston*,
   40 F.3d 312 (9th Cir. 1994) ................................................................. 8

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
   543 F.3d 586 (9th Cir. 2008) ............................................................... 17

*Gov't Emps. Ins. Co. v. Dizol*,
   133 F.3d 1220 (9th Cir. 1998) ............................................................. 14

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019) ................................................................. 40

*Gulf Ins. Co. v. Glasbrenner*,
   417 F.3d 353 (2d Cir. 2005) ................................................................. 5

*Immigrant Legal Res. Ctr. v. Wolf* (*ILRC*), No. 20-CV-05883-JSW,
   2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ........................................ 35, 37, 38

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ............................................................. 22

*Inst. of Certified Pracs., Inc. v. Bentsen*,
   *874 F.* Supp. 1370 (N.D. Ga. 1994) ..................................................... 16

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ............................................................... 23, 29

*King v. Russell*,
   963 F.2d 1301 (9th Cir. 1992) ............................................................. 16

*Lee v. Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) ............................................................... 23

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................... 6, 10, 13

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ......................................................................... 19

*Martensen v. Koch*,
   942 F. Supp. 2d 983 (N.D. Cal. 2013) ................................................... 5

*Martin v. Malhoyt*,
   830 F.2d 237 (D.C. Cir. 1987) ............................................................. 23, 25

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE,
TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

*Meyer v. Bush*,
    981 F.2d 1288 (D.C. Cir. 1993) ................................................................................ 19

*Miller v. Albright*,
    523 U.S. 420 (1998) .................................................................................................. 16

*Miller v. Lifestyle Creations, Inc.*,
    993 F.2d 883 (9th Cir. 1993) ...................................................................................... 5

*Munns v. Kerry*,
    782 F.3d 402 (9th Cir. 2015) ....................................................................................... 9

*Murphy v. Kenops*,
    99 F. Supp. 2d 1255 (D. Or. 1999) ............................................................................. 9

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ............................................................................ 30, 32, 33, 34

*Nationwide Mut. Ins. Co. v. Liberatore*,
    408 F.3d 1158 (9th Cir. 2005) ................................................................................... 14

*Nelsen v. King Cnty.*,
    895 F.2d 1248 (9th Cir. 1990) ..................................................................................... 7

*New York v. United States*,
    505 U.S. 144 (1992) .................................................................................................. 30

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ............................................................................................ 7, 8, 1

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) .................................................................................................. 30

*Pickern v. Pier 1 Imports*,
    457 F.3d 963 (9th Cir.2006) ...................................................................................... 28

*Printz v. United States*,
    521 U.S. 898 (1997) .................................................................................................. 30

*Rizzo v. Goode*,
    423 U.S. 362 (1976) .................................................................................................... 8

*Rosenblum v. Does 1-10*,
    No. 3:20-CV-01161-MO, 2020 WL 4253209 (D. Or. July 24, 2020) ........................ 7, 13, 17

*Sackett v. EPA*,
    566 U.S. 120 (2012) .................................................................................................. 19

iv

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE,
TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

*Shell Gulf of Mex. Inc. v. Ctr. for Biological Diversity, Inc.*,
   771 F.3d 632 (9th Cir. 2014) ............................................................ 14

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ................................................................... 13, 25

*Sounboard Ass'n v. FTC*,
   888 F.3d 1261 (D.C. Cir. 2018), *cert. denied* 139 S. Ct. 1544 (2019) ................... 18

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ...................................................................... 6

*Steinle v. City & Cty. of San Francisco*,
   919 F.3d 1154 (9th Cir. 2019) ...................................................... 26, 31

*United States ex rel. Solis v. Millennium Pharm., Inc.*,
   885 F.3d 623 (9th Cir. 2018) ........................................................... 4

*United States v. Evans*,
   581 F.3d 333 (6th Cir. 2009) .......................................................... 21

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ...................................................... 26, 27

*United States v. Washington*,
   759 F.2d 1353 (9th Cir. 1985) ......................................................... 14

*Updike v. Multnomah Cnty.*,
   870 F.3d 939 (9th Cir. 2017) ........................................................... 7

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) .......................................................... 38

*Wheeler v. Hurdman*,
   825 F.2d 257 (10th Cir. 1987) .......................................................... 5

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) .......................................................... 4

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) .................................................................... 6

*Wood v. Moss*,
   572 U.S. 744 (2014) ................................................................... 23

**Statutes**

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE,
TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

5 U.S.C. § 704 .................................................................................................. 17, 19

5 U.S.C. § 3345(a) ................................................................................................... 36

5 U.S.C. § 3346(a) ................................................................................................... 39

5 U.S.C. § 3347(a) ................................................................................................... 33

6 U.S.C. § 113(g) ......................................................................................... 33, 34, 38

18 U.S.C. § 115(a)(1)(B) .......................................................................................... 21

28 U.S.C. § 566(i) .................................................................................................... 21

28 U.S.C. § 1391 ................................................................................................ 15, 16

28 U.S.C. § 1404(a) ......................................................................................... 1, 3, 17

28 U.S.C. § 1406 .......................................................................................... 1, 2, 5, 16

40 U.S.C. § 1315 .............................................................................................. *passim*

Pub. L. No. 114-328 ................................................................................................. 36

**Rules**

Fed. R. Civ. P. 12(b) ................................................................................. 1, 4, 16, 31

Fed. R. Civ. P. 41(b) ................................................................................................ 16

**Regulations**

Executive Order 13753, *Amending the Order of Succession in the Department of Homeland Security*,
    81 Fed. Reg. 90667 (Dec. 9, 2016) ................................................... *passim*

Executive Order 13933,
    85 Fed. Reg. 40,081 (June 26, 2020) ...................................... 18, 25, 27

Ratification of Department Actions,
    85 Fed. Reg. 75223 (Nov. 16, 2020) ..................................................... 40

**Other Authorities**

*Department Policy on the Use of Force* (Sept. 7, 2018),
    https://www.dhs.gov/publication/law-enforcement ................................... 27

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE,
TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

*DHS Announces New Task Force to Protect American Monuments, Memorials, and Statues* (July 1, 2020),
    https://www.dhs.gov/news/2020/07/01/dhs-announces-new-task-force-protect-american-monuments-memorials-and-statues ........................................................................... 26

*In re Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650 (GAO Aug. 14, 2020),
    https://www.gao.gov/assets/710/708830.pdf (last visited Dec. 18, 2020) ............................... 35

*Information Regarding First Amendment Protected Activities* (May 17, 2019),
    https://www.dhs.gov/publication/memo-information-regarding-first-amendment-protected-activities ............................................................................................................... 27

Order Designating the Order of Succession for the Secretary of Homeland Security (Nov. 14, 2020),
    https://www.dhs.gov/sites/default/files/publications/20_1114_gaynor-order.pdf (last visited Dec. 9, 2020) ............................................................................................................. 40

Portland Police Bureau, *Fires and Criminal Activity Outside the Federal Courthouse* (July 24, 2020),
    https://www.portlandoregon.gov/police/news/read.cfm?id=251024 .......................................... 3

*Protests in Portland: A Timeline*,
    https://www.portlandoregon.gov/police/article/765145 .......................................................... 29

Vladeck & Wittes, *DHS Authorizes Domestic Surveillance to Protect Statues and Monuments* (July 20, 2020),
    https://www.lawfareblog.com/dhs-authorizes-domestic-surveillance-protect-statues-and-monuments .................................................................................................................... 26

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

**NOTICE OF MOTION AND MOTION TO DISMISS UNDER RULES 12(b)(1), 12(b)(3), AND 12(b)(6), OR, IN THE ALTERNATIVE, TO TRANSFER VENUE**

PLEASE TAKE NOTICE that on January 28, 2021, at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Edward M. Chen, Defendants shall and hereby do move this Court for an order dismissing this case under Rules 12(b)(1), 12(b)(3) and 12(b)(6) or the Federal Rules of Civil Procedure. In the alternative, Defendants seek a transfer to the U.S. District Court for the District of Oregon under either 28 U.S.C. § 1406(a) or 28 U.S.C. § 1404(a). This motion is based on this notice, the attached Memorandum of Points and Authorities, the pleadings, and files in this action, other matters of which the Court may take judicial notice, and such other written or oral argument as may be presented.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This case primarily concerns protests in downtown Portland, Oregon, from May through July of this year. Those protests frequently centered around federal property, including the Hatfield Federal Courthouse. These protests often turned riotous and violent at night. Some members of the large crowds attempted to damage federal property and attacked federal law enforcement officers protecting it. Portland Police responded with lawful force each night, often dispersing violent crowds after declarations of riot. Law enforcement officers from two federal agencies, the Department of Homeland Security (DHS) and the U.S. Marshals Service (USMS), also deployed to protect federal property.

Plaintiffs are the cities of Portland, Oregon, and Oakland, California (hereinafter, the "Cities"). They allege that DHS and USMS officers have conducted or may conduct general law enforcement activities in their cities against the wishes of city officials. They claim that Defendants' actions exceed the statutory authority of these agencies to protect federal property and

1

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

that Defendants have unlawfully commandeered local law enforcement agents through deputation. The Cities also allege that Acting DHS Secretary Chad Wolf had no authority to authorize these actions because he was improperly appointed to that position. The Cities seek only declaratory and injunctive relief.

The Cities have no standing to seek prospective equitable relief concerning the deployment of federal officers. The Complaint acknowledges that federal involvement in Portland has waned since July, and the Cities cite only speculative fears that federal officers will renew or begin surge activity as a basis for bringing this lawsuit. Such speculation fails to carry the Cities' burden to demonstrate certainly impending future injury, as is needed to establish standing. Moreover, Oakland lacks standing for the additional reason that the Complaint never alleges that *any* federal actions took place there, only that federal officers *might* deploy to Oakland at some point. Oakland should be dismissed as a plaintiff for that reason alone, and with Oakland no longer part of the case, the Court can dismiss the claims by Portland because the Northern District of California is an improper venue. Finally, the Complaint fails to state a valid claim on the merits.

Defendants accordingly submit this motion for the Court to: (1) dismiss all claims with prejudice under Rule 12(b)(1) and Rule 12(b)(6) because the Cities lack standing on some claims and the Complaint does not state a valid claim on the merits on the remaining claims; or, in the alternative, (2) dismiss all claims by Oakland as a plaintiff with prejudice under Rule 12(b)(1) because it lacks standing and dismiss the remaining claims without prejudice under Rule 12(b)(3) and 28 U.S.C. § 1406(a) because the Northern District of California is an improper venue; or, in the alternative, (3) dismiss all claims by Oakland under Rule 12(b)(1) and transfer the remaining claims to the District of Oregon under 28 U.S.C. § 1406(a); or, in the alternative, (4) transfer all claims to the District of Oregon under 28 U.S.C. § 1404(a) because the interest of justice so requires.

2

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

# BACKGROUND[1]

Beginning in late May 2020, protesters gathered in the streets of Portland and in cities across the United States to protest racism and police violence. Compl. (Dkt. No. 1) ¶¶ 92–95. Those protests in Portland continued every night through June and July. *Id.* ¶¶ 97–127. The protests clustered around certain federal buildings, including the Mark O. Hatfield Federal Courthouse, and Portland city government buildings. *Id.* ¶¶ 97, 122, 127. Each night, hundreds or thousands of protesters gathered in those locations. *Id.* ¶¶ 97, 115.

Also, each night, police clashed with protesters. *Id.* ¶ 97. While initially these clashes involved Portland police, in early July, 2020, DHS and USMS also deployed law enforcement units to Portland to protect federal property, including the Hatfield Federal Courthouse. *Id.* ¶ 116. As Portland's own police bureau has noted, protesters have thrown projectiles, set fires, and launched fireworks at the federal courthouse and at federal officers inside. *See* Portland Police Bureau, *Fires and Criminal Activity Outside the Federal Courthouse* (July 24, 2020), https://www.portlandoregon.gov/police/news/read.cfm?id=251024. The Complaint acknowledges that as many as 42% of demonstrations in Portland during the month of July turned violent. Compl. ¶ 130. Federal law enforcement officers, like Portland police, have frequently responded with crowd control devices, including impact munitions and chemical agents. *See* Compl. ¶¶ 121, 125, 210. DHS officers withdrew from Portland and reduced operations in the city after a July 29 agreement with the Oregon Governor. *Id.* ¶ 127.

Plaintiffs are the cities of Portland, Oregon, and Oakland, California. *Id.* ¶ 2. They have sued DHS, the U.S. Department of Justice (of which USMS is a component agency), Chad Wolf

---

[1] This motion treats the Complaint's factual allegations as true only for purposes of the motion to dismiss for failure to state a claim, as this Court must in ruling on it. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

in his official capacity as Acting Secretary of Homeland Security, and William Barr in his official capacity as U.S. Attorney General. *Id.* ¶ 3. The Cities claim that federal law enforcement agencies have encroached on their sovereignty by conducting general policing of the cities beyond what is authorized by federal statute. *Id.* ¶¶ 8, 10, 15. They additionally assert that Acting Secretary Wolf had no authority to authorize the deployment of DHS officers because he was improperly appointed to his position. ¶¶ 157–66. Portland also complains that a security fence around the Hatfield Federal Courthouse is blocking a city-owned right of way, *id.* ¶¶ 12, 149–54, and that the USMS deputation of Portland police in September amounts to unconstitutional commandeering of local officers, *id.* ¶¶ 18–19, 173–85. The Cities seek a declaratory judgment and attorneys' fees and costs. *Id.* at 45–46 (Prayer for Relief).

## **LEGAL STANDARD**

Defendants bring this motion under Federal Rule of Civil Procedure 12(b)(1) for lack of standing; Rule 12(b)(6), because the Cities have failed to state a claim upon which relief can be granted; and Rule 12(b)(3), because the Northern District of California is not a proper venue.

In response to a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *United States ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623, 625 (9th Cir. 2018). In order for the Court to have subject-matter jurisdiction over a challenge to agency action, the plaintiff must have standing to sue. *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A court may examine materials outside the pleadings as it deems appropriate in order to resolve the question of its jurisdiction. *See Miller v. Lifestyle Creations, Inc.*, 993 F.2d 883 (9th Cir. 1993) (mem.) (citing *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).

The plaintiff also has the burden of proving that venue is proper in response to a motion to dismiss under Rule 12(b)(3). *See Martensen v. Koch*, 942 F. Supp. 2d 983, 996 (N.D. Cal. 2013);

4

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

*see also Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (applying the "preponderance of the evidence" standard). A court may likewise consider materials outside the pleadings to determine whether venue is proper. *Martensen*, 942 F. Supp. 2d at 996. "If the court finds venue is improper, it has discretion to dismiss or to transfer venue to a proper court." *Id.*; *see* 28 U.S.C. § 1406(a).

Under Rule 12(b)(6), courts must dismiss complaints that do not allege sufficient facts to demonstrate a plausible entitlement to relief. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and it "asks for more than a sheer possibility that the defendant has acted unlawfully." *Id.*; *see Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019).

## **ARGUMENT**

## I.    **The Cities Lack Standing to Obtain Prospective Equitable Relief for Most Claims**

Notwithstanding that federal officers have not used force to disperse crowds gathered around the Hatfield Courthouse since September, and that federal officers have not once dispersed any riotous crowd in Oakland, this action asks the Court to enjoin the hypothetical use of force by federal officers at hypothetical future protests where such force might be deployed at some indeterminate time. Such speculative requests for relief fall well short of establishing standing to sue.

### A.    **Legal Standard for Standing to Obtain Prospective Equitable Relief**

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy."

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

*City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983). One of the "landmarks" that differentiates a constitutional case or controversy from more abstract disputes "is the doctrine of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The first requirement of standing is that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* Second, "there must be a causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant and not the result of the independent action of some third party not before the court. *Id.* Third, it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court. *Id.* at 561.

Where, as here, a party seeks prospective equitable relief, the injury in fact must be in the future; there must be "allegations of future injury [that are] particular and concrete." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 109 (1998). That "threatened injury must be *certainly impending*" and not merely "*possible*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Accordingly, the injury may not be based on a "speculative chain of possibilities." *Id.* at 410. In other words, where a plaintiff's request for injunctive relief lacks any non-speculative basis for finding a likelihood of future harm, the plaintiff cannot circumvent Article III merely by saying that he or she is *afraid* of future harm. *See id.* at 416.

While a plaintiff's allegations that he was injured in the past might support a remedy at law, a plaintiff seeking prospective equitable relief must establish imminent future harm to himself. *Lyons,* 461 U.S. at 105; *see also Nelsen v. King Cnty.*, 895 F.2d 1248, 1251 (9th Cir. 1990). Thus, even when he has suffered a specific past injury, a plaintiff must show a significant likelihood that it will be sustained again in the immediate future. *Updike v. Multnomah Cnty.*, 870 F.3d 939, 947

6

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE,
TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

(9th Cir. 2017) (denying injunctive relief to a plaintiff challenging the lack of American Sign Language interpreters in pretrial detainment and at arraignment, even though he had been booked at the same correctional facility five times before, because "standing for injunctive relief requires that a plaintiff show a 'real and immediate threat of repeated injury'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974))). Moreover, a plaintiff seeking injunctive relief must show not just that the predicted *injury* will reoccur, but also that the plaintiff himself will suffer it. *See, e.g.*, *id.* at 948 (holding that the plaintiff lacked standing for injunctive relief because his evidence was "insufficient to establish that any such wrongful behavior is likely to recur against him"); *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (holding that a plaintiff seeking declaratory or injunctive relief must "establish a personal stake" in the relief sought); *Rosenblum v. Does 1-10*, No. 3:20-CV-01161-MO, 2020 WL 4253209, at *6 (D. Or. July 24, 2020).

The facts and reasoning of *Lyons* are instructive. *Lyons* was a civil rights action against the City of Los Angeles and several police officers who had allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation. In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was threatened. The Supreme Court held that plaintiff lacked standing to seek prospective relief because he could not show a real or immediate threat of future harm.

> That Lyons may have been illegally choked by the police . . . , while presumably affording Lyons standing to claim damages . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

*Lyons*, 461 U.S. at 104; *see also O'Shea*, 414 U.S. at 495–96 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."); *Rizzo v. Goode*, 423 U.S. 362, 372

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

(1976). *Lyons* concluded that to demonstrate a real and immediate threat of injury, the plaintiff would have to show either a consistent practice, always followed by all officers, that violated his rights, or an official policy. *See Lyons*, 461 U.S. at 106 (requiring that he show "(1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, . . . or, (2) that the City ordered or authorized police officers to act in such manner"). Even an official policy that simply allowed for the challenged conduct is insufficient. *Id.* Similarly, a widespread practice that is not common to all law enforcement officers with whom a plaintiff may come in contact is also insufficient. *Rizzo*, 423 U.S. at 372 (holding that plaintiffs' allegations that police had engaged in widespread unconstitutional conduct aimed at minority citizens was based on speculative fears as to what an unknown minority of individual police officers might do in the future).

Courts in this Circuit have applied *Lyons* and *O'Shea* in similar contexts to hold that individual plaintiffs lack standing to pursue prospective injunctive relief where they could only speculate as to whether particular law enforcement practices would occur, even if they had previously been subjected to them. *See, e.g.*, *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994) (holding that a plaintiff who had been repeatedly convicted without court-appointed counsel lacked standing because whether she "will commit future crimes in the City, be indigent, plead guilty, and be sentenced to jail is speculative"); *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1259–60 (D. Or. 1999) (holding that plaintiffs lacked standing because it was highly speculative "that the Forest Service will exercise its discretion to issue future closure orders, that the closure orders will violate the First Amendment, that plaintiffs will violate those closure orders, and that plaintiffs will be arrested because of those closure orders"); *see also Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015) (applying *Lyons* to First Amendment challenge in which plaintiffs claimed defendant's actions produced a "chilling effect").

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

### B.     Oakland Lacks Standing for All Claims

As discussed below, both Portland and Oakland lack standing to challenge the deployment of federal officers to their cities because the fear of the alleged injuries recurring is merely speculative. But Oakland lacks standing to bring any of the claims raised in this lawsuit for a more fundamental reason: the Complaint fails to allege *any* facts, past or present, relating to a harm suffered by Oakland that could be attributed to Defendants. Oakland must therefore be dismissed as a plaintiff from this lawsuit.

Throughout the Complaint, the Cities refer to specific past events that took place in Portland. *See* Compl. ¶¶ 113–27 (deployment of Operation Diligent Valor by DHS to Portland); *id.* ¶¶ 149–55 (fence around Hatfield Courthouse); *id.* ¶¶ 173–85 (deputation of Portland police by USMS). References to Oakland, however, are scant. The *only* past allegations specific to Oakland are that: (1) Oakland is responsible for the health, safety, and welfare of its residents, *id.* ¶ 2; (2) Oakland is a diverse city with goals of promoting racial justice and police reforms, *id.* ¶ 29; (3) Oakland has "mutual aid" agreements with nearby cities and counties, *id.* ¶ 89; (4) Oakland's police department has a use of force policy and operates under a Negotiated Settlement Agreement and a recent injunction (neither of which involved federal officers), *id.* ¶¶ 211, 217; (5) President Trump offhandedly mentioned Oakland in a list of cities he thought were "a mess" and in need of intervention, *id.* ¶ 13; *see also id.* ¶¶ 67, 144–45; (6) Oakland's city council adopted Resolution No. 88276 (authorizing city officials to "Protect" the city and its residents against "President Trump's Threats To Take Actions" and "Any Related Actions Federal Officers Take"), *id.* ¶ 141; and (7) since the deployment to Portland, Oakland has engaged in new community outreach and devoted time to preparing for possible federal intervention in Oakland, *id.* ¶¶ 193–94. Indeed, Oakland states that it "has not yet been subject to direct federal intervention." *Id.* ¶ 192. The remaining allegations are mere speculation about future events. *See id.* ¶¶ 195–97 (speculating that Oakland's mutual aid partners might reject assistance if federal officers deploy to Oakland, which

9

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

could cost Oakland resources); *id.* ¶ 220 (speculating that federal intervention could complicate Oakland police use of force policy, settlement agreement, and injunction).[2]

With the arguable exception of President Trump's offhanded references to Oakland, none of the past allegations are attributable to Defendants. These allegations fail the traceability requirement necessary to confer standing. *See Lujan*, 504 U.S. at 560. President Trump's comments about Oakland, which the Cities call "threats," *id.* ¶ 67, are similarly insufficient to confer standing because they are not concrete and particularized, *see Lujan*, 504 U.S. at 560. Plaintiffs do not allege that President Trump or any other Defendant articulated concrete plans to send federal officers to Oakland. The alleged fear that federal law enforcement agencies would follow up on President Trump's vague "threats" is speculative, and far from the "certainly impending" injury required for standing to seek prospective equitable relief. *Clapper*, 568 U.S. at 409; *see also* Compl. ¶ 221 (citing only a "reasonable likelihood" that federal officers will deploy to Oakland). And given that no past injury has occurred, the allegations about future harms that could result from a hypothetical federal deployment to Oakland are likewise too speculative. Such a "speculative chain of possibilities" (*i.e.*, that federal officers *might* deploy to Oakland in the future, and Oakland's mutual aid partners *might* decline assistance as a result or the deployment *might* complicate existing settlements or injunctions) cannot form the basis for injunctive relief. *Clapper*, 568 U.S. at 410.

Because Oakland has not demonstrated that it has standing over any of the claims in this case, the Court lacks jurisdiction over those claims. The Court must therefore dismiss Oakland as a plaintiff.

---

[2] Oakland does not even join in the "Sixth Claim for Relief" (the deputation issue), *see id.* ¶¶ 256–53, seemingly acknowledging that potential future harms do not give rise to a current claim.

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

**C.      Portland Lacks Standing to Challenge Federal Law Enforcement Deployment**

Portland[3] lacks standing to seek injunctive relief related to federal law enforcement deployment to the city because the alleged injuries occurred prior to the Cities' filing of the Complaint, and there is no "certainly impending" surge activity.

The Complaint focuses on the deployment of DHS[4] officers to Portland as part of Operation Diligent Valor, which took place throughout July 2020. Compl. ¶¶ 113–27. According to the Complaint, "[o]n July 29, 2020, [Oregon's Governor] reached a negotiated agreement with the federal government. Defendants agreed to withdraw federal agents from Portland with assurance that Oregon State Police would take on additional duties guarding the safety of the federal courthouse in Portland." *Id.* ¶ 127. The Cities do not allege that there has been any surge activity of federal officers in Portland since July 29. The only activities alleged to have happened in Portland after that date are the September 25 deputation of Portland police by USMS with Portland Police Bureau (PPB) authorization and the ongoing issue of the fence around Hatfield Courthouse.[5] *Id.* ¶¶ 151–54, 173. Under *Lyons* and *Clapper*, the past events in Portland are insufficient to confer standing for prospective equitable relief.[6]

---

[3] Although this section focuses on Portland, the arguments presented apply to Oakland as well.

[4] Customs and Border Patrol (CBP), Federal Protective Service (FPS), and Immigration and Customs Enforcement (ICE) are subcomponents of DHS.

[5] These issues are either already moot or will soon be moot. As Defendants have conveyed to Portland by letter dated December 4, 2020, the security fence has been moved closer to the courthouse and no longer blocks the right of way or bike path. And as described further below, the federal deputation of PPB officers will expire on December 31, 2020, before briefing on this motion is complete.

[6] The Cities cannot circumvent their lack of standing by alleging, without any factual basis, that federal officers were acting pursuant to a "policy" adopted by Defendants. *See* Compl. ¶¶ 4, 65–70, 104, 109, 111–14. As discussed below, the Cities have failed to properly plead the existence of any specific "policy" that is a final agency action subject to judicial review.

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

The Cities contend that Defendants might decide to renew Portland surge activity in the future. The Cities support this with a comment by President Trump in reference to violence in Portland, stating "[w]e very much quelled it, and if it starts again, we'll quell it again very easily." *Id.* ¶ 134. From this statement, and statements about federal involvement in other cities, the Cities assert that, "[t]hough most federal agents were temporarily pulled out of Portland, President Trump has threatened that they can return at any time." *Id.* ¶ 146. The alleged risk of renewed surge activity, however, is insufficient to confer standing for injunctive relief for the same reasons that Oakland's fear of a future deployment is insufficient: Neither President Trump nor any of the Defendants have articulated a concrete plan, rather than vague "threats." The "threatened" renewed operations are speculative and not "certainly impending." *Clapper*, 568 U.S. at 409.

Finally, it should be noted that Portland does not attempt to assert standing as *parens patriae* on behalf of its residents. The only "harms" alleged by the Cities are budgetary and economic impacts to the Cities arising from the protests,[7] Compl. ¶¶ 187–98, complications with local law enforcement orders, *id.* ¶¶ 209–21, and the "Loss of Legislative Prerogative," *id.* ¶¶ 224–25. Even if Portland were to assert *parens patriae* standing, however, such claims would fail for two reasons. First, unlike States, cities and other political subdivisions "cannot sue as *parens patriae* because their power is derivative and not sovereign." *Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985). Second, "no state or municipal government can sue the federal government in a *Parens patriae* capacity." *City of Rome v. United States*, 472 F. Supp. 221, 236 n.68 (D.D.C. 1976) (three-judge court), *aff'd*, 446 U.S. 156 (1980); *see City of Olmstead Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) ("As municipalities derive their existence from the

---

[7] To the extent that the Cities claim harm from an increase in riots due to protesters' anger at the federal government, these harms are also not traceable to defendants. *See Lujan*, 504 U.S. at 560 (recognizing that an injury cannot be the result of "independent action by some third party not before the court" (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976))).

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

state and function as political subdivisions of the state, presumably they too cannot sue the federal government under the doctrine of *parens patriae*."). *See generally Rosenblum*, 2020 WL 4253209 (rejecting Oregon's *parens patriae* standing against the United States for claims arising from the Portland protests).

### D.   Because the Cities Lack Standing for Injunctive Relief, They Also Cannot Obtain a Declaratory Judgment for Those Claims

The Cities cannot pursue a declaratory judgment for claims over which they have no standing to seek injunctive relief. A request for declaratory judgment does not present a standalone claim, but merely is a remedy—and one that the Cities here are not entitled to seek. *Shell Gulf of Mex. Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632, 635 (9th Cir. 2014) ("The Declaratory Judgment Act . . . does not create new substantive rights, but merely expands the remedies available in federal courts"). The Declaratory Judgment Act does not by itself confer federal subject-matter jurisdiction. *Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158, 1161 (9th Cir. 2005). For a plaintiff to claim an entitlement to declaratory relief, the plaintiff "must first present an actual case or controversy within the meaning of Article III." *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222 (9th Cir. 1998) (en banc).

Here, as demonstrated above, the Cities have not shown that a case or controversy exists with respect to most of their claims for prospective relief. Furthermore, declaratory relief is improper here because it "will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985). As the Ninth Circuit has recognized, the utility of a declaratory judgment is fairly narrowly cabined; it is designed principally to allow a potential defendant "to file preemptive litigation to determine whether they have any legal obligations to their potential adversaries." *Shell Gulf of*

13

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

*Mex.*, 771 F.3d at 635. This action has not been filed by a party that faces the "Damoclean threat of impending litigation which a harassing adversary might brandish." *Id.*; *see also* 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2751 (4th ed. 2020) (noting that declaratory judgement "is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication without waiting until an adversary should see fit to begin an action after the damage has accrued"). Instead, the Cities claim that they have been harmed by Defendants in the past and want an injunction against future harm of the same type. That does not require an anticipatory settling of the legal relations between the parties, nor would such a declaration at the conclusion of this case reduce any uncertainty between the parties, especially because the underlying legal claims will necessarily be resolved at the same time as the Cities' other claims for relief. In short, the Cities' request for declaratory relief is entirely duplicative of the relief they already seek, and they cannot show how declaratory relief will offer any additional benefit.

## II.    The Northern District of California Is Not a Proper Venue

If the Court agrees that Oakland lacks standing and dismisses it as a plaintiff under Rule 12(b)(1), the Court should then dismiss the remaining claims because the Northern District of California is not a proper venue, regardless of whether the Court dismisses any claims by Portland.

The Complaint cites 28 U.S.C. § 1391 as the basis for venue. Compl. ¶ 26. Under that statute,

> [a] civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or (C) the plaintiff resides if no real property is involved in the action.

14

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

28 U.S.C. § 1391(e)(1).

Once Oakland is dismissed, there is no longer any basis for venue in this district: no defendant resides here, it is not the case that "a substantial part of the events or omissions giving rise to the claim occurred" here, and no (proper) plaintiff resides here. A plaintiff who lacks Article III standing cannot create venue where it would not otherwise exist. *See Miller v. Albright*, 523 U.S. 420, 426–27 (1998) ("[T]he District Court concluded that Mr. Miller did not have standing and dismissed him as a party. Because venue in Texas was therefore improper, *see* 28 U.S.C. § 1391(e), the court transferred the case to the District Court for the District of Columbia, the site of the Secretary's residence."); *Inst. of Certified Pracs., Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994) ("Having found that the Institute lacks standing to bring this action and has failed to state a claim upon which relief can be granted, plaintiff cannot manufacture venue by adding the Institute as a party."); *see also* 14D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3815 (4th ed.) ("[V]enue cannot be based on the joinder of a plaintiff" that has been added "for the purpose of creating venue in the district.").

Accordingly, the Court has two options: either it "[1] shall dismiss, or [2] if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406; *see also* Fed. R. Civ. P. 12(b)(3). The district court has discretion as between those options. *See King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992). "[D]istrict courts often dismiss rather than transfer under Section 1406(a) if the plaintiff's attorney reasonably could have foreseen that the forum in which the suit was filed was improper and that similar conduct should be discouraged." 14D Wright & Miller, *supra*, § 3827. Dismissal in this case would cause minimal prejudice because the Cities can likely refile in another district where there is no venue problem. *See* Fed. R. Civ. P. 41(b). And there are at least two proper venues in this case (District

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

of Oregon and District for the District of Columbia), so dismissal would be favored over transfer in order to allow the parties to decide which of the proper venues is preferred. In the alternative, the case should be transferred to the District of Oregon because most of the events giving rise to the claims occurred in Portland and because several other cases concerning the summer 2020 Portland protests have already been brought there. *See, e.g.*, *Rosenblum*, 2020 WL 4253209; *Western States Center, Inc. v. U.S. Dep't of Homeland Sec.*, No. 3:20-cv-01175-JR (D. Or.); *Clark v. Wolf*, No. 3:20-cv-01436 (D. Or.); *Index Newspapers LLC v. City of Portland*, No. 3:20-cv-1035-SI (D. Or.); *Pettibone v. Trump*, 3:20-cv-01464-YY (D. Or.); *Wise v. City of Portland*, No. 3:20-cv-01193 (D. Or.); *Wolfe v. City of Portland*, No. 3:20-cv-01882-SI (D. Or.).

Finally, even if the Court concludes that Oakland and Portland both have standing and that the claims should not be dismissed, the Court should nonetheless transfer the case to the District of Oregon under 28 U.S.C. § 1404(a). Under that statute, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." *Id.* As discussed, most of the events giving rise to these claims occurred in Portland, and specifically around the Hatfield federal courthouse. The District Court for the District of Oregon is familiar with the background of this case and the related cases already brought in that court, and most of the evidence pertaining to the protests is in Portland. As such, the interest of justice favors transfer to that court.

## III.   The Cities' Programmatic Challenge to the Alleged "Policy" Is Not Cognizable

The Cities challenge Defendants' "policy" primarily under the Administrative Procedure Act (APA). *See* Compl. ¶¶ 229, 242, 253, 265. These claims are unreviewable under the APA because there is no "policy" that may constitute a final agency action. *See* 5 U.S.C. § 704.

16

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

An agency action is "final" only if two conditions are met. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 591 (9th Cir. 2008) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Thus, "*Bennett* directs courts to look at finality from the agency's perspective (whether the action represents the culmination of the agency's decisionmaking) and from the regulated parties' perspective (whether rights or obligations have been determined, and legal consequences flow)." *Sounboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018), *cert. denied* 139 S. Ct. 1544 (2019) (mem.).

The Cities acknowledge that "[t]he full scope and parameters of the policy authorizing [the deployment of federal officers] are currently unknown." Compl. ¶ 4. The Cities variably contend that the "policy" consists of a combination of: (1) the deployments of federal agents to U.S. cities, including Portland under "Operation Diligent Valor," *see* Compl. ¶ 9, (2) Executive Order 13933, 85 Fed. Reg. 40,081 (June 26, 2020), *see id.* ¶ 6, and (3) a non-public DHS memo that allegedly authorizes surveillance activities of threats to monuments, memorials, and statues, *see id.* ¶ 11; *see also id.* ¶ 111 ("Taken together, the Executive Order, the creation or amendment of internal guidance documents, the creation of the PACT, the creation of other cross-designated federal law enforcement teams, and the deployment and operations of such teams *are, form part of, or are results of*, the Policy." (emphasis added)).

Under the *Bennett* test, designating DHS employees under 40 U.S.C. § 1315 and deploying them to Portland is not "final agency action."[8] The purpose of Operation Diligent Valor and the

---

[8] The Court should note, also, that USMS officers did not "deploy" to Portland at all. USMS has a standing obligation to protect federal courthouses. *See* 28 U.S.C. § 566(i).

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

"Protecting American Communities Task Force" (PACT) was, as the Complaint states, to "conduct[] ongoing assessments of potential civil unrest or destruction and [to] allocat[e] resources to protect people and property," and to engage in "potential surge activity to ensure the continuing protection of critical locations," (*i.e.*, the Hatfield Federal Courthouse). *Id.* ¶ 105. Such a deployment does not consummate Defendants' decisionmaking process; rather, it is an incremental step toward managing an unfolding crisis. Agency actions are consummate when they are "not subject to further Agency review," *Sackett v. EPA*, 566 U.S. 120, 127 (2012), and Defendants' deployment could have been augmented, curtailed, or rescinded at any time.

Likewise, the Executive Order and internal policy memorandum[9] are not reviewable final agency actions under *Bennett*. The Executive Order states that federal officers will "prosecute to the fullest extent permitted under Federal law, and as appropriate," persons who destroy or vandalize monuments, memorials, statues, or religious property. 85 Fed. Reg. at 40,082. Rather than sanctioning unconstitutional or unlawful tactics, the Executive Order expressly limits the conduct of federal officers to those "permitted under Federal law." Thus, this Order and any internal memoranda purporting to implement it merely indicate that federal officers will use their lawful authority to protect federal property and personnel. They do not create any new authority under which federal officers may act. As such, these documents fail the second *Bennett* prong because they do not fix any rights or obligations from which legal consequences will flow. "An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not . . . subject to judicial review." *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993).

---

[9] The veracity and contents of the alleged DHS memorandum are discussed more in the next section.

18

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

Furthermore, the Cities' challenge to a "generalized" policy is not cognizable under the APA. A plaintiff cannot seek "wholesale improvement" of a federal agency's operations "by court decree." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Broad law enforcement operations are not an "'agency action' within the meaning of [5 U.S.C.] § 702, much less a 'final agency action' within the meaning of § 704." *Id.* at 890 (noting a "'drug interdiction program' of the Drug Enforcement Administration" as an example of agency "operations" that are not agency actions); *see also Afifi v. Lynch*, 101 F. Supp. 3d 90, 110 n.14 (D.D.C. 2015) (concluding that law enforcement operations, such as investigations, are generally not final agency actions and citing additional cases). A "generalized" policy of where to deploy officers and what they generally should be doing does not terminate the decisionmaking process and finalize how federal officers will act toward the Cities, as would be required for a final agency action, *see Bennett*, 520 U.S. at 177–78, and there is no indication that the "generalized" policy, however defined, does not simply leave most discretion to federal officers on the scene.

**IV.    The Cities Have Failed to State Plausible Claims for Relief.**

Even if this Court had jurisdiction, and was the proper venue to bring this case, the Cities' claims should still be dismissed under Rule 12(b)(6) for failure to state plausible claims on which relief can be granted.

**A.    "The Policy" is not Contrary to Law (Count 1).**

In Count 1, the Cities claim that Defendants have exceeded the scope of 40 U.S.C. § 1315, and "therefore overstep[ped] the constitutional limitations on the federal police powers," in two ways. Compl. ¶¶ 226-38.[10] First, the Cities allege that "the Policy" authorizes "the designation of such agents to quell civil protests and surveil and engage with threats to damage

---

[10] Because the Cities do not allege that § 1315 is itself unconstitutional, it is only by violating that statute that, the Cities claim, Defendants have effected any constitutional violation.

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

or destroy *any* public monument, memorial, or statue." *Id.* ¶ 237. Second, the Cities allege that "the Policy" authorizes "the expansion of federal physical boundaries and the take-over of City rights-of-way for the purposes of securing federal property, without the express consent of the City." *Id.* The Cities have not plausibly alleged that either is true.

As a legal matter, the Cities' claim is driven by a mistakenly cramped reading of 40 U.S.C. § 1315. The Cities assume that federal law enforcement cannot issue or enforce dispersal orders to anyone outside federal property, which is incorrect. *Cf.* Compl. ¶ 74 (suggesting that it is only through local "agreements" that Defendants may operate "[o]utside of federal property"). DHS officers have authority to "protect[]" federal property "in areas outside the property to the extent necessary to protect the property and persons on the property," 40 U.S.C. § 1315(b)(1), and to "enforce Federal laws and regulations for the protection of persons and property" on and off federal property, *id.* § 1315(b)(2)(A). Separately, the Marshals Service has "final authority regarding security requirements for the judicial branch," including "the security of buildings housing the judiciary." 28 U.S.C. § 566(i).

"The statute thus expressly empowers FPS officers to conduct investigations and make arrests outside of federal property when 'necessary to protect the property and persons on the property.'" *United States v. Evans*, 581 F.3d 333, 340-41 (6th Cir. 2009). In *Evans*, two FPS officers followed the defendant's car after she caused a disturbance and made threats in a federal office in Detroit. *Id.* at 336. Thereafter, "approximately four to five blocks from [that] office," the defendant "maneuvered her car behind the officers' FPS vehicle and began 'tailgating' their marked police car." *Id.* After the defendant and others in the car made threatening gestures as if they had guns, the FPS officers pulled over the defendant, who was arrested and charged with threatening a federal law enforcement officer, in violation of 18 U.S.C. § 115(a)(1)(B). *Id.* at 338. The Sixth Circuit affirmed that both the surveillance and arrest were authorized under

20

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

§ 1315. *Id.* at 341, 342-43 ("As the district court and magistrate judge recognized, Evans's conduct, her tailgating of the FPS officers' marked police vehicle, and her visible hand gestures, which simulated the firing of a gun, provided the FPS officers with probable cause to arrest her, *regardless of her presence on non-federal property*.") (emphasis added). *Evans* and other cases illustrate that DHS agents operating under § 1315 may investigate and surveil persons *off* federal property and arrest them on suspicion of federal crimes, even if those crimes were themselves committed *off* federal property. Thus, neither federal presence nor federal arrests outside of federal property suggests any violation of § 1315. *See also United States v. Baldwin*, 745 F.3d 1027, 1030 (10th Cir. 2014) (Gorsuch, J.).

As a factual matter, the Cities have not raised a plausible inference that Defendants have a policy of quelling peaceful protests. Portland, a city of more than 130 square miles, has seen protests—peaceful and violent—across the city for months now. And yet, the Cities do not allege that Defendants have strayed more than three blocks from the Hatfield Courthouse. *Cf.* Compl. ¶ 122. That undermines any suggestion that Defendants are quelling civil protests, and it strongly suggests that Defendants' mission is, in fact, to protect federal property. "When faced with two possible explanations," a plaintiff must offer "facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013).

The Cities have offered no such facts here. *See generally* Compl. ¶¶ 113-27. The Cities allege that, on July 11, 2020, one protestor was struck by an impact munition; that sometime after July 14, 2020, an unidentified individual was detained "more than two blocks from the courthouse"; and that on July 22, 2020, federal agents fired tear gas into a crowd that included Portland Mayor Wheeler. Compl. ¶¶ 121, 122, 125. The first incident hardly evidences a

21

violation of § 1315, as the most plausible explanation—especially since the Cities offer no

details about the incident—is that the protestor was struck by lawfully employed munitions in

defense of the U.S. courthouse.[11] The second incident presumably refers to Mr. Mark Pettibone,

who was detained, taken to a holding cell, Mirandized, and released. Because DHS agents are

authorized by § 1315 to investigate off federal property, and to make arrests there, nothing about

the Pettibone incident—again, especially absent any details—suggests a violation of § 1315.

Even if it did, the Court should "decline to infer from alleged instances of misconduct on the part

of particular agents an unwritten policy of the [agency] to suppress disfavored expression, and

then to attribute that supposed policy to all field level operatives." *Wood v. Moss*, 572 U.S. 744,

763-64 (2014) (Ginsburg, J., for a unanimous Court); *cf. Martin v. Malhoyt*, 830 F.2d 237, 255

(D.C. Cir. 1987) ("One instance, however egregious, does not a pattern or practice make.").

The incident involving Mayor Wheeler, in particular, bears further discussion. The Cities

insinuate, by noting Mayor Wheeler's presence in the crowd, that "tear gas" was employed for

some political or retaliatory purpose—and thus not to protect federal property. *See* Compl. ¶ 125.

---

[11] Portland's own account of that evening confirms that "a group of people" had "focused most of its attention on the Mark O. Hatfield U.S. Courthouse and the federal officers inside," for "five or more hours," and that in response, "federal officers deployed munitions and CS gas, utilized an LRAD[,] and made arrests." PPB, *Portland Police Arrested One Person During Evening Demonstration Downtown* (July 12, 2020), *available at* https://www.portlandoregon.gov/police/news/read.cfm?id=250980. The Court may take judicial notice of this and other public records, prepared by one of the plaintiff Cities here. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("[A] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." (quoting *Lee v. Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001))).

To the extent that the Court finds any of the documents cited by Defendants unable to be considered in this posture, Defendants ask that the Court exclude those documents so that this motion is not converted into one for summary judgment. *See id.* at 998 ("When 'matters outside the pleading are presented to *and not excluded by the court*,' the 12(b)(6) motion converts into a motion for summary judgment under Rule 56." (emphasis added) (quoting Fed. R. Civ. P. 12(d))).

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

That allegation is simply not plausible. As Portland's own account of July 22, 2020, confirms, Mayor Wheeler addressed the crowd from approximately 9:15 to 10:30 p.m. *See* PPB, *Attacks and Unrest Continues Outside Federal Courthouse* (July 23, 2020).[12] Then Mayor Wheeler walked to the U.S. courthouse and stood at the fence protecting it, whereupon the following happened:

> Soon after Mayor Wheeler finished addressing the crowd, people in the group began throwing flares and other incendiaries over the fence that protects the west side of the Federal Courthouse. Over the next 45 minutes, people continued to throw flammable material as well as incendiary devices over the fence, eventually starting a large fire. Other people breached the fence while others kicked and shook the fence. Federal Police Officers exited the building and began to disperse the crowd.

> Around 12:24 a.m., a large animated group remained at the fence surrounding the Federal Courthouse. One individual in the crowd disregarded the fence and encroached through the portico to a door of the Federal Courthouse where they threw an item into the building. The flaming item disappeared inside of the courthouse and Federal Officers exited and addressed the crowd.

> At 12:31 a.m., Portland Police declared a riot due to the violent conduct of the large group creating a grave risk of public alarm. Police issued public address announcements and told the group to leave the area, moving to the north and the west. The majority of the group did not leave.

> Over the next several hours, people continued to congregate near the fence outside of the Federal Courthouse. During this time, Molotov Cocktails were thrown at the federal building, along with hundreds of projectiles. There were multiple fires lit by the crowd in the area surrounding the courthouse to include the heavily wooded areas in the parks and trash receptacles on neighboring blocks. Multiple vandalisms occurred including fire hydrants which were opened wasting several hundred gallons of water into the street. At least one assault was reported.

> Over the next several hours, the group slowly dissipated.

---

[12] *Available at* https://www.portlandoregon.gov/police/news/read.cfm?id=251022. For the same reasons noted above, *supra* n. 12, the Court can consider this exhibit even on Defendants' Rule 12(b)(6) motion.

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

*Id.* at 1-2. This account, posted publicly by Plaintiff Portland, dispels any notion that the use of chemical agents on July 22, 2020, was somehow unrelated to protecting federal property.[13] The U.S. courthouse was subject that night—after Mayor Wheeler's address, and shortly after he positioned himself at the surrounding fence—to physical assault, fires, Molotov cocktails, and "hundreds of projectiles." *Id.* at 2. Portland itself declared a riot that night. *Id.* The Cities have not plausibly alleged that any incidental exposure of the mayor to chemical agents, in response to this violent and protracted siege of federal property, evidences any § 1315 violation.

The Cities' broader allegations do not raise a plausible inference that Defendants are "taking over" any city, let alone the Cities here. *See generally* Compl. ¶¶ 100-08. The Cities allege that, in implementing Executive Order 13933, *see* Compl. ¶ 100, Defendants took several steps evidencing a violation of 40 U.S.C. § 1315, and an intent to quell protests instead of protecting federal property. But the "purpose" section of that Order affirms that "[i]ndividuals and organizations have the right to peacefully advocate for either the removal or the construction of any monument," and likewise affirms that "no individual or group has the right to damage, deface, or remove any monument by use of force." 85 Fed. Reg. at 40,081. Neither of those propositions is controversial, and neither reflects a change from the "prior status quo." Compl. ¶¶ 67-83. More importantly, the actual "policy" promulgated is "to prosecute to the fullest extent *permitted under Federal law, and as appropriate*," persons who destroy or vandalize monuments, memorials, statues, or religious property. *Id.* at 40,082 (emphasis added). And the federal policy is further to "withhold Federal support" to State and local governments if they fail to protect such properties, which only illustrates consciousness of the federalism constraints on

---

[13] It also seriously impugns the Cities' repeated suggestions, based on inapt statistics, that the protests have been peaceful, and that Defendants have therefore overreacted. *E.g.*, Compl. ¶ 93.

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

what the federal government can do in this area. Nothing in this Order suggests a policy of quelling peaceful protests or protecting federal property beyond the limits of § 1315.

The Cities also infer a violation of § 1315 from the formation of the Protecting American Communities Task Force ("PACT"). *See* Compl. ¶ 105. But "conducting ongoing assessments of potential civil unrest or destruction," and "allocating resources to protect people and property," DHS, *DHS Announces New Task Force to Protect American Monuments, Memorials, and Statues* (July 1, 2020),[14] (alterations omitted), are a far cry from any unlawful or unconstitutional action.[15]

The Cities cite a DHS memorandum allegedly leaked to the media. *See* Compl. ¶ 107-08. But while the Cities do not attach a copy of that memorandum, media outlets that claim to have assessed the memorandum describe it as authorizing three "appropriate missions" for monitoring protest activity: "(1) Threats to damage or destroy any public monument, memorial, or statue (MMS); (2) Threats of violence to law enforcement personnel, facilities, or resources; and (3) Threats to damage, destroy, or impede the functioning of other government facilities." Vladeck & Wittes, *DHS Authorizes Domestic Surveillance to Protect Statues and Monuments* (July 20, 2020).[16] Even assuming *arguendo* that this is an accurate reading of the alleged (but

---

[14] *Available at* https://www.dhs.gov/news/2020/07/01/dhs-announces-new-task-force-protect-american-monuments-memorials-and-statues. Because the Cities expressly cite the July 1, 2020 article in their Complaint, Compl. ¶ 105, the Court may consider it on this motion. *Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1162–63 (9th Cir. 2019) ("[T]he incorporation by reference doctrine . . . permits a court to consider a document 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'") (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

[15] Nor do all federal agents' authority in Portland necessarily depend on § 1315. The PACT comprises several federal law-enforcement agencies, each of which has organic statutes providing justifications, arrest authority, etc.

[16] *Available at* https://www.lawfareblog.com/dhs-authorizes-domestic-surveillance-protect-statues-and-monuments.

25

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

unauthenticated) memorandum, these "missions" do not exceed constitutional or statutory limits.[17] And the first mission, in particular, allegedly prohibits surveillance "for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other Constitutional or legal rights, or for the purpose of suppressing or burdening criticism or dissent." *Id.* Thus, far from suggesting the sort of illicit purpose that the Cities posit, this alleged memorandum *specifically prohibits* such purposes.[18]

The Cities compare Portland to other cities that have seen protests in recent months, asking the Court to infer that Defendants' response to Portland betrays an ulterior motive other than protecting federal property. *See* Compl. ¶¶ 76-78, 79-81, 82. But the Cities do not allege any attack on federal property in those cities, commensurate with the weeks of such attacks in Portland, that would have justified a response under § 1315. Indeed, the protests in all three other cities were on *state* property. *See* Compl. ¶¶ 76 ("Michigan State Capitol in Lansing"), 79 ("California State Capitol in Sacramento"); 82 ("State Capitol in Salem, Oregon"). That any of these capitols are listed on the National Register of Historic Places, or are National Historic Landmarks, *id.* ¶¶ 77, 80, does not transform them into property that is "owned, occupied, or secured by the Federal Government," within the meaning of 40 U.S.C. § 1315(a). Therefore, that

---

[17] The Court should note, also, that the alleged document concerns only DHS and enforcement of 40 U.S.C. § 1315. Plaintiffs do not allege that the document says anything about USMS and enforcement of 28 U.S.C. § 566(i).

[18] Opposite "the Policy" supposed by the Cities, the Court can take judicial notice of the policies that Defendants *actually have. See, e.g.*, DHS, *Information Regarding First Amendment Protected Activities* (May 17, 2019), https://www.dhs.gov/publication/memo-information-regarding-first-amendment-protected-activities; DHS, *Department Policy on the Use of Force* (Sept. 7, 2018), https://www.dhs.gov/publication/law-enforcement. These policies directly refute the Cities' suggestions of a "policy" of engaging in unlawful activity.

26
DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

statute would not have justified any designation of additional DHS employees in response.[19] Because Lansing, Sacramento, and Salem are inapposite comparators, Defendants' alleged inaction in response to protests there does not evidence any violation of § 1315.

Finally, the Cities' other contrary-to-law claim—that Defendants are taking over Portland rights-of-way for the purposes of securing federal property, without the express consent of the City—can likewise be dismissed. First, there is only one "right of way" allegedly infringed on: a *one block* stretch of bike lane immediately adjacent to the Hatfield Federal Courthouse. Second, the Parties dispute, and have been corresponding separately on, the question of whether Defendants are in fact impinging any right of way. Third, § 1315 expressly authorizes federal agents to operate off federal property for the purpose of protecting it. Even taking the Cities' allegations as true, temporarily blocking a right of way in response to weeks of unmitigated violence directed at the federal property hardly suggests a § 1315 violation.

### B.    "The Policy" is not Arbitrary and Capricious (Count 2).

In Count 2, the Cities claim that "the Policy" is arbitrary and capricious, and thus violative of the APA, for two reasons. Compl. ¶¶ 239-46. First, they allege that Defendants' justification for the policy is pretextual: while invoking "federal property protection," Defendants are in fact perpetrating a "takeover" of city police forces and powers. *Id.* ¶ 242. Second, the Cities allege that Defendants failed to consider the "destructive impacts on local government" or the "harms that have and will flow to Plaintiffs." *Id.* ¶ 245.

The Cities have not plausibly alleged that Defendants' justifications are pretextual. *See generally* Compl. ¶¶ 128-42. First, the Cities cite "anonymous statements" from "White House

---

[19] And because those sites are not federal property, Defendants would not have had cause to investigate or prosecute any crime(s) against federal property during those protests. EO 13933 only directs prosecution of perpetrators "to the fullest extent permitted under Federal law." 85 Fed. Reg. at 40,082.

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

Officials." Compl. ¶ 128. That merits no response, as it does not even put Defendants on notice of what alleged statements they must defend against. *See Pickern v. Pier 1 Imports*, 457 F.3d 963, 968 (9th Cir.2006) ("Rule 8's liberal notice pleading standard . . . requires that the allegations in the complaint 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" (citation omitted)). Second, the Cities cite U.S. Crisis Monitor statistics, Compl. ¶ 130; crime rates, *id.* ¶ 131; and a "comprehensive review by the Armed Conflict Location and Event Data ("ACLED") project," *id.* ¶ 132 (claiming that 93% of protests have been peaceful). Presumably, this is meant to show that there was no need to deploy additional federal agents to protect federal property. But Portland's own data tell a different story. *See generally* PPB, *Protests in Portland: A Timeline*.[20] In the months of June, July, and August, there were only *nine* days that did not see fires set, projectiles thrown, vandalism, fireworks/mortars used, or a riot declared at one of the Portland protests. *Id.* More than half of the days in July saw such violence at the U.S. courthouse, specifically. *Id.* And by PPB's count, 821 people were arrested during the Portland protests from June to September—an average of 6.7 per day. The Court can easily dispense with the Cities' suggestion that there was no *non-pretextual* reason to dispatch additional DHS employees to Portland.

Unable to allege hard evidence of pretext, the Cities revert to various informal statements, many of which have been addressed above, and none of which demonstrates pretext. Compl. ¶¶ 133, 134. The Cities then reach further still, citing their own declination of Defendant Wolf's "offer" of help and subsequent statements of disinterest with working alongside federal agents. Compl. ¶¶ 136-41. But the Cities' self-serving statements shed no light on Defendants'

---

[20] *Available at* https://www.portlandoregon.gov/police/article/765145. This is a public, governmental record published by one of the plaintiff Cities here, of which the Court can take judicial notice. *Khoja*, 899 F.3d at 999.

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

reasons for augmenting the federal presence in Portland, and thus do not support any claim of pretext.

Nor can the Cities plausibly allege that Defendants violated the APA by failing to consider important problems and explain their rationale. "The Supreme Court has established that the Administrative Procedure Act does not itself require an agency to explain the basis for its decision, unless an adjudication required to be made on the record or a formal rulemaking is involved." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1337 (Fed. Cir. 2001) (citing *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655-56 (1990); *Camp v. Pitts*, 411 U.S. 138, 142 n. 3 (1973)).

### C.    Defendants Have Not Commandeered the Portland Police Bureau (Count 6).

In Count 6, Portland claims that USMS, which falls under the purview of Defendants Barr and DOJ, violated the Tenth Amendment by refusing to "honor" Portland's request to cancel the deputation of its officers as Deputy U.S. Marshals. Compl. ¶¶ 256-63.

"The Constitution limited but did not abolish the sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.'" *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018) (citing *The Federalist No. 39* at 245 (C. Rossiter ed. 1961)). To prove federal trespass upon that sovereignty, a state or its subdivision may show (1) that the federal government has required the state or subdivision to enact certain regulations, instead of regulating the people directly, *New York v. United States*, 505 U.S. 144, 178 (1992); (2) that the federal government has commanded state or local officers "to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997); or (3) that the federal government has prohibited the state or subdivision from enacting certain regulations, *Murphy*, 138 S. Ct. at 1478.

None of that is alleged here. Portland's claim rests on a single incident of deputation, stemming from a September 26, 2020, rally by the "Proud Boys." *See* Compl. ¶¶ 167-85. In

29

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

anticipation of the rally, Oregon's Governor declared a state of emergency and issued an executive order "for the purpose of implementing a coordinated law enforcement response." *Id.* ¶ 170. The Governor also assumed control of PPB and other local law enforcement. *Id.* The superintendent of the Oregon State Police, who had been appointed incident commander, authorized federal deputation of 56 local police officers. *Id.* ¶ 173. The Cities allege that, after the Governor's executive order expired on September 27, 2020, "the federal deputation was in fact no longer needed." *Id.* ¶ 175.[21] Nevertheless, the U.S. Attorney and U.S. Marshal refused to cancel the deputation. *Id.* ¶¶ 179-80.

These allegations, even taken as true, do not amount to any "take-over" or "commandeering" of Portland's police bureau. The impetus for the deputation was *Oregon's* desire for federal and State coordination. The deputation was ordered and approved by *Oregon's* State Police, who were at that time in charge of PPB.[22] Thus, the Cities' allegations are entirely consistent with what they describe as the "existing framework for local law enforcement mutual aid or cross designation." Compl. ¶¶ 84-91.

The fact that federal officials would not formally "cancel" the deputation is insufficient to make out a commandeering claim. Deputized local officers are not conscripts; deputation is mutual and voluntary. The most common purpose of these deputations is to allow local law enforcement to serve on joint task forces—fighting organized crime, terrorism, etc.—and to enforce federal laws while doing so. The deputations thus expand, not contract, the authority of local officers. And as Portland's own allegations demonstrate, deputized officers are not subject

---

[21] The Cities may be correct that Oregon's state of emergency expired on September 27, 2020, but the federal deputation—to which Oregon assented—expressly continues through December 31, 2020.

[22] As Portland acknowledges, its police power derives from the State of Oregon. Compl. ¶ 260.

30

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

to the operational control of the U.S. Marshals. *See* Compl. ¶ 182 ("On October 2, 2020, Mayor Wheeler, as Police Commissioner, directed PPB officers to take no further action of any kind pursuant to the federal deputation, including the enforcement of any federal law.").[23] There is no allegation that any Defendants has commanded, or even tried to command, PPB to take any action in service of federal objectives since Mayor Wheeler ordered them not to.

Instead of alleging that its officers are actually under federal control, Portland merely argues that it "remains concerned about public confusion over the chain of command" and fears "that [its] officers *could* be ordered to respond to a federal chain of command." Compl. ¶ 183. But this subjective (and unwarranted) fear does not effect a Tenth Amendment violation. *Cf. Murphy*, 138 S. Ct. at 1475-79 (surveying anti-commandeering principles and caselaw). Count 6 should be dismissed.

Finally, as Portland knows, the special deputation is set by its terms to expire on December 31, 2020, which will moot any claim that might otherwise have been viable. Once the deputation expires, Defendants may move specifically to dismiss this claim as moot, depending on Portland's response to this motion, which is presently due after December 31, 2020.

### D. Because Mr. Wolf served lawfully as Acting Secretary under the HSA, Plaintiffs' claims (Counts 3–5) challenging his service fail as a matter of law.

Plaintiffs claim that, "because Mr. Wolf has not been authorized to serve as Acting Secretary under the [Federal Vacancies Reform Act ("FVRA")] or the [Homeland Security Act ("HSA")]," "any action he took to contribute to, direct, revise, promulgate, enact, or enforce the

---

[23] As Portland itself recited in a subsequent city resolution, once the executive order was terminated, "local law enforcement returned to the normal local chain of command by the City of Portland." *See* Portland City Council Resolution No. 37513, *Establish rules and limitations on Portland Police Bureau members subject to deputization by federal law enforcement agencies*, *available at* https://efiles.portlandoregon.gov/Record/14016312/. This is a public, governmental document, published by Plaintiff Portland, and the Court can therefore consider it.

31

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

Policy" is "unlawful" and must be "set aside" under the FVRA and the APA. Compl. 41–42, 44. If the Court reaches the merits of these claims, they fail for two reasons: (1) Mr. Wolf has served lawfully as Acting Secretary under the HSA; and (2) even if his acting service was improper when he took the specific actions challenged by Plaintiffs, these actions have since been ratified by the lawfully serving Acting Secretary, thus curing any service-related defects.

### 1. Mr. Wolf has served lawfully as Acting Secretary since November 2019 under an order of succession designated pursuant to the HSA.

Although the FVRA is generally the "exclusive means for temporarily authorizing an acting officer to perform the functions and duties" of a Senate-confirmed office, it also preserves the authority of other statutory provisions that "expressly" designate or permit "the head of an Executive department[] to designate" an acting officer. *See* 5 U.S.C. § 3347(a). The HSA is one such statute. Under the HSA, if neither the Secretary nor Deputy Secretary is available to exercise the duties of the Secretary's office due to "absence, disability, or vacancy in the office," then the Under Secretary of Management serves as Acting Secretary. 6 U.S.C. § 113(g)(1). The HSA also permits the Secretary to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* § 113(g)(2). These provisions operate "[n]otwithstanding" the FVRA. *Id.*

On April 9, 2019, then-Secretary of Homeland Security Kirstjen Nielsen exercised her authority under § 113(g)(2) by designating a new order of succession for the Office of the Secretary. *See* Decl. of Juliana Blackwell ("Blackwell Decl.") ¶ 2, Ex. 1, Designation of an Order of Succession for the Secretary (Apr. 9, 2019) ("April 2019 Order"). The April 2019 Order was unequivocal in this regard, stating *five* times that it was designating an "order of succession" and *thrice* invoking § 113(g)(2). *See id.* It was also unqualified—the new order of succession would apply to all vacancies in the Office of the Secretary, regardless of whether the vacancy was created

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE,
TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

by a Secretary's resignation or otherwise. *See id.* The April 2019 Order directed the new order of succession to be placed in Annex A of DHS Delegation No. 00106 ("Delegation 00106"), *see id.*, an administrative document that is periodically revised to collect the orders of succession and delegations of authority for certain positions in DHS.

The April 2019 Order was the first order of succession ever designated under § 113(g)(2). Previously, the order of succession for the Office of the Secretary had been governed by Executive Order ("E.O.") 13753, issued by the President pursuant to his authority under the FVRA. Executive Order 13753, *Amending the Order of Succession in the Department of Homeland Security*, 81 Fed. Reg. 90667 (Dec. 9, 2016). But because an order of succession designated under § 113(g)(2) operates "[n]otwithstanding" the FVRA, *see* 6 U.S.C. § 113(g)(2), when Ms. Nielsen signed the April 2019 Order, it superseded E.O. 13753 as a matter of law.

Thus, when Ms. Nielsen resigned on April 10, 2019, Kevin McAleenan—Commissioner of U.S. Customs and Border Protection and the senior-most official under the April 2019 Order—became Acting Secretary. *See* April 2019 Order at 2; *see also* Decl. of Neal J. Swartz ("Swartz Decl.") ¶ 2, Ex. 1, Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Apr. 16, 2018); *id.* ¶ 3, Ex. 2, Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Apr. 11, 2019). In November 2019, Mr. McAleenan designated a new order of succession under § 113(g)(2). Blackwell Decl. ¶ 4, Ex. 3, Amendment to the Order of Succession for the Secretary (Nov. 9, 2019). When Mr. McAleenan resigned later that month, the senior-most official under that order of succession was Mr. Wolf—the Under Secretary for Strategy, Policy and Plans—who then became Acting Secretary, a position in which he has served lawfully ever since. *Id.*

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

Plaintiffs offer little support for their claim that Mr. Wolf's acting service has been improper, relying exclusively on a few general legal conclusions drawn from decisions of the Government Accountability Office ("GAO") and two district courts. *See* Compl. 27–29 (citing *In re Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650 (GAO Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf (last visited Dec. 18, 2020) ("GAO Decision"); *Casa de Md. v. Trump*, No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020); *Immigrant Legal Res. Ctr. v. Wolf* (*ILRC*), No. 20-CV-05883-JSW, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020)). Collectively, these decisions found that Mr. McAleenan had unlawfully assumed the position of Acting Secretary—and thus had no authority to designate the order of succession under which Mr. Wolf has served—because E.O. 13753 (which did not call for Mr. McAleenan to become Acting Secretary) continued to govern the order of succession at the time of Ms. Nielsen's resignation. *See* GAO Decision at 6–11; *Casa de Md.*, 2020 WL 5500165, at *20–23; *ILRC*, 2020 WL 5798269, at *7–8. But these decisions did so not by disputing Ms. Nielsen's authority under § 113(g)(2), but by insisting that the April 2019 Order did not do what it repeatedly said it was doing: designating an unqualified order of succession under § 113(g)(2). Instead, they concluded that the April 2019 Order was far more limited in scope, merely amending Annex A of Delegation 00106 to provide the order for delegating the Secretary's authority when the Secretary is "unavailable to act during a disaster or catastrophic emergency." *See* GAO Decision at 6–7; *Casa de Md.*, 2020 WL 5500165, at *21–23; *ILRC*, 2020 WL 5798269, at *7–8.

These decisions are flawed in at least two critical respects. *First*, their reading of the April 2019 Order misunderstands the history and structure of Delegation 00106. In December 2016, then-Secretary Jeh Johnson signed Revision 8 of Delegation 00106, which he divided into two

34

relevant sections, each addressing a *different* type of order. *See* Blackwell Decl. ¶ 5, Ex. 4, DHS Orders of Succession and Delegations of Authorities for Named Positions, DHS Delegation No. 00106, Revision No. 08 (Dec. 15, 2016) ("Revision 8"). Section II.A addressed the *order of succession* for the Office of the Secretary: a list of officials who would become Acting Secretary in the event of a vacancy. *See id.* at 1. The Secretary did not then have the authority to designate his or her own order of succession (Congress did not enact § 113(g)(2) until *after* Mr. Johnson signed Revision 8 of Delegation 00106, and this authority had not been exercised until Ms. Nielsen signed the April 2019 Order). *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903, 130 Stat. 2000 (2016) (codified at 6 U.S.C. § 113(g) (Dec. 23, 2016)). Thus, § II.A simply acknowledged that the President had designated the order of succession in E.O. 13753 under the FVRA, and it would be triggered by a Secretary's "death, resignation, or inability to perform the functions of the Office."[24] *See* Revision 8 at 1. Section II.B, on the other hand, was Mr. Johnson's own order *delegating the authority* of the Secretary under § 112(b)(1): an order issued by the Secretary that permits subordinate officials to exercise certain powers of the Secretary, though these officials do not become Acting Secretary and no vacancy in the Office of the Secretary need exist. *See id.* Section II.B placed Mr. Johnson's order delegating the Secretary's authority in Annex A of Delegation 00106, and limited its application to instances when the Secretary was "unavailable to act during a disaster or catastrophic emergency." *Id.*

The decisions cited by Plaintiffs uniformly failed to appreciate the distinction between orders of succession and delegations of authority, a failure that underpins their misreading of the April 2019 Order. In their view, §§ II.A and II.B of Delegation 00106 "[e]ach [provided] its own *order of succession*" for "assuming the position of Acting Secretary" that applied in different

---

[24] The events triggering acting service under Revision 8 of Delegation 00106 are identical to those provided in the FVRA. *See* 5 U.S.C. § 3345(a).

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

circumstances. GAO Decision at 5 (emphasis added); *accord Casa de Md.*, 2020 WL 5500165, at *20; *ILRC*, 2020 WL 5798269, at *8. By reading Delegation 00106 this way, each decision maintains that the April 2019 Order merely amended Annex A only as it had operated previously under § II.B (i.e., when the Secretary was "unavailable to act during a disaster or catastrophic emergency"), while also making sense of the April 2019 Order's repeated references to the "order of succession" it was designating under § 113(g)(2). But as explained above, that understanding is patently incorrect because § II.B has *never* been an order of succession. If the April 2019 Order were read to have merely amended the order for delegating the Secretary's authority under § 112(b)(1), the April 2019 Order's repeated references to the "order of succession" it was designating under "§ 113(g)(2)" would be rendered utterly meaningless. *See* April 2019 Order at 1–2. And because the decisions relied on by Plaintiffs failed to understand the difference between orders of succession and delegations of authority, they did not even attempt to explain: (1) why Ms. Nielsen would repeatedly invoke her authority under § 113(g)(2) if she was merely exercising her power to amend § II.B's delegation of authority under § 112(b)(1); or (2) why the April 2019 Order says nothing of the Secretary's power to delegate authority under § 112(b)(1) or the limiting circumstances under which Annex A had applied previously in § II.B of Delegation 00106.

Thus, to give full effect to the *entire* text of the April 2019 Order, it should be read to have designated an order of succession under § 113(g)(2) that would govern all vacancies in the Office of the Secretary, for this is exactly what the order says. *See id.* at 1. And because this was the first time the Secretary exercised her authority under § 113(g)(2), it is unremarkable that the April 2019 Order amended Annex A to serve thereafter both as the order of succession under § 113(g)(2) *and* its original function as the order for delegating the Secretary's authority under § 112(b)(1) when the Secretary is "unavailable to act during a disaster or catastrophic emergency." *See id.*

36

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

*Second*, the decisions cited by Plaintiffs relied on Revision 8.5 to Delegation 00106—which Ms. Nielsen never signed or otherwise issued—to determine the governing order of succession. *See* GAO Decision at 9; *Casa de Md.*, 2020 WL 5500165, at *22; *ILRC*, 2020 WL 5798269, at *8. Again, Delegation 00106 is an administrative document periodically revised to collect the orders of succession and delegations of authority for certain positions in DHS. Revision 8.5 of Delegation 00106—intended to reflect the April 2019 Order—mistakenly left § II.A unchanged, retaining an outdated reference to E.O. 13753. *See* Blackwell Decl. ¶ 3, Ex. 2, DHS Orders of Succession and Delegations of Authorities for Named Positions, DHS Delegation No. 00106, Revision No. 08.5 (April 10, 2019). But this administrative error in Revision 8.5 of Delegation 00106 is irrelevant in determining the governing order of succession at the time of Ms. Nielsen's resignation. As Secretary, Ms. Nielsen was the only person in DHS who could designate an order of succession for the Office of the Secretary. *See* 6 U.S.C. § 113(g)(2). Therefore, the April 2019 Order became the governing order of succession as soon as she affixed her signature, and an unsigned administrative document cannot override her signed order. *Cf. Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 195 (4th Cir. 2013) (finding an agency's "formal approval" of a project was the final agency action, not the agency's "subsequent activities in carrying it out"). By hanging their analyses on the wrong document, it is unsurprising that the decisions relied on by Plaintiffs come to the wrong conclusion regarding the legality of Mr. Wolf's acting service.

At bottom, the plain text of the April 2019 Order resolves this issue: "By the authority vested in me as Secretary of Homeland Security, including the [HSA], 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows . . . ." When read in light of the context in which it was issued, the April 2019 Order unequivocally designated an order of succession under § 113(g)(2) for all vacancies in the Office of the Secretary

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

that superseded E.O. 13753 as a matter of law. Therefore, under the April 2019 Order, Mr.

McAleenan (and Mr. Wolf, in turn) served lawfully as Acting Secretary. Accordingly, Plaintiffs'

claims challenging Mr. Wolf's acting service cannot be sustained.[25]

> ### 2.   Even if Mr. Wolf's acting service was improper when he performed the challenged actions, the actions have been ratified by the lawfully serving Acting Secretary, curing any service-related defects.

Even were the Court to conclude that Mr. Wolf was not authorized to begin serving as

Acting Secretary in November 2019, Plaintiffs' challenge to his acting service still fails.

Plaintiffs' claims rely on the theory that the April 2019 Order never designated an order of

succession for vacancies in the Office of the Secretary, and thus E.O. 13753 (issued under the

FVRA) continued to govern in such instances. If that were true, then when the President

submitted Mr. Wolf's nomination for Secretary of Homeland Security to the Senate on

September 10, 2020, the FVRA permitted an Acting Secretary to serve for the duration of the

pending nomination (even though the FVRA's initial 210-day time limit had lapsed). *See* 5

U.S.C. § 3346(a)(2). On that date, the senior-most successor under E.O. 13753 was Peter

Gaynor, Administrator of the Federal Emergency Management Agency, who would have thus

become Acting Secretary under the FVRA on submission of Mr. Wolf's nomination. *See* Order

Designating the Order of Succession for the Secretary of Homeland Security (Nov. 14, 2020),

https://www.dhs.gov/sites/default/files/publications/20_1114_gaynor-order.pdf (last visited Dec.

9, 2020).

---

[25] Because Mr. McAleenan and Mr. Wolf both served as Acting Secretary pursuant to the HSA, the FVRA and its initial 210-day time limit is inapplicable to their acting service. The FVRA's 210-day time limit applies only to a "person serving as an acting officer as described under section 3345"—i.e., a person serving under the FVRA. *See* 5 U.S.C. § 3346(a)(1). Plaintiffs agree, alleging that the FVRA's 210-day time limit would have prohibited an Acting Secretary from serving "*under the FVRA*" after November 6, 2019. *See* Compl. 28. Plaintiffs do not claim that acting service under the HSA is similarly limited by § 3346(a)(1).

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

Recognizing that ongoing challenges to Mr. Wolf's acting service risked "an unnecessary distraction to the mission of [DHS]," Mr. Gaynor, "out of an abundance of caution" and with "any authority" he might have had as Acting Secretary, designated a new order of succession for the Office of the Secretary under § 113(g)(2) on November 14, 2020. *Id.* Under that order of succession, the senior-most successor was Mr. Wolf—as the Senate-confirmed Under Secretary for Strategy, Policy, and Plans—who would have immediately become Acting Secretary pursuant to the HSA after Mr. Gaynor designated the new order of succession. *See id.*

In that capacity, Mr. Wolf "affirm[ed] and ratif[ied] any and all actions involving delegable duties that [he had] taken from November 13, 2019, through November 14, 2020," including the specific actions challenged here. Ratification of Department Actions, 85 Fed. Reg. 75223 (Nov. 16, 2020). Mr. Wolf's ratification of the challenged actions consequently cured any perceived service-related defects in those actions, resolving Plaintiffs' claims on the merits. *See Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1190–91 (9th Cir. 2016) (holding that the "subsequent valid appointment" of an officer, "coupled with [the officer's] ratification" of his prior actions issued under an invalid appointment, "cure[d] . . . any Appointments Clause deficiencies"); *accord Guedes v. ATF*, 920 F.3d 1, 13 (D.C. Cir. 2019).

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

1

## <u>CONCLUSION</u>

2   For the foregoing reasons, the Court should dismiss all claims and/or transfer venue to the

3 District of Oregon.

4

5 Dated: December 21, 2020       Respectfully submitted,

6

7                JEFFREY BOSSERT CLARK
                Acting Assistant Attorney General

8

9                DAVID L. ANDERSON
                United States Attorney

10               ALEXANDER K. HAAS
                Director, Federal Programs Branch

11

12               BRIGHAM J. BOWEN
                Assistant Branch Director

13

14               */s/ Jason C. Lynch*
                JASON C. LYNCH (D.C. Bar No. 1016319)

15               MICHAEL P. CLENDENEN (D.C. Bar
                 No. 1660991)

16               Trial Attorneys
                United States Department of Justice

17               Civil Division, Federal Programs Branch
                1100 L Street NW

18               Washington, DC 20530
                Tel: (202) 514-1359

19               Fax: (202) 616-8460
                Email: jason.lynch@usdoj.gov

20

21               *Attorneys for Defendants*

22

23

24

25

26

27              40

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE,
28 TO TRANSFER VENUE
Case No. 3:20-cv-7184-SK

1

2

3

4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

5

6

7

8

9

10

11

12

13

THE CITY OF PORTLAND AND THE CITY
OF OAKLAND,


                        Plaintiffs,


            v.

WILLIAM BARR, in his official capacity as
Attorney General, *et al.*,

                        Defendants.

Case No. 3:20-cv-7184-SK

**[PROPOSED] ORDER GRANTING
DEFENDANTS' CONSENT
MOTION FOR EXTENION OF
PAGE LIMITS**

Honorable Edward M. Chen

14

**[PROPOSED] ORDER**

15

16

17

18

19

20

21

22

            Having considered Defendants' Motion to Dismiss or, in the Alternative, to Transfer Venue, and

any opposition, reply, and oral argument presented, the Court finds it appropriate to dismiss the

Complaint (ECF No. 1). Plaintiffs lack standing to seek prospective equitable relief against Defendants

based on the allegations in the Complaint. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013);

*City of Los Angeles v. Lyons,* 461 U.S. 95, 105 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).

The claims are therefore dismissed with prejudice under Federal Rule of Civil Procedure 12(b)(1) for

lack of jurisdiction.

23

24

25

            Therefore, IT IS HEREBY ORDERED that this action is dismissed with prejudice.

            IT IS SO ORDERED.

26

27

_____
EDWARD M. CHEN
U.S. District Judge

28

DEFS.' NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO
TRANSFER VENUE
Case No. 3:20-cv-7184-SK