OFFICE OF THE CITY ATTORNEY
CITY OF PORTLAND
ROBERT TAYLOR, OR SBN 044287
Interim City Attorney
Admitted *Pro Hac Vice*
DENIS VANNIER, OR SBN 044406
Senior Deputy City Attorney
Admitted *Pro Hac Vice*
NAOMI SHEFFIELD, OR SBN 170601
Deputy City Attorney
Admitted *Pro Hac Vice*
1221 SW 4th Avenue, Suite 430
Portland, Oregon 97204
T: (503) 823-4047; F: (503) 823-3089
Email: robert.taylor@portlandoregon.gov
*Attorneys for Plaintiff City of Portland*

OFFICE OF THE CITY ATTORNEY
CITY OF OAKLAND
BARBARA J. PARKER, CA SBN 069722
City Attorney
MARIA BEE, CA SBN 167716
Chief Assistant City Attorney
ZOE M. SAVITSKY, CA SBN 281616
Supervising Deputy City Attorney
MALIA MCPHERSON, CA SBN 313918
Deputy City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
T: (510) 238-3601; F: (510) 238-6500
Email: zsavitsky@oaklandcityattorney.org
*Attorneys for Plaintiff City of Oakland*

JILL HABIG, President, CA SBN 268770
JONATHAN B. MILLER, Legal Director, MA SBN 663012
Admitted *Pro Hac Vice*
LIJIA GONG, Counsel, CA SBN 294268
4096 Piedmont Avenue #149
Oakland, California 94611
T: (301) 335-3828
Email: lijia@publicrightsproject.org
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CITY OF PORTLAND AND THE CITY OF OAKLAND,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT M. WILKINSON, in his official capacity as Acting United States Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; DAVID P. PEKOSKE, in his official capacity as Acting Secretary of Homeland Security; and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Civil Action No. 3:20-cv-7184<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**[Administrative Procedure Act Case]**<br><br>Action filed:   October 14, 2020<br><br>Assigned to the Honorable Edward M. Chen |

**INTRODUCTION**

1.      This lawsuit challenges the unlawful and unconstitutional overreach of federal law enforcement in response to and in anticipation of protests for racial justice in progressive United States cities. In particular, the lawsuit challenges the federal government's new policy authorizing the expanded and unbounded jurisdiction of federal law enforcement under the guise of protecting federal property, and the federal government's related and unconstitutional practice of commandeering local law enforcement officers for similar ends.

2.      Plaintiffs are the cities of Portland, Oregon, and Oakland, California—cities that, like others across the United States, have primary responsibility for the health, safety, and welfare of their residents, including the protection and oversight of general public safety during protests. Plaintiffs have police departments, fire departments, and other local governmental departments whose purposes and responsibilities are to reduce and address violence and/or support public safety in their communities. In conducting these important functions, Plaintiffs aim to respect, honor, and protect the First Amendment rights, among other rights, of their residents and visitors, so that those residents and visitors can demonstrate, march, and protest. Plaintiffs also have obligations under local and state law to respond, as necessary, to threats of violence and community harm. Outside of the exceptional actions taken by Defendants as described in this First Amended Complaint, Plaintiffs have long operated with this understanding of their duties and authority.

3.      Defendants are the United States Department of Justice ("DOJ"), the United States Department of Homeland Security ("DHS"), and the new acting leaders of both departments. In response to directives from President Donald J. Trump beginning in or around June 2020, Defendants unilaterally, unlawfully, and unconstitutionally began developing a policy that authorized the deployment and operation of federal agents in U.S. cities under the pretext of protecting federal property but for the actual purpose of quelling protests with which President Trump disagreed (the "Policy").

4.      The full scope and parameters of the Policy authorizing these actions are currently unknown, as no ordinary public process was followed in its creation.

5.      Upon information and belief, the Policy is a response to, incorporates, and/or is guided by, the June 26, 2020 Executive Order 13,933, *Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence* (the "Executive Order"), signed by President Trump following nationwide protests—quite possibly the largest social justice protests in our nation's history—against police brutality and systemic racism. The Executive Order prescribes a set of directives aimed at punishing and responding to "State and local governments" that had allegedly "lost the ability to distinguish between the lawful exercise of rights to free speech and assembly and unvarnished vandalism," or otherwise "failed to protect public monuments, memorials, and statues."

6.      Upon information and belief, following the issuance of the Executive Order, Defendants implemented the new Policy which authorizes the cross-designation of federal agents purportedly under 40 U.S.C. § 1315 to protect and defend *all* monuments, memorials, and statues, irrespective of their connection or proximity to federal property. Given the widespread existence of such objects in public places throughout U.S. cities, the Policy effectively creates blanket authorization for the deployment of a federal police presence in almost every corner of urban America.

7.      The Policy meaningfully and illegally expands the jurisdiction granted by statute. 40 U.S.C. § 1315 solely permits designation of DHS employees to protect federal property owned or leased by the General Services Administration ("GSA"), or to engage in activity off such GSA-owned or -leased property specifically in furtherance of their duty to protect that property.

8.      Upon information and belief, Defendants are now permitted to protect any monument, memorial, or statue, irrespective of whether they are owned or leased by the GSA or on land owned or leased by the GSA, and to engage in activity under the pretext of protecting such objects under the Policy.

9.      Federal law enforcement agents have, under the Policy, been deployed to U.S. cities, either secretly or with little warning, under at least three separate operations or programs: Operation Legend; Operation Diligent Valor, which includes the deployment of agents in Portland,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Oregon during the summer of 2020; and the Protecting American Communities Task Force ("PACT").

10.     Although Defendants and/or their agents or employees have publicly claimed that certain operations are for the purpose of protecting federal property under 40 U.S.C. § 1315, internal memoranda, internal email communications, internal policies, various public statements, and activities or failures to act in cities such as Portland and Washington, D.C. instead reveal a distinct and meaningful policy shift to use federal law enforcement to unilaterally step in or replace local law enforcement departments that do not subscribe to President Trump's view of domestic "law and order" and to quell viewpoints, speech, or protests with which President Trump disagrees. These interventions also are intended to pressure local officials and police departments to react more aggressively to stop or thwart racial justice protests.

11.     The animating intent of the Policy was to use property protection as the pretextual justification for viewpoint discrimination. Although Defendants have broad discretion about how they direct resources to protect approximately 9,000 GSA-owned or -leased properties, that discretion does not include general enforcement activity on state and local land or making enforcement decisions based on viewpoint. Yet that undergirds the Policy: animus toward certain political views, whether those views are expressed by protesters, municipal leaders, or municipalities themselves.

12.     In 2020, the Policy was implemented to suppress protests or other activities in progressive, Democratic-controlled cities where protestors expressed support for Black Lives Matter or other racial justice actions, causes that President Trump and his administration did not support, under the pretext of protecting federal property. The Policy was implemented either through direct intervention in, and deployment of federal law enforcement to, cities, such as Defendants did in Portland in July 2020, or via threats to do so in order to pressure state and local law enforcement to shut down or severely limit the extent of such protests as quickly as possible, including through the use of racially discriminatory tactics and excessive use of force. In this manner, the Policy has been the source of over-policing progressive cities and progressive viewpoints.

13.     Although the Policy is not public, there is considerable evidence of its existence. Among other things, reported non-public memos from DHS reveal that, under the Policy and in response to the Executive Order, federal law enforcement agents are authorized to engage in surveillance activities for threats to *any* public monument, memorial, or statue (whether under federal, state, or local control)—which in major cities like Plaintiff jurisdictions, could constitute surveillance within the *entire* jurisdiction regardless of federal interests or harms at stake.

14.     As detailed further below, in developing and implementing the Policy, DHS officials engaged in extensive communication regarding the Executive Order. Defendants also issued several new documents that incorporated or responded to the Executive Order and prepared to explain to members of Congress why they were now invoking 40 U.S.C. § 1315 to perform the activities under the Policy.

15.     In addition, DOJ and/or DHS have engaged in a variety of unauthorized activities under the Policy. Such activities in Portland have included surveilling the text messages of protesters and building a fence that blocks the right-of-way on City property and refusing to remove it upon request of City officials. DHS's inspector general also concluded recently that memoranda issued in June and July 2020 by the Director of the Federal Protective Services ("FPS"), a component of DHS, acted unlawfully by failing to identify specific officers and agents from other components of DHS as well as the U.S. Secret Service that were cross designated under 40 U.S.C. § 1315 to deploy under the Policy.

16.     Even after the significant deployment of federal agents into Portland as well as smaller operations in other U.S. cities, President Trump expressed an intent to expand or at least continue the Policy. President Trump stated: "We're going to have more federal law enforcement. That I can tell you."—while threatening to send federal agents into major cities "run by liberal Democrats." For instance, he said: "We're not going to let New York and Chicago, and Philadelphia and Detroit and Baltimore and all of these—Oakland is a mess. We're not going to let this happen in our country."

17.     These threats were not new. President Trump has long threatened American cities led by Democrats. But as recently as April 2020, Defendants did not purport to have, or act in

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

accordance with, the authority they now assert under the Policy. In April, numerous public monuments, memorials, and statues were under equal or greater threat from armed and uncivil protesters who opposed public health measures to control COVID-19. But those protesters expressed a different set of political views than the majority of those protesting after May 25, 2020 and before the events of January 6, 2021, and no policy was then in effect to allow or require the type of federal decisions and operations now occurring or allowed to occur under the Policy.

18.     Importantly, events in Washington, D.C., both in Lafayette Square Park on June 1, 2020 and around the U.S. Capitol on and around January 6, 2021, shed further light on the pretextual nature of the Policy's purported "federal property preservation" rationale.

19.     In June 2020, federal agents, including Defendants, used overwhelming force (including tear gas, batons, chemical irritants, projectiles, and flash grenades) to quell a largely peaceful protest supporting Black Lives Matter on or near federal property in Lafayette Square Park. On information and belief, those federal agents, including Defendants, did not have information or intelligence suggesting that there were significant, credible threats to federal property prior to these protests.

20.     In January 2021, federal agents, including Defendants, did not similarly respond to significant information (including internal intelligence assessments, reports, and official warnings) that extremists were traveling to Washington, D.C., the site of numerous federal properties under Defendants' protection per 40 U.S.C. § 1315 and home to innumerable federal monuments, memorials, and statues, to commit violence, attack federal properties and people within them, and engage in "war." Through their non-response, a riotous and insurrectionist mob comprised mostly of White people and supporting President Trump's dangerous election conspiracy theories was able to gather on and travel across federal properties and by many monuments, memorials, and statues unmolested; breach the Capitol; and pose a direct threat to a joint session of Congress.

21.     When these two situations are compared, it is clear that Defendants and other federal agencies and components did not respond based the level of threat to federal property or personnel, or the violence that occurred.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    22.    It is also clear that Defendants' Policy for responding to threats to and violence on

2    or around federal property cannot merely be the facially neutral standards of 40 U.S.C. § 1315.

3    Nor can Defendants' Policy be attributed merely to law enforcement discretion, as any ordinary

4    and constitutional exercise of such discretion would lead to a reasonably proportionate response

5    based on the level of threat to federal property. As this First Amended Complaint details here and

6    below, there is no consistently and reasonably discernable connection between threats to federal

7    property and Defendants' responses to those threats.

8    23.    Due to both its overreach and pretextual nature, the Policy threatens to upend the

9    current federalism structure and working relationships between local and federal law enforcement

10   agencies. Section 1315 has never before been interpreted to permit the actions taken by Defendants

11   under its auspices. Since June 2020, Plaintiffs have had and continue to have ongoing and

12   significant uncertainty about how and whether Defendants will respond to certain types of threats,

13   violence, or protests, depending on the viewpoint expressed by those issuing threats, committing

14   violence, or engaging in protest.

15   24.    Defendants have not and did not publicly rely on any of the limited authorities, as

16   described below, that would lawfully allow deployments of federal agents within the parameters

17   defined in such laws.

18   25.    The Policy is not merely a change in Defendants' interpretation of their own

19   enforcement authority. The Policy is based on a misunderstanding, misinterpretation, error, and/or

20   disregard for the scope of Defendants' legal authority.

21   26.    Defendants have sought to cloak this final agency action as being merely a series

22   of enforcement decisions. While the Policy relates to and influences enforcement choices, it is

23   nevertheless a Policy. It is a Policy that lacks transparent or non-invidious guidelines on the

24   deployment of federal personnel. It is a Policy that is in excess of the authority provided in the

25   statute used to justify federal deployments. And it does not establish a viewpoint-neutral standard

26   for when intervention by federal agents is appropriate. Instead, the Policy allows cross-designation

27   and deployment irrespective of the actual or understood threat posed to federal property and based

28   instead on impermissible viewpoint discrimination.

27.     Using the purported authority under the Policy or other, unknown authorities, Defendants have also instituted an unlawful practice in Portland of commandeering control of local law enforcement officers in direct contravention of the City's express revocation of consent, and for unknown or pretextual ends (the "Practice").

28.     Based on information and belief, the Practice is similarly in response to, incorporates, and/or is guided by, the Executive Order.

29.     In addition, no constitutional authority has been offered for the related Practice of commandeering Portland's law enforcement by refusing to release Portland law enforcement officers from their temporary deputation as federal agents, conscripting them without consent and against Portland's express wishes.

30.     This monumental policy change and new commandeering practice harms Plaintiffs' and other cities' abilities to safely govern and police in ways aligned with and responsive to community goals and racial equity reforms. As local governments, Plaintiffs have independent police forces; community relationships; and locally determined policing policies, practices, and procedures. Plaintiffs' police forces have always been able to expect when and how federal law enforcement agents could assert federal powers within their jurisdictions. The use of deployments and operations violating established constitutional parameters, politically motivated interventions, and lawless commandeering of local law enforcement are unconstitutional and unauthorized in part because of the havoc such actions impose on local jurisdictions and the innumerable ways in which these deployments run roughshod over the longstanding federalist balance of the general policing power.

31.     Plaintiffs are further harmed by the Policy and Practice because they threaten, intimidate, chill and/or discourage the exercise of constitutional or civil rights of their residents, leaders, and/or the jurisdictions themselves.

32.     The Policy and Practice also harm Plaintiffs to the extent they have and will continue to incite violence and make it more difficult for Plaintiffs to fulfill their core public safety missions.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

33.     Plaintiffs are additionally harmed by their increased costs, expenditures, and resources devoted to responding to actions taken by Defendants under the Policy and Practice.

34.     Harm to the Plaintiffs remains ongoing, because the Policy remains in place and leaves significant questions around and uncertainty about Defendants' response to protests, civil unrest, and potential violence depending on the viewpoint of the individuals and governments involved. As of January 20, 2021, one day before the filing of this Amended Complaint, Plaintiffs were actively monitoring, among other things, potential threats of violence by a variety of groups in and around the inauguration of President Joseph R. Biden and related threats across the nation.

35.     In fact, on January 20, 2021, ostensibly to protect the federally owned U.S. Immigration and Customs Enforcement ("ICE") facility in Portland, federal law enforcement officers declared an unlawful assembly with respect to hundreds of individuals gathered near, but largely not on, the federal property. Federal law enforcement used tear gas and other munitions to disperse the crowd for two blocks beyond the federal building.

36.     Plaintiffs therefore bring this action to enjoin Defendants' new Policy and new Practice, which are unconstitutional, arbitrary and capricious, in excess of Defendants' legal authority, and/or wholly pretextual.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; and other federal statutes.

38.     This Court has the authority to issue declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the APA, 5 U.S.C. § 706.

39.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States officers or agencies sued in their official capacities, a substantial part of the events or omissions giving rise to this action have occurred or will occur in this district, and one Plaintiff resides in this district.

//

//

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

**INTRADISTRICT ASSIGNMENT**

2        40.     Pursuant to the Northern District Civil Local Rule 3-2(c)-(d), the intradistrict

3    assignment should be to the Oakland or San Francisco Division because a substantial part of the

4    acts or omissions that give rise to this action are occurring in the County of Alameda.

5

**PARTIES**

6        41.     The CITY OF PORTLAND is a municipal corporation governed by charter, located

7    in the District of Oregon, and existing under the laws and constitution of the State of Oregon.

8    Portland is home to more than 650,000 residents, and the City's leadership has committed to

9    significant reforms to local policing and other policies, with an aim toward promoting racial

10   justice.

11       42.     The CITY of OAKLAND is a municipal corporation and charter city located in the

12   Northern District of California, organized and existing under and by virtue of the laws of the State

13   of California. The City of Oakland is home to over 420,000 people and consistently ranks as one

14   of the most ethnically and racially diverse major cities in the United States. Approximately 23%

15   of Oakland's residents identify as Black or African American, 26% as Hispanic or Latinx, 15% as

16   Asian or Asian-American, and 5.5% as multi-racial. The City's leadership is engaged in significant

17   reforms to local policing and other policies, with an aim toward promoting racial justice.

18       43.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this

19   action because the Policy and its implementation and the Practice harm Plaintiffs' independent and

20   constitutionally recognized economic, dignitary, and proprietary interests and will continue to

21   cause injury unless and until the Policy is vacated and Defendants' practices are permanently

22   enjoined.

23       44.     ROBERT M. WILKINSON is the Acting United States Attorney General. He is

24   sued in his official capacity.[1]

25

26   _____

[1] Per Federal Rule of Civil Procedure 25(d): "An action does not abate when a public officer who
27   is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is
pending. The officer's successor is automatically substituted as a party. Later proceedings should
28   be in the substituted party's name." As such, Acting United States Attorney General Robert M.
Wilkinson is automatically substituted for William Barr, and Acting Secretary of Homeland
Security David P. Pekoske is automatically substituted for Chad Wolf.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

45.     The UNITED STATES DEPARTMENT OF JUSTICE is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).

46.     DAVID P. PEKOSKE is the Acting Secretary of Homeland Security. He is sued in his official capacity.

47.     The UNITED STATES DEPARTMENT OF HOMELAND SECURITY is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f). Its stated missions involve anti-terrorism, border security, immigration and customs. It was created in 2002 by combining 22 different federal departments and agencies into a single Cabinet agency.

## FACTUAL ALLEGATIONS

### *Background*

48.     Adherence to the Constitution is the bedrock of American democracy. Regardless of any changes to the interpretation of the Constitution over time, certain structures endure.

49.     One such foundational structure is the separation of federal powers: the division of authority and responsibility that guides all legal action taken in the United States. Under the separation of powers, the Congress makes law, the Executive Branch implements that law, and the Judiciary assesses the legality of those laws and actions.

50.     Another foundational structure is federalism: the division or sharing of legal power between the national government and other government units, including states, counties, cities, parishes, commonwealths, territories, and tribal governments (hereafter "other governments"). Other governments, including cities, "ensure[] that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' [are] held by governments more local and more accountable than a distant federal bureaucracy." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45 at 293 (J. Madison)).

51.     A federalist system's division of power evolves, but in expected ways, such as through Congress passing new laws to further regulate other governments, or other governments using the courts to push back on laws or rules made by the Congress or the Executive Branch.

1
2
3
4
5
6

52.     Within this federalism framework and under the Tenth Amendment to the United States Constitution, the general police powers are left to the states, who in turn often delegate such plenary authority to cities like Plaintiffs. *See, e.g.*, Cal. Const., art. 11, § 7; Or. Const., art XI, § 2. As the Supreme Court has long held, "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 536.

7
8
9
10
11
12

53.     Accordingly, the federal government has never created a federal domestic police force with broad powers. The general policing power, including over most violent crime, is left to other governments. As courts have repeatedly held, "We can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

13
14
15
16
17

54.     Instead, where Congress has authorized, the Executive Branch has executed, and the Judiciary approved, the federal government has created a constellation of different law enforcement agencies, each of which has a specific domain of authority as defined by federal statutes. For the most part, those domains of authority are not coextensive with other governments' general policing power.

18
19
20
21

55.     Within the scope of those federal statutes, such federal law enforcement activities have been limited to: (a) the enforcement of a direct federal interest (*e.g.*, enforcement of a federal law); or (b) assisting other governments, which constitutes the enforcement of an indirect federal interest.

22
23
24
25

56.     Whether enforcing a direct federal interest or assisting other governments, federal law enforcement acts within prescribed legal bounds. Either federal law enforcement is invited by other governments to participate in any number of lawful collaborative activities or federal law enforcement may intervene without invitation in the circumstances where federal law permits.

26
27
28

57.     In the former category of invited collaboration, Plaintiffs have, like many other cities, frequently engaged in lawful partnerships with federal law enforcement. From subject-specific task forces to investigating borderless crimes, other governments often depend on and

engage with federal law enforcement to help protect residents and visitors. Plaintiffs have, for example, partnered with the Federal Bureau of Investigation on child exploitation task forces; with the Drug Enforcement Administration to combat illegal drug trafficking; with the Bureau of Alcohol, Tobacco, Firearms and Explosives to proactively identify the source of guns used for crimes; with the United States Marshals Service ("USMS") to apprehend those fleeing the justice system; and with the Secret Service to tackle identity theft.

58.     These past and present local-federal relationships are voluntary and consensual. Federal law enforcement and local law enforcement agencies generally work together in Plaintiffs' communities with a mutual understanding of the mission, clear directives regarding jurisdictional functions, and specific agreements (*e.g.*, via Memoranda of Understanding or Agreement) that inform both sides of their respective obligations. Such partnerships were and are authorized by law, typically memorialized by mutual agreement, and not the subject of this lawsuit.

59.     In the latter category of uninvited intervention, the federal government has certain powers that are superior to those of other governments, made so by the Supremacy Clause.

60.     Such powers include federal enforcement of crucial fundamental federal rights, including civil rights. Throughout the nation's history, federal enforcement authorities have at times overridden other governments' ignorant or bigoted refusals to grant or defend constitutionally protected rights. Whether desegregating schools or extending the voting franchise to Black people, federal enforcement—without invitation or local approval—has been at times both lawful and vital.

61.     Such intervention powers may also, in extraordinary circumstances, permit the deployment of federal forces domestically, in which federal law enforcement temporarily takes over the general police powers otherwise reserved to other governments. Such circumstances are constitutionally delineated by Article I, Section 8, one of the Militia Clauses (allowing Congress to "call[] forth the Militia to execute the Laws of the Union") and by Article IV, Section 4 (the obligation to protect the states against invasion and against "domestic violence").

62.     The Constitution reserves both of those described powers for the Legislative Branch, either exclusively or principally. The cited Militia Clause only gives power to Congress.

The Article IV Republican Form of Government Clause gives power first to the Legislature, and then only to the Executive "when the Legislature cannot be convened."

63.     Under these authorities, Congress has, among other things, passed the Insurrection Act of 1807, now codified as amended at 10 U.S.C. §§ 251-255, which allows domestic military intervention when circumstances make it impracticable to enforce the law by any other means, and the complementary Posse Comitatus Act of 1876, now codified at 18 U.S.C. § 1385, eliminating virtually any use of the military to regulate American civilians.

64.     These laws represent some key legal guardrails constitutionally implemented by the Legislative Branch to limit and define where the Executive Branch may, without permission and while overriding other governments' prerogatives, nonetheless enforce federal law.

65.     Specifically, the Insurrection Act empowers the President to call into service the United States Armed Forces and the National Guard: (a) when formally requested by a state; (b) to address an insurrection in any state, when that insurrection makes it impracticable to otherwise enforce the law; or (c) to address an insurrection, domestic violence, unlawful combination or conspiracy, in any state, which results in the deprivation of constitutionally secured rights, and where the state is unable, fails, or refuses to protect those rights. 10 U.S.C. §§ 251-253.

66.     There is a set legal process for invoking the Insurrection Act that is neither clandestine nor equivocal. To invoke the Act, a president must issue a "proclamation to disperse": that is, "by proclamation, immediately order the insurgents to disperse and retire peaceably to their abodes within a limited time." 10 U.S.C. § 254. Such proclamations have been issued as Executive Orders and/or as Proclamations published in the Federal Register.

67.     The Insurrection Act has never been invoked in the 21st century. In its limited usage in the 20th century, the federal government often invoked the Act to protect civil rights, particularly the rights of Black children to attend desegregated schools.

68.     When the Act was most recently invoked, in 1992, then-President George H.W. Bush issued a general Proclamation and an operationalizing Executive Order. *See* Proclamation No. 6427, 57 Fed. Reg. 19,359 (May 1, 1992); Exec. Order No. 12804, 57 Fed. Reg. 19,361 (May 1, 1992). Executive Order 12804 provided detailed instructions for Cabinet officials to respond to

the alleged insurrection in California. Among other things, it directed the Attorney General: "(1) to coordinate the activities of all Federal agencies assisting in the suppression of violence and in the administration of justice in and about the City and County of Los Angeles, and other districts of California, and (2) to coordinate the activities of all such agencies with those of State and local agencies similarly engaged."

69.    DOJ is aware of the legal process for invoking the Insurrection Act. As an agency, DOJ has typically been involved when the Insurrection Act is invoked.

70.    The Executive Branch's authority under the Act, or under other such extraordinary emergency powers, does not undergird the Policy.

71.    Any invocations of emergency powers or interventions under those powers are rare, reserved for extraordinary circumstances, and are not the subject of this lawsuit.

72.    Finally, Executive Branch agencies, endowed by Congress or the Constitution with particular powers, must, per Article II, Section 3, "take care" to execute their duties under those authorities. Sometimes, those authorities are clearly defined by statute or a provision of the Constitution. At other times, those authorities are further crystalized and concretized by Executive Branch interpretations of the authority so granted. Those interpretations come in forms such as regulations, rules, and myriad types of sub-regulatory guidance.

73.    The legality of such Executive Branch interpretations of its authority is easily tested, commonly through the APA, which governs how the Executive Branch creates and acts on those interpretations, and what those interpretations are. Stated simply, the APA is a key method by which the Judiciary may assess the legality of the Executive Branch's interpretation of its powers, including whether such interpretations are "arbitrary and capricious," "contrary to constitutional right[s]," or "in excess of statutory authority." 5 U.S.C. § 706.

74.    Such Executive Branch interpretations of its authority may also be tested through other legal means, such as by questioning their constitutionality directly in federal court.

75.    Such Executive Branch interpretations are the subject of this lawsuit.

76.    As these recitations reflect, the federal government has lawful tools to intervene—

- 15 -

voluntarily or involuntarily—in other governments' exercise of their police powers. These recitations also reflect that those tools are either used with mutual agreement, or without agreement in circumstances, such as those enumerated, rooted in the Constitution. Finally, these recitations reflect that the federal government follows lawful and expected paths to exercise authority over other governments.

**_Policy Change Regarding Deployment and Operation of Federal Forces_**

77.     Consistent with the above framework, until recently, Plaintiffs believed that they understood the structure, procedures, and basis for both the invited and the uninvited deployment and operations of federal law enforcement agents into their communities.

78.     However, in 2020, following the direction of President Trump, Defendants instituted this new Policy, the full parameters of which are unknown, but that, at minimum, unlawfully expands the unilateral deployment, cross-designation, and operations of federal law enforcement to broadly assert general police powers in U.S. cities based on the viewpoints of the protesters, municipal leaders, or municipalities themselves.

79.     The Policy and each and every instance where Defendants, through their officers, employees, and/or agents, unlawfully deployed, cross-designated, or commanded federal law enforcement to act in excess of or contrary to 40 U.S.C. § 1315 or the Constitution constitute "final agency action" under the APA.

**_Prior Status Quo_**

80.     President Trump long issued threats against cities he views as progressive or racially diverse, including Plaintiffs. In 2017, he threatened to "send in the feds" to Chicago if their mayor did not fix the "carnage," and compared the city unfavorably to Afghanistan. In 2019, in describing Los Angeles, New York, and San Francisco, he referred to these "sanctuary cities run by liberal people" as places where "people living there are living in hell," and threatened that he might "intercede" or "may do something to get that whole thing cleaned up." In 2020, he repeatedly threatened Plaintiffs Portland and Oakland.

81.     Separately, after President Trump took office, Americans engaged in some of the largest peaceful protests in our nation's history. The day after his inauguration, between 3.2 million

and 5.2 million people marched in the streets to protest for women's rights and against the President. Hundreds of thousands protested again for the same reason on the same day in the following years. Since January 2017, millions of people have participated in protests across the country, including protests at federal property, monuments, memorials, and statues, as well as at state and local property, monuments, memorials, and statues.

82.     Despite President Trump's repeated threats, and despite thousands of protests by millions of Americans, Defendants never previously asserted or exercised the authority they are now asserting and exercising under the Policy, nor, on information and belief, engaged in the related Practice.

83.     An alleged source of the authority for the Policy is 40 U.S.C. § 1315. Under subsection (a) of that statute, the Secretary of Homeland Security protects the buildings, grounds, and property that are owned, occupied, or secured by the federal government.

84.     Although FPS, a division of DHS, is typically the main provider of security and law enforcement services at federal government facilities, the Secretary of Homeland Security may transfer DHS officers or agents specifically "for duty in connection with the protection of" that federal property. 40 U.S.C. § 1315(b)(1).

85.     The scope of 40 U.S.C. § 1315 is clear. The statute states that the Secretary of Homeland Security: "shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government (including any agency, instrumentality, or wholly owned or mixed-ownership corporation thereof) and the persons on the property." *Id.* § 1315(a).

86.     Based on information and belief and on publicly available facts such as those recited here, until as recently as May 2020, there had been no policy or practice through which Defendants unilaterally deployed or commanded federal law enforcement under 40 U.S.C. § 1315 for general police purposes; to respond to or quash civil protests; to protect and surveil non-federal property, monuments, memorials, or statues; or to unilaterally take over non-federal property.

87.     Based on information and belief and on publicly available facts such as those recited here, until as recently as May 2020, there had been no policy or practice through which Defendants unilaterally deployed or commanded federal law enforcement to quell civil protests

1    expressing a viewpoint with which the President disagreed based on the pretext of protecting

2    federal property.

3            88.     For example, as recently as April 2020, hundreds of protesters gathered at the

4    Michigan State Capitol in Lansing to protest executive orders and shelter-in-place orders in light

5    of the COVID-19 pandemic.

6            89.     The Michigan State Capitol was completed in 1878, has been listed on the National

7    Register of Historic Places since 1971, and was designated as a National Historic Landmark in

8    1992. The Capitol and its grounds contain at least one monument, three memorials, and several

9    statues. The Capitol is 0.1 miles from the Charles E. Chamberlain Federal Building and Post

10   Office.

11           90.     During these so-called "lockdown protests," many protesters openly carried

12   firearms in or around the Capitol, forcibly entered the Michigan State Capitol, issued threats

13   against Michigan Governor Gretchen Whitmer, and verbally assaulted Michigan state police.

14           91.      When these armed protesters objecting to COVID-19 quarantine measures rallied

15   in the Michigan Capitol, President Trump called them "very good people" and urged Governor

16   Whitmer to "give a little" in response to the protesters' objections.

17           92.     Earlier, in the spring, President Trump had encouraged his supporter to "liberate"

18   Michigan as well as Minnesota in response to strict restrictions responding aimed to stop the spread

19   of COVID-19.

20           93.     As another example, in both April and May 2020, hundreds of protesters gathering

21   at the Pennsylvania State Capitol in Harrisburg to protest executive orders and shelter-in-place

22   orders in light of the COVID-19 pandemic.

23           94.     The Pennsylvania State Capitol was built in 1906, has been listed on the National

24   Register of Historic Places since 1977, and was designated a National Historic Landmark in 2006.

25   The Capitol and its grounds contain at least three monuments and several statues. The Capitol is

26   approximately 0.2 miles from the Ronald Reagan Federal Building and U.S. Courthouse.

27           95.     During these so-called "lockdown protests," some protesters openly carried

28   firearms in or around the Pennsylvania State Capitol.

96.     As another example, in April 2020, hundreds of protesters gathered at the Wisconsin State Capitol in Madison to protest executive orders and shelter-in-place orders in light of the COVID-19 pandemic.

97.     The Wisconsin State Capitol was completed in 1917 and was designated a National Historic Landmark in 2001. The Capitol is approximately 0.4 miles from the U.S. Courthouse in Madison.

98.     During these so-called "lockdown protests," some protesters openly carried firearms, including long guns, in or around the Wisconsin State Capitol.

99.     As another example, as recently as May 2020, hundreds of protesters gathered at the California State Capitol in Sacramento to protest executive orders and shelter-in-place orders in light of the COVID-19 pandemic.

100.    The California State Capitol was completed in 1874, has been listed on the National Register of Historic Places since 1973, and was designated as a California Historical Landmark in 1974. The Capitol and its park are home to numerous monuments, memorials, and statues, including the World Peace Rose Garden, the California Peace Officers' Memorial, the Vietnam Veterans Memorial, and the Thomas Starr King Memorial. The Capitol is one mile from the local federal courthouse and under one mile from the local DHS office.

101.    During these so-called "lockdown protests," protesters gathered at the Capitol in violation of stay-at-home orders, confronted California Highway Patrol officers, and displayed depictions of California Governor Gavin Newsom as a Nazi in front of a Swastika banner.

102.    In April and May, protesters also gathered outside the State Capitol in Salem, Oregon. At least one protester appears to be open carrying a rifle in news footage. Members of the far-right militia groups the "Three Percenters" and "Proud Boys" also attended the protests. Several of the protests were allegedly organized by militia groups in violation of Oregon Governor Kate Brown's stay-at-home orders.

103.    In December, protesters carrying firearms and bear spray, including members of the far-right group Patriot Prayer, gathered at the Oregon State Capitol in Salem to protest COVID-

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

19 restrictions. Members of this group stormed the Oregon statehouse, broke windows, and attempted to gain access to the building.

104.     Based on information and belief, federal law enforcement officers were not deployed in response to any of these so-called "lockdown protests"; were not directed to surveil the protesters or public officials; did not to assess threats to public buildings, monuments, memorials, or statues; did not to protect against civil unrest; and were not to otherwise engaged in general policing.

105.     In fact, in many instances, President Trump and his administration encouraged and emboldened supporters to protest against these COVID-19 restrictions, including through the display of weapons and other threats of force and violence.

***Existing Framework for Local Law Enforcement Mutual Aid or Cross Designation with Other Government Agencies***

106.     As described above, there are numerous examples of how local law enforcement, including Plaintiffs' police departments, collaborate with or receive assistance from other law enforcement agencies, including federal law enforcement agencies such as Defendants and their subcomponents.

107.     Coordinating with local law enforcement has, outside of the Policy and Practice, been fundamental to how federal law enforcement agencies interact with their local counterparts.

108.     Even in circumstances where the local jurisdiction has policies that are directly in opposition to the federal law enforcement agency's activities, the federal agencies, including Defendants, have nonetheless coordinated with local agencies in some fashion, given the longstanding recognition of the importance of such coordination.

109.     For example, 28 C.F.R. § 0.112 governs special deputation powers of the USMS, which is a bureau within DOJ. Pursuant to this section, the USMS Director is authorized to deputize, in relevant part, "[s]elected federal, state, or local law enforcement officers whenever the law enforcement needs of the U.S. Marshals Service so require." 28 C.F.R. § 0.112(b).

110.     The duties of the USMS include protecting the federal judiciary, apprehending federal fugitives, managing and selling seized assets illegally acquired by criminals, housing and transporting federal prisoners, and operating the Witness Security Program.

111.     Separately, Plaintiffs have also long entered into and relied on "mutual aid" agreements with fellow local governments, such as other city and county governments. These mutual aid agreements set forth the circumstances under which mutual aid partners will come to the assistance of a member of the agreement. For example, Oakland has requested assistance from its mutual aid partners, such as Alameda County and surrounding cities, in responding to natural disasters or to certain violent "Occupy" protests a decade ago. It is not uncommon for mutual aid partners to request dozens or even hundreds of officers to assist with significant needs. Indeed, in response to the recent demonstrations, Portland has sought and received mutual aid from numerous other local law enforcement agencies.

112.     No matter the originating source of the mutual aid, Plaintiffs' police departments follow specific procedures when any outside law enforcement participate in their operations, or when outside law enforcement perform operations in their cities.

113.     Those procedures typically include that, when any outside law enforcement agency comes to assist Plaintiffs' police departments, those outside agents or officers first check in at the local staging center or emergency operations center, learn of the operation plan, and are connected in some manner to the department's communications systems. These universal steps are designed to protect all law enforcement officers and ensure they are operating with similar information and shared means of communication.

### *Nationwide Protests for Racial Justice and Police Reform*

114.     On May 25, 2020, George Floyd was tragically killed by Minneapolis police and a video of his death was widely circulated in the media. On May 26, 2020, people gathered in Minneapolis in protest. Shortly thereafter, people gathered throughout the nation, including in Plaintiffs' jurisdictions, to advocate for police reform and racial justice.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

115.    Polls have suggested that between 15 million and 26 million people participated in these protests, making them the largest demonstrations in American history. Between May 22 and August 22, approximately 93% of protests were peaceful.

116.    Incidents of property damage and violence, however, were reported in many jurisdictions in the country. Incidents of property damage occurred in suburban California, and armed civilians and other non-state actors committed acts of violence in states including Florida, Indiana, and Tennessee.

117.    People began to gather in Downtown Portland on or around May 29, 2020, including at an event titled "A Eulogy for Black America" organized by the Portland chapter of the NAACP.

118.    On May 29, 2020, Portland Mayor Ted Wheeler issued a statement that he stood "in solidarity with those who grieve for the senseless death of George Floyd" and committed to standing alongside "our black community and not just call out racism when we see it, but meaningfully take a stand against it."

119.    In Portland, protests continued in June. The first few days of June were identified as having the largest crowds of the Portland George Floyd protests, with numbers exceeding 10,000 people each day. During this time, a much smaller group of people engaged in significant property damage and violence directed at police. Notwithstanding some criminal activity, the majority of the protests remained peaceful, and toward the end of June, the scale of protests began to decrease. The focal points of protests during June were the Justice Center (which houses the Portland Police Bureau's ("PPB's") Central Precinct and primary offices, as well as the Multnomah County Detention Center) and other PPB and Multnomah County buildings. At times these protests occurred at or near the Hatfield Federal Courthouse, which is across the street from Justice Center.

120.    Portland was not alone in experiencing protests, nor alone in experiencing major or minor threats to federal property. According to FPS officials, between May 28, 2020 and June 10, 2020, FPS responded to "168 protests and more than 168 attacks at federal facilities," including in

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

places ranging from Concord, New Hampshire to Dallas, Texas to Fort Lauderdale, Florida to Phoenix, Arizona.

121.    Further, FPS officials reported that, in that timeframe, "133 Federal facilities . . . sustained vandalism/damage," including in Dallas, where "FPS Officers discovered what appears to be bullet holes in windows on floors 9-13 at the Earl[e] Cabel[l] Federal Building and US Courthouse." In other communications, FPS officials reported vandalism, graffiti, damage, and broken windows at the U.S. Courthouse in Las Vegas, as well as multiple threats to the Richmond Federal Courthouse in Richmond, Virginia, including vandalism from spray paint and individuals discussing "burning down" the courthouse.

122.    Yet despite those significant threats and actual damage to federal property, most of those cities were not subject to direct threats of intervention by President Trump, and only progressive cities like Portland were subject to deployments under the Policy.

123.    At this time, President Trump continued his past practice of frequent and repeated threats to deploy uninvited federal law enforcement and/or military power to progressive cities.

124.    Protests continued nationally throughout June 2020, along with the President's threatening rhetoric.

### ***President Trump Responds to Protests and Issues the Executive Order; Defendants Institute the Policy***

125.    On May 29, 2020, three days after protests began in Minneapolis in response to the killing of George Floyd, President Trump threatened unilateral intervention and stated: "Either the very weak Radical Left Mayor, Jacob Frey, get his act together and bring the City under control, or I will send in the National Guard & get the job done right."

126.    Three days later, during an address to the nation on June 1, 2020, President Trump stated: "I am your President of law and order . . . . If a city or a state refuses to take the actions that are necessary to defend the life and property of their residents, then I will deploy the United States military and quickly solve the problem for them."

127.    After the speech, federal law enforcement and the D.C. National Guard forcibly removed thousands of peaceful protesters from Lafayette Square Park with pepper-spray balls,

smoke canisters, flash-bang grenades, shields, and horses. After the protesters were cleared, President Trump, then-Attorney General William Barr, then-Secretary of Defense Mark Esper, and others walked from the White House through Lafayette Square for a photo opportunity at St. John's Episcopal Church.

128.    On June 5, 2020, President Trump criticized Washington, D.C. Mayor Muriel Bowser for her city's treatment of protesters. President Trump called the mayor "grossly incompetent, and in no way qualified to be running an important city like Washington, D.C. If the great men and women of the National Guard didn't step forward, she would have looked no better than her counterpart Mayor in Minneapolis!"

129.    On June 11, 2020, President Trump set his sights on Seattle, Washington where protests were ongoing. President Trump criticized both Governor Jay Inslee as well as Mayor Jenny Durkan: "[They] are being taunted and played at a level that our great Country has never seen before. Take back your city NOW. If you don't do it, I will. This is not a game. These ugly Anarchists must be stopped IMMEDIATELY. MOVE FAST!"

130.    One day later, President Trump attempted to increase the pressure by stating: "These Liberal Dems don't have a clue. The terrorists burn and pillage our cities, and they think it is just wonderful, even the death. Must end this Seattle takeover now!"

131.    Repeatedly and with great frequency during the month of June 2020, President Trump expressed disapproval about the response of local officials in Democratic-run cities to Black Lives Matter protests following the killing of George Floyd. President Trump sought to portray the largely peaceful protests as violent and dangerous and to characterize the cities' response as weak and inadequate.

132.    On information and belief, despite President Trump's rhetoric and the rhetoric of others in his administration, at that time, there was no publicly available intelligence that there were credible and uniquely serious threats to federal property in any of the jurisdictions named by the President, nor were there any media or other reports of such intelligence or threats. Instead, as detailed above, numerous federal facilities in other cities were threatened or damaged in May and June 2020.

133.    President Trump's repeated public statements were part of the pretext for the issuance of Executive Order 13,933 and Defendants' actions that followed.

134.    Also during the month of June, President Trump expressed significant concern about progressive efforts to tear down and/or remove statues and memorials dedicated to the racist and violent legacy of the Confederacy.

135.    On June 24, 2020, the White House issued an official statement that: "We must build upon our heritage—not tear it down."  One day later, President Trump added: "Very sad to see States allowing roving gangs of wise guys, anarchists & looters, many of them having no idea what they are doing, indiscriminately ripping down our statues and monuments to the past. Some are great works of art, but all represent our History & Heritage."

136.    None of the statues, memorials, or monuments referenced in these and other statements by the President or the White House were on federal property as defined by 40 U.S.C. § 1315.

137.    On June 26, 2020, President Trump signed Executive Order 13,933, entitled *Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence*.

138.    The Executive Order announced that the federal government would: (a) prosecute anyone vandalizing or desecrating public monuments, memorials, and statues; government property; or religious property; (b) prosecute anyone inciting related violence; and (c) withhold federal support from local and state governments that failed to protect such structures from vandalism.

139.    The Executive Order further stated that if the Secretary of the Interior, the Secretary of Homeland Security, or the Administrator of General Services requested federal personnel "to assist with the protection of Federal monuments, memorials, statues, or property," they "shall" be provided by the Department of Defense, DOJ, and/or DHS.

140.    Defendants rapidly began to implement this Executive Order, consistent with President Trump's motivation of quelling Black Lives Matter protests, targeting Democratic cities,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and establishing broad federal police presence in certain cities. These actions were taken pursuant to the Policy and are further evidence of the existence of the Policy.

141.    First, on or around June 30, then-Acting Secretary of Homeland Security Chad Wolf (acting without proper authority) issued a memorandum to CBP, ICE, the Transportation Security Administration ("TSA"), Secret Service, FPS, I&A, and other subcomponents of DHS entitled "DHS Support to Protect Federal Facilities and Property," in which Mr. Wolf stated that his memo and other actions were "in furtherance of" the Executive Order, and that DHS was coordinating with Defendant DOJ as well as the Department of the Interior "to establish information/intelligence sharing and resource coordination."

142.    In that memorandum, Mr. Wolf also announced the formal formation of PACT within DHS. PACT was charged with "conduct[ing] *ongoing* assessments of potential civil unrest or destruction and allocat[ing] resources to protect people and property," including "potential surge activity to ensure the continuing protection of critical locations."

143.    Second, on or around July 1, 2020, leadership (the Office of the Executive Secretariat) of FPS, a subcomponent of DHS, circulated a draft Education and Training Bulletin, ETB 20-0004, to the DHS Office of General Counsel ("OGC") and the Office of Operations Coordination, requesting comments and "clearance" (*i.e.*, high-level government approval) of the document. The contents of ETB 20-0004 are unknown, but its existence was revealed in response to a Freedom of Information Act ("FOIA") request for documents, including those created by Defendant DHS in response to the Executive Order.

144.    Third, and potentially as an element or component of ETB 20-0004, Defendants began changing or continuing to change guidance regarding the lawful scope of federal activity under 40 U.S.C. § 1315. Rather than limiting federal involvement under that statute to federal laws or property, Defendants expanded the ability of federal agents to address threats to *any* public monument, memorial, or statue, regardless of its federal nature.

145.    As another example, a July 2020 leaked, unclassified document entitled "Job Aid: DHS Office of Intelligence & Analysis (I&A) Activities in Furtherance of Protecting American Monuments, Memorials, Statues, and Combatting Recent Criminal Violence" ("Job Aid") shows

that parts of the Defendants' intelligence community were now authorized to monitor and collect information regarding protest activities beyond suspected or planned attacks on federal facilities, including threats to damage or destroy *any* public monument, memorial, or statue.

146.     The "Job Aid" was intended to "expand[] intelligence activities necessary to mitigate the significant threat to homeland security articulated in the President's executive order of June 26, 2020."

147.     At this time, emails produced in response to FOIA requests to Defendants show that FPS developed a "priority list of at-risk federal facilities, monuments and statues," a list it began or continued to refine under the Policy.

148.     At this time, DHS also began to develop rationales and justifications for the Policy. For instance, a Senior Legislative Affairs Advisor in Defendant DHS' Office of Legislative Affairs ("OLA") communicated to their OGC that someone(s) "will have questions on authorities" regarding FPS' role in effectuating the Executive Order. Another member of the OLA team requested that a DHS official responsible for coordinating with Congress "be alerted" "when 40 U.S.C. § 1315 is being used in the protection of monuments, statues, etc.," a request framed as necessary "given Members [of Congress] will likely have questions." Such requests suggest that invocation of 40 U.S.C. § 1315 for this purpose was atypical or new.

149.     Finally, Defendants began deploying, cross-designating, and/or commanding federal law enforcement agents pursuant to the Executive Order and the Policy.

150.     Specifically, Mr. Wolf announced the deployment and pre-position of Rapid Deployment Teams across the country ahead of the July 4th holiday. Mr. Wolf stated that PACT would not "stand idly by while violent anarchists and rioters seek not only to vandalize and destroy the symbols of our nation, but to disrupt law and order and sow chaos in our communities."

151.     Defendants DHS and DOJ engaged in extensive communication, planning, requests for guidance, and other activity regarding deployments under the Policy, including possible deployments to several cities, as well as discussion of protecting various monuments in those locations.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

***Deployment and Other Activities in Portland***

2

     152.    The following recitations are merely limited examples of why the Policy and/or

3

specific acts in furtherance of the Policy constitute final agency action under which rights and

4

obligations have been determined and from which legal consequences have flowed.

5

     153.    It is unclear how many deployments of federal agents were made pursuant to the

6

Policy. In addition to the deployment to Portland described below, Defendants sent personnel to

7

Seattle in advance of the July 4th holiday as well.

8

     154.    In the days before Defendants deployed federal personnel to Portland, the crowds

9

attending demonstrations had shrunk. By early July 2020, only about 150 people could be seen

10

gathering in downtown Portland on any given night.

11

     155.    On or about July 2, 2020, Mr. Wolf ordered the deployment of DHS, USMS, U.S.

12

Customs and Border Protection ("CBP"), and the FPS to Portland in response to civil protests as

13

part of Operation Diligent Valor.

14

     156.    Mr. Wolf purportedly designated approximately 114 ICE and CBP agents as FPS

15

agents for purposes of Operation Diligent Valor

16

     157.    Defendants did not seek Portland's consent. Defendants did not act at the direction

17

of PPB incident command that had been policing nightly protests for over a month.

18

     158.    The federal forces deployed to Portland from CBP included members of BORTAC,

19

a paramilitary unit of the United States Border Patrol. BORTAC troops wear military-type

20

uniforms and armament, are trained for tactical raids on organized gangs smuggling persons or

21

drugs into the United States, and have in the past been deployed to such places as Afghanistan and

22

Iraq.

23

     159.    On information and belief, BORTAC troops have no training in civilian crowd

24

control or protection of First Amendment activities.

25

     160.    Through Operation Diligent Valor, Defendants sent teams of agents—untrained in

26

crowd control and wearing military fatigues—onto Portland's streets. Their uniforms bore no

27

governmental, administrative or personal names, just the word "police" in tape. Federal agents

28

used tactics and munitions that escalated violence in Portland.

161.    On or about July 11, 2020, federal agents allegedly fired impact munitions into an unarmed crowd. One of the bullets struck a protester and fractured his skull.

162.    Starting on or about July 14, 2020, federal agents drove around Portland in unmarked vans and detained individuals associated with the protests. Federal agents were patrolling and detaining individuals far beyond the immediate vicinity of the federal courthouse. Agents allegedly seized at least one individual who was more than two blocks from the courthouse and not engaged in any activity related to federal property.

163.    Upon information and belief, federal agents seized multiple protesters and held them for hours before releasing them for lack of probable cause. The federal agents gave no justification for why they detained particular residents, searched their belongings, and placed residents in cells for hours before reading them their *Miranda* rights.

164.    Far from imposing peace in the City's streets, the tactics and munitions used by federal agents antagonized demonstrators, escalated the protests, and caused further unrest.

165.    On July 22, 2020, federal agents fired tear gas into a crowd that included Portland Mayor Wheeler.

166.    Later reports of internal DHS documents showed that the DHS' Office of Intelligence Analysis also collected and analyzed messages between protesters in Portland, specifically surveilling protesters' communications via the Telegram messaging app, discussing where to take the protests and how to avoid officers. The purpose of this monitoring is still unknown. It is also unknown whether the surveillance was limited to the protection of federal property or gathered on federal property.

167.    On July 29, 2020, Governor Brown reached a negotiated agreement with the federal government. Defendants agreed to withdraw federal agents from Portland with assurance that Oregon State Police would take on additional duties guarding the safety of the federal courthouse in Portland.

168.    According to a November 2, 2020 report from the Office of the Inspector General of DHS ("OIG"), the Director of FPS issued memoranda in June and July 2020 that sought to

- 29 -

1  designate personnel from CBP, ICE, TSA, and Secret Service, pursuant to 40 U.S.C. § 1315(b)(1),

2  including to Portland.

3      169.   Those memoranda which sought to cross-designate federal agents to exercise

4  authority under 40 U.S.C. § 1315 failed to specifically name the agents being so designated and

5  failed to comply with the requirements of the statute. As a result of that shortcoming, the OIG

6  could not confirm that all federal agents deployed pursuant to 40 U.S.C. § 1315 had received

7  training about the scope of the statute.

8      170.   Such training and instruction were necessary for many of these cross-designated

9  agents because "[l]aw enforcement officers from CBP, ICE, TSA, and Secret Service typically

10 lack this precise scope of authority." Some of these agents, the OIG concluded, used force during

11 their deployment to Portland.

12     171.   Such findings from the OIG contravene Defendants' statements provided to

13 Congress in mid-2020 in a document entitled "Responses to the House Appropriations Committee

14 Staff Questions Regarding the DHS Protecting American Communities Task Force (PACT),"

15 which includes the statement that "[t]he [rapid deployment] teams consist of personnel who have

16 requisite training to support security operations and respond to civil disturbances."

17     172.   In sum, in furtherance of Executive Order 13,933 and at the direction of President

18 Trump, Defendants established the Policy to police and suppress certain viewpoints, including

19 support of the Black Lives Matter movement, through a number of means including those

20 described above, all under the guise of protecting federal property.

21     173.   U.S. Marshals Service officers were also present in Portland, operating side-by-side

22 with DHS agents. Upon information and belief, then-Attorney General William Barr, acting in his

23 official capacity, directed USMS agents to follow the Policy.

24 ***Justifications for the Policy Are Pretextual***

25     174.   The purported purpose of the Portland deployment described above, an example of

26 an act taken in furtherance of the Policy, was to protect federal property that had been vandalized

27 or threatened during protests.

28

175.   Anonymous statements from White House Officials, however, indicate such purpose was mere pretext. The sources alleged that President Trump became interested in federal operations against protesters in Portland as a way to convey a "law-and-order message" and to "amplify strife in cities."

176.   As stated above, DHS has cited 40 U.S.C. § 1315 as the legal basis for Operation Diligent Valor and the general practice of deploying federal agents to Portland and other locations, despite the observed scope and operations of agents being well beyond the purpose or function of protecting federal property or persons.

177.   The U.S. Crisis Monitor found that prior to that deployment, "over 83% of demonstrations in Oregon were non-violent. Post-deployment, the percentage of violent demonstrations [rose] from under 17% to over 42% [in Oregon], suggesting that the federal response has only aggravated unrest."

178.   Despite statements justifying deployments as responses to crime or "anarchy," crime rates in Plaintiffs' communities have been decreasing overall; neither city is in the list of top 10 United States cities with the largest number of violent crimes per 100,000 residents. Moreover, Plaintiffs' crime rates do not differ dramatically from those in other, Republican-run cities. For example, violent crime rates in Fresno, Jacksonville, Oklahoma City, and Tulsa—cities with Republican mayors—far exceed the violent crime rates in Portland. These cities also have murder rates at twice that of Portland.

179.   As stated above, Portland was also not alone in experiencing threats or harm to federal property. Instead, per FPS officials, at least 168 federal facilities contemporaneously experienced threats or harm, including in places such as Dallas, Richmond, and Phoenix. Some of those threats were serious, such as threats to burn down a federal courthouse. Yet Portland, not Dallas, Phoenix, Richmond, or other such cities, was a key city targeted for deployments under the Policy.

180.   A comprehensive review by the Armed Conflict Location and Event Data ("ACLED") Project and the Princeton University Bridging Divides Initiative underscores the overall peaceful nature of the social justice-related protests in summer 2020. Between May 25,

- 31 -

2020, and August 22, 2020, there were 7,750 Black Lives Matter-related demonstrations in 2,440 locations in all 50 states and Washington, D.C. Overall, in summer 2020, there were at least 10,600 demonstrations across the United States. Of those, more than 93% involved only peaceful protests. And according to ACLED, violence occurred at around 220 locations.

181.    President Trump and Defendants have repeatedly made public comments revealing that the officially stated goal of operations such as those in Portland was not protecting federal property. Instead, their statements suggest that the animating and invidious purpose for these actions—that is, for the Policy—is to punish progressive cities and leaders and violently quell the exercise of constitutionally protected activity. Specifically, the President's, Defendants', and Policy's purpose is to further the view that diverse and/or progressive cities and their leaders, as well as movements for racial justice and police reform, are dangerous and should be suppressed.

182.    At a White House event on July 13, 2020, President Trump claimed that "[f]ar-left mayors are escalating the anti-cop crusade, and violent crime is spiraling in their cities." He pledged to be "very strong on law enforcement" by sending federal officers to "liberally run" jurisdictions—"even if we have to go in and take over cities."

183.    President Trump admitted that federal agents were deployed to Portland specifically to quell protests: "We've done a great job in Portland. Portland was totally out of control, and they went in and, I guess, we have many people right now in jail. And we very much quelled it. And if it starts again, we'll quell it again very easily. It's not hard to do, if you know what you're doing."

184.    President Trump has also repeatedly falsely characterized the protesters as violent and dangerous. He stated that the goal was to "clean out this beehive of terrorists." President Trump also stated that protesters are "anarchists" who "hate our country."

185.    In addition, Mr. Wolf affirmed that actions taken under the Policy were without other governments' consent, asserting: "The city of Portland has been under siege for 47 straight days by a violent mob while local political leaders refuse to restore order to protect their city . . . . I reiterate the Department's offer to assist local and state leaders to bring an end to the violence perpetuated by anarchists."

1

186.    Local and state leaders did not accept that offer.

2

187.    Local and state officials have repeatedly and vehemently stated their opposition to

3

the federal deployment in Portland. Oregon Attorney General Ellen Rosenblum filed a lawsuit

4

against the federal government to stop its deployment and tactics. Oregon Governor Brown stated:

5

"This political theater from President Trump has nothing to do with public safety. The President

6

is failing to lead this nation. Now he is deploying federal officers to patrol the streets of Portland

7

in a blatant abuse of power by the federal government."

8

188.    From the outset, the City of Portland expressed its opposition to the deployment of

9

federal agents under Operation Diligent Valor without its consent.

10

189.    Only a few days after the federal agents were deployed, on July 8, 2020, Portland's

11

Deputy Police Chief Chris Davis made a public statement that the presence of federal agents, who

12

are "governed by their own policies and procedures," only "complicates things" for PPB.

13

190.    On July 19, 2020, Mayor Wheeler stated the following:

14

> What's happening here is, we have dozens, if not hundreds of federal troops
> descending upon our city. And what they're doing is, they are sharply escalating the
> situation . . . our local and state law enforcement officials had contained the situation
> . . . The tactics that the Trump administration are using on the streets of Portland are
> abhorrent . . . this is completely unconstitutional.

15

16

17

18

191.    In response to the tactics and munitions used by federal agents, and consequent

19

public outcry, on July 22, 2020, Portland's City Council adopted Resolution 37496, which

20

prohibits PPB cooperation with any federal agents deployed to Portland under an executive order.

21

In response to Defendants' actions under the Policy, on July 28, 2020, Oakland's City Council

22

adopted Resolution No. 88276 ("Directing And Authorizing The City Attorney And The City

23

Administrator To Take Any And All Lawful Necessary Steps To Protect The Rights Of The People

24

And The City Of Oakland Against President Trump's Threats To Take Actions That Result In

25

Harm To The People Of Oakland Or The City Of Oakland, And Against Any Related Actions

26

Federal Officers Take That Result In Harm To The People Of Oakland Or The City Of Oakland").

27

192.    The actions taken by Defendants in Portland under the Policy were not taken

28

pursuant to any known lawful federal authority.

193.     Further, as described above, Defendants' failure to respond to the clear, imminent, extensive, and serious threats to Washington, D.C. on or around January 6, 2021, suggest that mere protection of federal property cannot be the justification for the Policy: if it were, Defendants would have responded in some significant fashion based on threats known beforehand by Defendants and other federal agencies and reportedly described by the Federal Bureau of Investigation ("FBI"), a subcomponent of Defendant DOJ, as individuals preparing for "war." These are threats that Defendants and other federal agencies were well aware of before the January 6 attack.

194.     Upon information and belief, the administrative record will reveal that Defendants' explanation of agency action is incongruent with Defendants' nonpublic positions and explanations.

***Plaintiffs Remain at Risk Under the Policy***

195.     Rather than retreat from the activities in Portland, Defendants expressed an intent to expand the presence of federal law enforcement throughout the United States.

196.     President Trump indicated that, under the Policy, Defendants would continue to target cities he views as progressive, stating in early September: "They'll make every city look like frankly, a Portland, or you look at other Democrat-run cities. Look at what's happened in New York, as high as 300% increase in crime. Chicago, Baltimore, take a look at Oakland. All Democrat-run top 10 cities in the country and long beyond that, all Democrat-run."

197.     As recently as September 21, 2020, President Trump continued to propagate disinformation about Plaintiffs. He stated: "What they're talking about, you look at Portland, you look at Chicago, you look at New York, you look at Baltimore and Oakland and all—these are Democrat-run cities that are horrible on crime, there's no law and order, no cash bail, no anything."

198.     Though most federal agents were temporarily pulled out of Portland, President Trump threatened that they could return at any time. President Trump also has stated the federal government would further escalate any conflict if local law enforcement does not rein in "anarchists and agitators." He has consistently stated that he will not hesitate to send in federal authorities if the local government could not stop "crime and violence" from breaking out.

199.     President Trump's threats and warnings were not limited to federal property. He announced a plan to send law enforcement to polling places on election day, stating: "We're going to have sheriffs, and we're going to have law enforcement. And we're going to have hopefully U.S. attorneys, and we're going to have everybody and attorney generals."

200.     President Trump's provocations continued throughout the remainder of his administration. He issued a memorandum purporting to direct Defendants to review federal funding provided to "anarchist" cities, including Portland, and to withdraw such funding to punish these cities.

201.     Defendants continue to take unlawful actions under the Policy. For instance, FPS erected and refused to remove a fence and barriers around the Hatfield Federal Courthouse in Portland, which are in the City-controlled public right-of-way. The fence and barriers, which extended into adjacent Main Street, effectively blocked an entire bike lane without Portland's permission. The fence and barriers also extended onto Third Avenue and effectively blocked vehicular travel in one lane.

202.     The only statutory authority FPS has offered to Portland to justify the fence is 40 U.S.C. § 1315.

203.     The fence was first erected by FPS on July 18, 2020. According to a statement from U.S. Attorney Billy J. Williams, the federal government's stated purpose of the fence was "to de-escalate tensions between protesters and federal law enforcement officers, and to allow much-needed building repairs to begin."

204.     The fence is not on federal property, and FPS did not seek permission before erecting the fence. In order to lawfully erect the fence, Portland City Code Chapter 17.24 requires a permit to be obtained from the Portland Bureau of Transportation ("PBOT"). FPS obtained no such permit.

205.     Portland has asked FPS multiple times to move its fence out of the right-of-way and onto the sidewalk adjacent to the Courthouse. FPS has not yet done so and has taken the position that they are permitted to install the fence and associated barriers pursuant to 40 U.S.C. § 1315.

206.     In an October 7, 2020 email to Portland officials, FPS indicated its contractor had moved the fence to allow access to the storm drain and expected to move the fence back from the bike lane "in the next few weeks." This is merely the latest assurance by FPS that it will move its fence.

207.     Portland has implored FPS to remove the fence from the City-controlled right-of-way for six months. While FPS has removed the fence from the right-of-way on certain streets, as of January 19, 2021, the fence continues to block the public right-of-way on SW 3rd Avenue.

208.     Upon information and belief, Defendants either continue to have a presence in Portland or could be deployed to Portland on short notice, and there is a continued dispute regarding the scope of their authority under 40 U.S.C. § 1315, including the ability to unilaterally take over City-controlled or -owned property under a pretext of securing federal property.

### *President Trump's Incitement, Riot at U.S. Capitol, and Ongoing Threats to U.S. Cities*

209.     Following the Presidential election on November 3, 2020, President Trump began an unprecedented and dangerous attempt to overturn the outcome of the election through a variety of means, including the incitement of violence at the U.S. Capitol.

210.     President Trump repeatedly stated that he had won in a landslide, that there was massive voter fraud, and that the results could not be trusted. He directed the DOJ to investigate allegations of voter fraud, even though there were no substantiated claims, and authorized his private legal team to file dozens of frivolous lawsuits around the country, virtually all of which were completely unsuccessful.

211.     President Trump also explored other efforts to pressure election officials and others to overturn the election results. Those attempts included a lengthy January 2, 2021 telephone call to the Georgia Secretary of State, where President Trump asked the Secretary to "find" enough votes to overturn the election results.

212.     President Trump also focused his efforts on the certification of the Electoral College vote during a joint session of Congress on January 6, 2021. In advance, President Trump promoted a rally among his supporters: "Come to D.C. January 6th to 'StopTheSteal.'"

213.    On January 1, 2021, President Trump tweeted: "The BIG Protest Rally in Washington, D.C. will take place at 11:00 A.M. on January 6th. Locational details to follow. StopTheSteal!" He also confirmed that he would be in attendance.

214.    Bolstered by President Trump's invitation as well as continued allegations of election fraud, thousands of supporters of President Trump traveled to and assembled in Washington, D.C. on January 6. Many came with firearms, weapons, body armor, and/or other devices with the intention to cause damage to property, overcome federal law enforcement, and breach the U.S. Capitol. The FBI and other federal agencies issued nonpublic warnings prior to January 6 that these activities posed significant and serious threats to Washington, D.C., which contains large swathes of federal property under Defendants' protection under the auspices of 40 U.S.C. § 1315.

215.    During the January 6 rally, President Trump's personal lawyer, Rudolph Giuliani urged the crowd to engage in "trial by combat" while President Trump's son Donald, Jr. warned unsupportive members of Congress "we're coming for you."

216.    While on stage at the rally, President Trump falsely insisted that Democrats had "stolen" the election, and that his supporters instead should "fight much harder" to "stop the steal" and "take back our country" at the Capitol. President Trump also falsely asserted that Vice President Mike Pence had the authority to reject the results of the Electoral College.

217.    At the conclusion of the rally at the Ellipse near the White House, and following the direction of President Trump, the agitated crowd of violent supporters marched to the U.S. Capitol and breached the security perimeter, gained entry to the building, and interrupted the joint session for several hours.

218.    In addition, extremists placed several improvised explosive devices in other locations in Washington, D.C., including at the headquarters of both the Democratic National Committee and Republican National Committee.

219.    A massive law enforcement effort is underway to identify, locate, and charge hundreds of individuals for the myriad crimes committed in connection with the threats to and violence in Washington, D.C., including the breach of the U.S. Capitol.

220.    Many components of law enforcement had intelligence that President Trump's supporters were planning to engage in violent acts in advance of January 6. For example, the New York Police Department sent a packet of material to Capitol Police and the FBI including raw intelligence data, which indicated that there would likely be violence at the Capitol. In addition, the FBI's Norfolk, Virginia Field Office found specific threats against members of Congress, an exchange of maps of the tunnel system under the Capitol complex, and gathering places in Kentucky, Pennsylvania, and South Carolina where extremists were meeting before convoying up to Washington, D.C. Other federal law enforcement agencies reported on numerous plans to gather and commit violent acts in various locations in Washington, D.C.

221.    In addition, many of the most extreme and violent organizers discussed their plans in the open through the use of social media and other online forums.

222.    Despite all of the information gathered and all of the reasons to believe that events at and around the U.S. Capitol on January 6 were likely to include violence, federal officials were not sufficiently prepared for the violence of the pro-Trump mob.

223.    In contrast to efforts in Washington, D.C. in June 2020 or in Portland in July 2020, federal officials did not prepare for or arrive at the scene of potentially threatened federal property equipped to deploy an aggressive display of force.

224.    In contrast to its efforts in Portland during the summer of 2020, on information and belief, DHS's Office of Intelligence and Analysis did not produce any threat assessment about the possibility of violence on January 6 at the U.S. Capitol, though some attackers used the same messaging platform, Telegram, that was allegedly used by protesters in Portland and was allegedly the subject of the surveillance described by I&A.

225.    Some others in federal law enforcement have speculated that DHS did not produce a bulletin out of concern that doing so might run afoul of First Amendment free speech protections that allow people to protest and assemble peacefully. Such considerations were not similarly made in 2020 for protesters expressing support for Black Lives Matter.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

226.    Upon information and belief, Defendants did not deploy or cross-designate agents pursuant to the Policy for January 6. Washington, D.C. is home to extensive amounts of federal property covered by 40 U.S.C. § 1315.

227.    After the January 6 attack, in advance of Inauguration Day, federal agencies warned cities across the country about the possibility of further violence. For example, the FBI stood up a command post in Portland in anticipation of violent activities by right-wing groups and supporters of President Trump.

228.    Plaintiffs have expended considerable resources planning for potential unrest.

229.    Because of Defendants inconsistent treatment of the mostly peaceful Black Lives Matter protesters of the summer of 2020 as compared to the pro-Trump violent mob on January 6, Plaintiffs have continued uncertainty about the degree to which they may expect future federal intervention should unrest unfold in their cities, and the terms under which such intervention would occur.

### *Mr. Wolf Was Unlawfully Acting as Secretary of Homeland Security, and Any Aspects of the Policy Promulgated or Implemented Under His Purported Authority Must Be Set Aside*

230.    Federal service for positions which require Presidential appointment and Senate confirmation is governed by the Appointments Clause, U.S. Const. art. 2, § 2, cl. 2, and, among other statutes, the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.* When such a position becomes vacant, the FVRA sets default rules for who may serve as an acting official until an appointed nominee can be confirmed. *Id.* § 3345.

231.    However, these default rules do not apply if an agency-specific statute expressly designates who can serve in an acting capacity to lead the agency. *Id.* § 3347(a)(1)(B); 6 U.S.C. § 113(a)(1)(A), (g).

232.    The Homeland Security Act ("HSA") is one such statute: in 6 U.S.C. § 113(g), the statute sets forth the agency-specific rules for filling vacancies and for succession.

233.    Subsection (g)(1) of that statute has limits: it only explicitly states the order of succession through three roles (the Secretary, followed by the Deputy Secretary, followed by the Under Secretary for Management). 6 U.S.C. § 113(g)(1).

- 39 -

234.   To establish a further order of succession beyond those three roles, "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* at (g)(2). Such further designation is explicitly contemplated in the FVRA. 5 U.S.C. § 3347(a)(1)(A).

235.   In the past, DHS Secretaries have exercised this authority to record orders of succession. These lawful orders are broadly contained in *DHS Orders of Succession and Delegation of Authorities for Named Positions*, Dep't of Homeland Sec., Delegation No. 00106, Revision No. 08.5 (Dec. 15, 2016) ("DHS Orders").

236.   From 2016 into 2019, the DHS Orders stated, "In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13,753, amended on December 9, 2016."

237.   Executive Order 13,753 ("E.O. 13,753") set the following order of succession: (1) Deputy Secretary; (2) Under Secretary for Management; (3) Administrator of the Federal Emergency Management Agency ("FEMA"); (4) Under Secretary for National Protection and Programs (which was renamed the Director of the Cybersecurity and Infrastructure Security Agency in 2018); (5) Under Secretary for Science and Technology; (6) Under Secretary for Intelligence and Analysis; (6) Commissioner of the U.S. Customs and Border Protection; and so on.

238.   In the same timeframe, the DHS Orders also included an "Annex A," an order of temporary succession "in the event [the Secretary is] unavailable to act during a disaster or catastrophic emergency. DHS Orders at § II.B. Annex A, by its own terms, solely applied unavailability during disasters or emergencies.

239.   As the last Senate-confirmed DHS Secretary, Kirstjen Nielsen, prepared to resign on April 10, 2019, she issued a new version of Annex A, purporting to revise the order of delegation of authority in that Annex.

240.   Again, by its own terms, this version of Annex A applied only to temporary unavailability during a disaster or emergency. It did not purport to apply to the order of succession in the case of resignation: that order was still governed by E.O. 13,753.

1
2
3

241.   Despite this, after Secretary Nielsen's resignation, CBP Commissioner Kevin McAleenan purported to serve as Acting Secretary, skipping two other Senate-confirmed individuals in the lawful line of succession.

4
5

242.   Mr. McAleenan's purported succession was unlawful under the HSA and its related orders.

6
7
8

243.   Nevertheless, on November 8, 2019, Mr. McAleenan purported to revise the DHS Orders, attempting to (a) wholly replace E.O. 13,753's order of succession with Annex A and (b) change the order of delegation of authority in Annex A.

9
10
11
12

244.   Were Mr. McAleenan's actions lawful, E.O. 13,753's order of succession in the event of resignation would be moot, and Annex A's new order of delegation of authority would govern both in the event of unavailability due to disaster or emergency *and* in the event of resignation (or death or inability to perform the duties of the office).

13
14
15
16

245.   Under the purported new DHS Orders incorporating the purported new Annex A, Mr. McAleenan resigned, and Mr. Wolf, who was the Under Secretary for Strategy, Policy, and Plans, assumed the position of Acting Secretary, his Under Secretary role having been purportedly pushed up the line of delegation of authority by Mr. McAleenan's November 8, 2019 action.

17
18
19
20
21
22

246.   But Mr. Wolf was not lawfully serving in that role. Mr. McAleenan invalidly amended the line of succession, as he was not serving lawfully in the first instance (having unlawfully skipped two individuals in the line of lawfully promulgated succession under the original DHS Orders and E.O. 13,753). Because Mr. McAleenan's attempted amendments were invalid, Mr. Wolf himself skipped an individual in the line of lawfully promulgated succession under the original DHS Orders and E.O. 13,753.

23
24
25

247.   As explained above, the HSA governs who may lawfully serve as acting secretary of Homeland Security. However, the FVRA, not the HSA, defines when a "vacancy" occurs at the principal officer level, and controls what happens during a vacancy. 5 U.S.C. §§ 3346, 3348.

26
27

248.   Specifically, the FVRA states that acting officers may serve for no longer than 210 days starting the date the vacancy occurs or while the person's nomination is pending in the

28

- 41 -

1    Senate, and that, after 210 days, unless there is someone lawfully in an acting role, the office

2    "shall remain vacant" until the president submits a nominee for that role. *Id.*

3         249.    On or around April 10, 2019, Secretary Nielsen resigned. 210 days later, on

4    November 6, 2019, no one had been lawfully serving as acting secretary and the president had

5    not submitted a new nominee for the role. Nonetheless, Mr. Wolf took over that role.

6         250.    Because he was not lawfully serving under either the FVRA or HSA, actions

7    taken by Mr. Wolf were "without force and effect." 5 U.S.C. § 3348(d)(1). Actions promulgated

8    "without force and effect" "may not be ratified." *Id.* § 3348(d)(2).

9         251.    Mr. Wolf's nomination to the role of DHS Secretary on September 10, 2020, did

10   not automatically cure or ratify his past actions.

11        252.    At least six federal district courts agree, wholly or in part, and have set aside DHS

12   actions because Mr. McAleenan or Mr. Wolf (or both) unlawfully assumed the role of Acting DHS

13   Secretary. *See, e.g.*, *Pangea Legal Services v. U.S. Dept. of Homeland Security, et al.*, consolidated

14   with Immigration Equality v. *U.S. Dept. of Homeland Security, et al.*, Nos. 20-CV-09253 and 20-

15   CV-09258 (N.D. Cal. Jan. 8, 2021); *Batalla Vidal v. Wolf*, No. 16CV4756NGGVMS, 2020 WL

16   6695076, at *9 (E.D.N.Y. Nov. 14, 2020); *La Clinica de la Raza v. Trump*, No. 19-CV-04980-

17   PJH, 2020 WL 6940934, at *14 (N.D. Cal. Nov. 25, 2020); *Nw. Immigrant Rights Project v. United*

18   *States Citizenship & Immigration Servs.*, No. CV 19-3283, 2020 WL 5995206 at *17 (D.D.C. Oct.

19   8, 2020); *Immigrant Legal Resource Ctr. v. Wolf*, 2020 WL 5798269, at *9 (N.D. Cal. 2020); *Casa*

20   *de Maryland, Inc. v. Wolf*, 2020 WL 5500165, at *23 (D. Md. 2020). *See also Bullock v. U.S.*

21   *Bureau of Land Mgmt.*, 2020 WL 5746836 (D. Mont. 2020) (holding that William Perry Pendley,

22   the person exercising authority of the Director of the Bureau of Land Management, served

23   unlawfully for 424 days and enjoining him from exercising that authority); *L.M.-M., v. Cuccinelli*,

24   442 F.Supp.3d 1, 29, 34 (D.D.C. 2020) (holding that Acting U.S. Citizenship and Immigration

25   Services ("USCIS") Director Cuccinelli "was designated to serve as the acting Director of USCIS

26   in violation of the FVRA" and "because Cuccinelli was exercising the authority of the USCIS

27   Director in violation of the FVRA, the directives were not issued 'in accordance with law,' and

28   must, accordingly, be set aside under the APA").

253.   These FVRA and HSA lawsuits generally ask courts to set aside and/or enjoin actions by officials acting unlawfully in federal agency roles, because those actions are "without force and effect," 5 U.S.C. § 3348(d)(1), "may not be ratified," *id.* § 3348(d)(2), and were therefore promulgated "in excess of statutory authority" and not "in accordance with law," *id.* §§ 706(2)(C), (2)(A).

254.   In addition to court review of agency action, the U.S. Government Accountability Office ("GAO") likewise found Mr. Wolf to be acting ultra vires. Congress has delegated the GAO to play a core role in FVRA compliance: namely, per the FVRA, the GAO must collect information about vacancies, and if the GAO "makes a determination that an officer is serving longer than the 210-day period including the applicable exceptions to such period under section 3346 or section 3349a, the Comptroller General shall report such determination immediately" to various authorities, including Congress. 5 U.S.C. § 3349.

255.   On August 14, 2020, the GAO issued a report under its FVRA duties and authority, entitled "Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security." In sum, the report finds that Acting Secretaries "Wolf and [Ken] Cuccinelli were named to their respective positions of Acting Secretary and Senior Official Performing the Duties of Deputy Secretary by reference to an invalid order of succession" and that "[b]ecause Mr. Wolf draws his authority to serve as Acting Secretary from [an invalid] Delegation, Mr. Wolf cannot, therefore, rely upon it to serve as the Acting Secretary."

256.   The GAO report also analyzed whether Mr. Wolf could be lawfully serving under the succession provisions of the HSA and found that he could not.

257.   Mr. Wolf has twice attempted to ratify his ultra vires actions as Acting DHS Secretary. Neither attempt has cured his unlawful exercise of authority.

258.   First, while Mr. Wolf was purportedly Acting DHS Secretary, then-FEMA Administrator Peter Gaynor also used "any authority vested in [him] *as Acting Secretary of Homeland Security*" to revise and/or ratify the actions by Mr. McAleenan to replace the original DHS Orders with the new Orders overriding E.O. 13,753 with new Annex A (emphasis added).

259.    One federal district court characterized the "two acting secretaries" maneuver as the government's attempt to "allow a government official to take administrative action in the alternative," further holding that "DHS cannot recognize [Mr. Gaynor's] authority only for the sham purpose of abdicating his authority to DHS's preferred choice, and only in the alternative." *Batalla*, 2020 WL 6695076 at *9.

260.    Later, Defendants abandoned the "two acting secretaries" theory and agreed that FEMA Administrator Gaynor was "never" Acting DHS Secretary. *Pangea Legal Services,* 2021 WL 75756, at *5.

261.    In addition to the "two acting secretaries" theory, DHS also attempted another form of ratification that is of no legal consequence. In the past two weeks, Mr. Wolf has seen his September 10, 2020 nomination for DHS Secretary withdrawn (January 7); resigned from the role of Acting Secretary (January 11); returned to his prior position as Under Secretary for Strategy, Policy, and Plans (January 11); allegedly been delegated the authority to ratify his own past actions by the new Acting Secretary, FEMA Administrator Gaynor (January 12); and used this new purported delegated authority to ratify "any and all prior regulatory actions involving delegable duties that [he had] taken from November 13, 2019 through January 11, 2021" (Chad F. Wolf, Signed Ratification of Delegable Prior Action as AS 01.13.21, U.S. Dept. of Homeland Security) (January 14).

262.    Courts do not have to accept at face value agencies' blanket ratifications of past actions. Instead, they examine whether "a properly appointed official has the power to conduct an independent evaluation [of the past actions] of the merits and does so," *Wilkes-Barre Hospital Company, LLC v. N.L.R.B.*, 857 F.3d 364, 371 (D.C. Cir. 2017) (citation omitted), and whether the ratifier was exercising "independent judgment" in doing so, *Jooce v. Food & Drug Admin.*, 2020 WL 680143, at *5 (D.D.C. Feb. 11, 2020), *aff'd*, 981 F.3d 26 (D.C. Cir. 2020).

263.    It is unlikely, given the recitation of events above, that any properly appointed official conducted an independent evaluation of past actions, or that any official who conducted such an evaluation exercised independent judgment.

- 44 -

264.    On information and belief, Mr. Wolf promulgated and/or implemented all, some, or part of the Policy challenged in this lawsuit, and any aspects of the Policy promulgated and/or implemented under his authority must be set aside and/or enjoined.

265.    On information and belief, as of this filing, no lawfully acting Secretary of Homeland Security has taken the necessary steps that could possibly serve to properly ratify the Policy.

**_Related Practice of Unlawfully Commandeering Portland's Law Enforcement Officers_**

266.    In addition and related to the Policy, Defendants continue to engage in a related Practice that also asserts authority not delegated to them under the Constitution or under other legal authority.

267.    On or about September 21, 2020, the City of Portland, Oregon State Police, and several federal law enforcement agencies, including the USMS, began logistics planning for an anticipated rally of the Proud Boys in Portland on Saturday, September 26, 2020.

268.    The Proud Boys are an extremist pro-White hate group. Members of the Proud Boys, which appeared at the 2017 "Unite the Right" rally in Charlottesville, Virginia, "regularly spout white nationalist memes and maintain affiliations with known extremists" and "are known for anti-Muslim and misogynistic rhetoric."

269.    In anticipation of the Proud Boys rally, on September 25, 2020, Governor Brown declared a state of emergency and issued an executive order for the purpose of implementing a coordinated law enforcement response. As part of the order, Governor Brown temporarily assumed control of local law enforcement, including PPB, the Multnomah County Sheriff's Office, the Gresham Police Department, and the Port of Portland Police.

270.    Governor Brown appointed Multnomah County Sheriff Michael Reese and Oregon State Police Superintendent Travis Hampton to serve as incident commanders in the law enforcement coordination area, and they therefore assumed control of PPB, Multnomah County Sheriff's Office, Gresham Police Department, and Port of Portland Police.

271.    The Governor's executive order, by its own terms, became effective at 12:01 A.M. Pacific Time on Saturday, September 26, 2020, and expired at 12:01 AM Pacific Time on Monday,

- 45 -

1    September 28, 2020. Governor Brown's executive order and state of emergency were then

2    terminated at 6:00 AM on September 27, 2020.

3         272.    Pursuant to a direction given by Superintendent Hampton, on September 25, 2020,

4    PPB Chief Charles Lovell authorized fifty-six officers, sergeants, and lieutenants from PPB's

5    Rapid Response Team, which typically handles protests, to be deputized as federal agents for the

6    purposes of tactical response to the anticipated rally and disturbance of the peace caused by the

7    Proud Boys.

8         273.    Because of the Governor's executive order and over the course of dealing with

9    Oregon State Police, PPB anticipated that the deputation would be limited to the weekend

10   surrounding the Proud Boys hate-related event or so long as the state of emergency remained in

11   effect.

12        274.    After the expiration of the state executive order, the federal deputation was in fact

13   no longer needed.

14        275.    Deputations must be voluntary and consensual.

15        276.    On September 29, 2020, Portland City Attorney Tracy Reeve wrote to the U.S.

16   Attorney's Office in Portland to clearly and expressly communicate the City's withdrawal of

17   consent to the federal deputation of the fifty-six PPB officers.

18        277.    City Attorney Reeve explained that the Governor's executive order had terminated,

19   and PPB "was back under the control and direction of the City of Portland, and specifically Police

20   Commissioner and Mayor Ted Wheeler and the Portland City Council." Because the executive

21   order terminated, "[t]he City of Portland [did] not consent to the continuing federal deputization

22   of PPB officers and hereby formally withdr[e]w[] its consent to this deputization effective

23   immediately."

24        278.    As of September 29, 2020, the deputation stopped being voluntary and consensual

25   because Portland withdrew its consent; therefore, the deputations were of no further legal effect

26   on and after that date.

27        279.    Neither the U.S. Attorney's Office nor any other federal agency, including the

28   USMS, responded to City Attorney Reeve's communication.

- 46 -

280.     Instead, on September 30, 2020, U.S. Attorney Williams and United States Marshal for the District of Oregon Russ Burger issued a press release regarding the deputation of the PPB officers.

281.     The release stated that the "U.S. Marshal will not cancel the cross-deputation of local and state law enforcement officers." In defense of their decision to commandeer Portland's police force, U.S. Attorney Williams and United States Marshal for the District of Oregon Burger stated that continued deputation would provide "accountability and deterrence" for "criminal acts" and would support "front line law enforcement officers and their families in a way that they have not seen from City Hall."

282.     Despite Defendant agencies' purported desire to hold individuals accountable for and deter criminal acts, it is the responsibility of PPB and other local law enforcement to generally address criminal activity in Portland. It is the responsibility of the State of Oregon and City of Portland to enact laws and enforce laws that strike the proper balance between deterring criminal activity and supporting First Amendment expression. And it is the responsibility of Portland, as the employer of PPB officers, to support and protect local law enforcement.

283.     On October 2, 2020, Mayor Wheeler, as Police Commissioner, directed PPB officers to take no further action of any kind pursuant to the federal deputation, including the enforcement of any federal law.

284.     On December 31, 2020, the deputations from September 26, 2020 expired by their terms. However, Portland continues to voluntarily deputize PPB officers as U.S. Marshals, and with other federal agencies, to advance important law enforcement goals.

285.     Nonetheless, because the federal government has previously refused to recognize Portland's withdrawal of consent to deputation, Portland remains concerned about current and future deputation of PPB officers and Portland's ability to terminate such relationships and ensure that PPB officers are acting consistent with their obligations to Portland.

286.     The practice of refusing to terminate the deputation of Portland's officers limits the City's law enforcement discretion, creates potential conflict between Defendants and Portland over

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the use and tactics of Portland's own officers and other law enforcement personnel, and unlawfully usurps the legislative and governance prerogative of local officials.

287.    The Practice of continued, non-consensual deputation of Portland's law enforcement officers unconstitutionally infringes on Portland's authority to end the deputation and unconstitutionally compels local officers to continue to serve as federal law enforcement officials, whether in name or in scope of authority.

### *Harm to Plaintiffs*

#### *Economic Injury*

288.    Plaintiffs have already suffered economic harms and will continue to suffer such harms under the Policy and Practice.

#### Portland's Economic Harms

289.    At the time of the federal government's deployment into Portland, protests in the City were growing more peaceful and were more easily managed on a day-to-day basis by PPB.

290.    As a direct result of the unlawful intervention by Defendants, Portland experienced a significant increase in violent protests and civil disturbance. Dr. Robert Pape and his team of researchers at the University of Chicago examined 122 protest events in Portland between May 28, 2020, and August 6, 2020, and found that violence behavior increased and peaceful protests decreased during the 25 days when federal agents were present.

291.    Following the removal of federal agents from the streets of Portland, PPB was required to expend additional resources on crowd management and maintaining peace.

292.    As a direct result of the unlawful intervention of Defendants, PPB was required to spend additional money on overtime for patrol officers and other resources in response to the heightened tensions within Portland.

293.    Since July 2020 and continuing to the present, Portland's elected leadership and other city officials have spent hundreds of hours in meetings, discussions, and other planning efforts to respond to the presence of federal agents and to plan for possible additional federal intervention under the Policy.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   294.   In January 2021, Portland's elected leadership and other city officials have spent

2   hours in discussions and other planning efforts to prepare for potential violent protests by pro-

3   Trump supporters.

4   Oakland's Economic Harms

5   295.   Although Plaintiff City of Oakland has not yet been subject to direct federal

6   intervention under the Policy, it has nonetheless already suffered and will continue to suffer

7   economic harms.

8   296.   In response to the Policy, Oakland has also engaged in new outreach through the

9   departments that are members of its Emergency Operations Center, activities that would not have

10   been necessary and resources that would not have been required but for the Policy.

11   297.   Oakland's elected leadership has devoted time since July 2020 preparing for

12   possible federal intervention under the Policy. Due to the uncertainty caused by the Policy, city

13   officials had to return to such preparations after January 6, 2021.

14   298.   Oakland's economic harms will significantly increase if the City becomes a target

15   of deployment under the Policy, for many reasons. One such reason is the City's "mutual aid"

16   agreements, as described above. The City's mutual aid agreements with other governments have

17   never contemplated coming to the assistance of a sister government in the event of unprecedented

18   federal intervention, such as the interventions that have occurred and may occur under the Policy.

19   299.   Oakland has had mutual aid requests rejected when the aid sought does not comport

20   with the agreements or conflicts with their partners' policies.

21   300.   Oakland will suffer significant economic harm if it cannot rely on mutual aid. In

22   the limited instances in which mutual aid has been unavailable, for instance, the Oakland Police

23   Department has been forced to cancel days off, pay substantial additional overtime, and divert

24   officers from their assigned duties.

25   301.   Defendants did not take either Portland or Oakland's economic harms into account

26   in enacting the Policy.

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

***Budgetary and Other Uncertainty; Impairment of Ability to Provide Services***

302.    Plaintiffs depend on the clear delineation of and communication about federal, state, and local police authority to safely govern and police their communities.

303.    Plaintiffs must know or reasonably expect when federal law enforcement agents will be or could be deployed in their cities, both as a constitutional and safety matter.

304.    Plaintiffs have historically worked closely with Defendants' local representatives to ensure the safety of the federal property Defendants have authority to protect.

305.    Even when the federal government has, in the past, intervened involuntarily in cities, counties, or states, it has done so using lawful processes, such as by filing enforcement actions in court or, in extreme and rare circumstances, formally invoking powers such as the Insurrection Act and following such statutes' requirements for a declaration. The Act is not invoked secretly or ambiguously. 10 U.S.C. § 254.

306.    The current Policy represents an entirely new process by which cities may find federal law enforcement in the midst of civil protests, throughout their jurisdictions, and surveilling their residents well beyond federal crimes or properties.

307.    Plaintiffs' uncertainty about whether, when, and with what parameters federal agents may be deployed to their cities under the Policy prevents them from appropriately advising their police departments and fire departments, among others, and from fully planning their budgets.

308.    Further, Plaintiffs' police departments, among other departments, have a strong and abiding interest in the community relationships they have formed, often over many years, with advocates, faith leaders, youth groups, and others in their jurisdictions. These relationships are crucial to addressing racial justice issues, de-escalating and interrupting violence, and engaging in successful long-term reform efforts. These relationships are also premised on Plaintiffs' police departments being able to fulfill the terms of their agreements, both formal and informal, with their community partners. Uncertainty regarding whether, when, and why federal law enforcement authorities, who lack any knowledge of these crucial agreements and understandings, may intervene in Plaintiffs' streets, harms Plaintiffs' capacity to honor their commitments to their residents and reduce violence in their communities.

309.    Finally, because the full scope of the Policy is vague and unknown, Plaintiffs' city officials have no certainty about whether any particular decision they might make will lead to federal intervention under the Policy.

310.    Recent events also made clear that this harm is ongoing. Defendants' intervention to quell Black Lives Matter protests in Portland as well as their deployment to other Democrat-run cities during the summer of 2020 contrast sharply with the preparation for and response to the January 6, 2021 pro-Trump siege on the U.S. Capitol. The wide variation in response cannot be explained by difference in threat levels to federal property. Accordingly, the pretextual explanations for the Policy have created confusion and sowed doubt about when and how Defendants will respond to protests, unrest, or violence in Plaintiff cities.

311.    Plaintiffs continue to respond to Black Lives Matter protests, as well as protests by groups on both the left and the right, without the ability to anticipate or predict how Defendants will respond under the Policy. This uncertainty makes responding to and policing these protests more challenging and costly.

312.    Together, these injuries perceptibly impair Plaintiffs' ability to provide the services they were formed to provide and frustrate Plaintiffs' goals and values.

313.    Under the Policy, federal enforcement actions are likely to violate or contravene Plaintiffs' otherwise lawful policies and values.

### ***Activity Considered Impermissible by Local Policy Permitted Under the Policy***

314.    Plaintiffs have specific policies, practices, and procedures for activities such as the use of force or use of surveillance by law enforcement authorities.

315.    The City of Portland has a use of force policy, Directive 1010.00, and a crowd control policy, Directive 0635.10. These policies govern a number of PPB policies, practices, and procedures in responding to demonstrations, including PPB's use of impact munitions and chemical agents. The use of chemical agents has been further restricted by order of Portland's Police Commissioner, consistent with the City's values on policing.

316.    The City of Oakland has a use of force policy, DGO K-3, and a crowd control policy, Training Bulletin III-G. Those documents govern a number of Oakland Police Department

policies, practices, and procedures, including its use of nonlethal impact weapons and chemical agents, as well as video and photographic recording of protesters engaged in protected First Amendment activity.

317.    These policies and trainings are intended to govern Plaintiffs' police departments' interactions with their communities. Based on those policies and trainings, in Plaintiffs' communities, residents have expectations for their interactions with local law enforcement. Federal law enforcement officers have not been trained in municipal community policing, critical civilian crowd management, and/or de-escalation techniques. The unconstrained actions of federal forces undermine the work of local law enforcement, including ongoing violence prevention programs and community engagement.

318.    Under the Policy, Plaintiff City of Portland has been unable to adhere to its local policies favoring de-escalation of potentially volatile situations because Defendants' actions under the Policy have inflamed local passions, encouraged violence, and generated the need for PPB response where it otherwise would not have been needed.

### *Frustration of Federal Court Orders; Separation of Powers*

319.    Plaintiffs are each, separately, under federal court orders that govern the activities of their police departments in various ways.

320.    Plaintiff City of Portland's police department operates in part under a Negotiated Settlement Agreement in *United States v. City of Portland*, Case No. 3:12-cv-02265-SI (D. Or. 2012), as well as recent injunctions in *Don't Shoot Portland v. City of Portland*, Case No. 3:20-cv-00917-HZ (D. Or. 2020) and *Index Newspapers LLC v. City of Portland*, Case No. 3:20-cv-01035-SI (D. Or. 2020).

321.    Plaintiff City of Oakland's police department operates under a longstanding Negotiated Settlement Agreement in *Delphine Allen. v. City of Oakland*, Master Case File No. C00-4599-TEH (N.D. Cal. 2012), as well as under a recent injunction in *Anti Police-Terror Project v. City of Oakland*, Case No. 20-cv-03866-JCS (N.D. Cal. 2020).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

322.    Collectively, these various court orders bind Plaintiffs' police departments' activities, including governing many of their policies, practices, and procedures, and limiting their use of various forms of force.

323.    Under the Policy, as carried out in, at a minimum, Portland, Defendants used arrest techniques, force, and surveillance that would facially violate Plaintiffs' federal court orders.

324.    Plaintiff City of Oakland would face the same bind if any deployments are sent to Oakland under the Policy.

### *Loss of Use and Enjoyment of Public Facilities*

325.    Portland has provided bike and vehicle lanes in its right-of-way on Main Street and Southwest 3rd Avenue.

326.    FPS's fence and barriers, erected without permission, prevent the use of enjoyment of this public land by Portland and its residents. *See Gingery v. City of Glendale*, 831 F.3d 1222, 1227 (9th Cir. 2016).

### *Loss of Legislative Prerogative*

327.    Plaintiff City of Portland shares in Oregon's sovereign general police power to provide for the health and safety of its residents.

328.    The federal government's commandeering of Portland law enforcement, complete once Defendant DOJ and then-Attorney General Barr refused to cancel the deputation of the PPB officers, pressed these officers into service in disregard of the City's own legislative and enforcement priorities.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**(Administrative Procedure Act—Action Not in Accordance with the Law)**

**(Against All Defendants)**

**(5 U.S.C. § 706)**

329.   Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

330.   Under the APA, courts must "hold unlawful and set aside agency action" that is not in accordance with law, in excess of statutory authority, contrary to constitutional right, or without observance of procedure required by law. 5 U.S.C. § 706(2).

331.   Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

332.   Defendants' Policy is "final agency action" under the APA because it is fairly characterized as Defendants' final word on the matter and has legal consequences for Plaintiffs' resident protesters during civil protests, as well as, independently, for Plaintiffs facing economic harms and federal encroachment on police powers and the "take over" of their jurisdictions. *See U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)); *see also New York v. U.S. Immigration & Customs Enforcement*, 431 F. Supp. 3d 377, 386-88 (S.D.N.Y. 2019).

333.   Agency action need not be in writing, or ever known to the public, to be judicially reviewable as "final" action. *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138-39 (D.D.C. 2018); *Wagafe v. Trump*, 2017 WL 2671254, at *1, *10 (W.D. Wash. 2017); *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (concluding that "the record" as a whole "leaves no doubt" that a policy exists, even though "the details ... are still unclear").

334.   Furthermore, each instance where Defendants, through their officers, employees, and agents, directly or constructively, unlawfully deployed or commanded federal law enforcement to act in excess of or contrary to law constitutes "final agency action" under the APA.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

335.    40 U.S.C. § 1315(b)(1) allows the Secretary of DHS to designate certain federal employees "as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." These authorized duties include enforcing federal laws, making arrests if federal crimes are committed in the presence of an officer, and conducting investigations on and off the property for crimes against the property or persons on the property.

336.    40 U.S.C. § 1315(d)(3) further allows the Secretary to "utilize the facilities and services of Federal, State, and local law enforcement agencies, with the consent of the agencies."

337.    40 U.S.C. § 1315(e) also allows the Secretary to "enter into agreements with Federal agencies and with State and local governments to obtain authority for officers and agents designated under this section to enforce Federal laws and State and local laws concurrently with other Federal law enforcement officers and with State and local law enforcement officers" "[]for the protection of property owned or occupied by the Federal Government and persons on the property."

338.    These statutory provisions do not authorize the designation of employees for general law enforcement purposes in United States cities where the intent, mission, and purpose of the designation is not reasonably connected to such federally stated interests. Significantly, 40 U.S.C. § 1315 does not represent Congressional authorization to suppress insurrections under the Militia Clause.  *See* U.S. Const. art. I, § 8, cl. 15.

339.    Further, these statutory provisions do not authorize the expansion of federal property into City- or State-owned rights-of-way, or the takeover of City property for federal purposes, without the consent of the non-federal agencies, as Defendants assert.

340.    The Policy therefore oversteps the constitutional limitations on the federal police powers, including as enumerated in the Militia Clause, the Republican Form of Government Clause, and the Tenth Amendment, and is not in accordance with and exceeds Defendants' authority under 40 U.S.C. § 1315 because it (a) authorizes the designation of such agents to quell civil protests and surveil and engage with threats to damage or destroy *any* public monument,

memorial, or statue, regardless of whether they are owned or leased by the GSA or on land owned or leased by the GSA, and to engage in activity under the pretext of protecting such objects for the purposes of viewpoint discrimination and (b) authorizes the expansion of federal physical boundaries and the take-over of City rights-of-way for the purposes of securing federal property, without the express consent of the City.

341.    Internal memoranda, internal email communications, internal policies, various public statements, and activities or failures to act in cities such as Portland and Washington, D.C. reveal a distinct and meaningful policy shift to use federal law enforcement to unilaterally step in or replace local law enforcement departments that do not subscribe to President Trump's view of domestic "law and order" and to quell viewpoints, speech, or protests with which President Trump disagrees. These interventions were intended to pressure local officials and police departments to react more aggressively to stop or thwart racial justice protests.

342.    The animating intent of the Policy was to use property protection as the pretextual justification for viewpoint discrimination.

343.    The Policy was implemented to suppress protests or other activities in progressive, Democratic-controlled cities where protestors expressed support for Black Lives Matter or other racial justice actions, causes that President Trump and his administration did not support, under the pretext of protecting federal property. The Policy was implemented either through direct intervention in, and deployment of federal law enforcement to, cities, such as Defendants did in Portland in July 2020, or via threats to do so in order to pressure state and local law enforcement to shut down or severely limit the extent of such protests as quickly as possible, including through the use of racially discriminatory tactics and excessive use of force.

344.    Pursuant to the Policy, Defendants improperly designated and deployed "officers and agents" to Portland, which constitutes a final agency action subject to review under the APA. As a result, all of the DHS personnel purporting to be designated FPS agents under 40 U.S.C. § 1315 were unlawfully deployed and unable to exercise any authority under the statute whatsoever.

345.    Only the Secretary of DHS or someone exercising his lawfully delegated authority may delegate DHS employees to guard federal property. 40 U.S.C. § 1315(b)(1); 6 U.S.C. §

112(b)(1) ("[t]he Secretary . . . may delegate any of the Secretary's functions to any officer, employee, or organizational unit of the Department"). According to the OIG Report, the Acting Secretary delegated the authority to designate FPS officers to the Under Secretary for Management, who in turn further delegated this authority to the FPS Director. That second delegation to the FPS Director was not authorized by law and not properly delegated.

346.    The FPS Director did not properly designate any DHS employees to be deployed to Portland. Designation requires specifically identifying employees for deployment. 40 U.S.C. § 1315(b)(1). The FPS Director did not designate any specific employees for deployment, but rather circulated broadly worded designation memoranda to leadership in various DHS components. The memoranda reference an attached distribution list of personnel to be deployed, but at the time they were distributed, there were no such lists attached. As a result, Defendants' deployment of federal agents to Portland supposedly pursuant to 40 U.S.C. § 1315 was unlawful.

347.    Defendants' unlawful actions have caused, are causing, and will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

## SECOND CLAIM FOR RELIEF

### (Administrative Procedure Act—Arbitrary and Capricious)

### (Against All Defendants)

### (5 U.S.C. § 706(2)(A))

348.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

349.    5 U.S.C. § 706(2)(A) provides that a court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

350.    Long-established principles of federalism, paired with congressional limitations, restrict the ability of the federal government to unilaterally deploy domestic military or police interventions.

351.    Defendants have adopted a Policy to circumvent these limitations and deploy federal agents using property protection as the pretextual justification for viewpoint discrimination.

352.    The Policy was implemented to suppress protests or other activities in progressive, Democratic-controlled cities where protestors expressed support for Black Lives Matter or other racial justice actions, causes that President Trump and his administration did not support, under the pretext of protecting federal property.

353.    The contours of the Policy are not reasonably connected to the facially neutral standards of 40 U.S.C. § 1315. As detailed above, there is no consistently and reasonably discernable connection between threats to federal property and Defendants' responses to those threats.

354.    Accordingly, Defendants' purported justification for the Policy is pretextual and, thus, arbitrary and capricious under the Administrative Procedure Act.

355.    In enacting the Policy, Defendants have also acted arbitrarily and capriciously because Defendants did not fully consider the foreseeable harms of their policy and did not adequately explain the decision-making rationale behind the policy change, beyond a pretextual rationale.

356.    In implementing the Policy, Defendants failed to consider, among many things, the direct and destructive impacts on local governments in their administration of general public safety, and the aforementioned harms that have and will flow to Plaintiffs.

357.    Defendants' unlawful action has caused, is causing, and will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

**THIRD CLAIM FOR RELIEF**

2

**(Federal Vacancies Reform Act; Homeland Security Act)**

3

**(Against Defendants Pekoske and DHS)**

4

**(5 U.S.C. § 3345 *et seq.*; 6 U.S.C. § 113)**

5     358.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding

6    paragraphs of this First Amended Complaint.

7     359.    The Secretary of Homeland Security may be appointed by the President only with

8    the advice and consent of the Senate, 6 U.S.C. § 112(a)(1), and when the Office of the Secretary

9    is vacant, the order of succession is governed by the FVRA and/or the HSA.

10     360.    Under those authorities, Mr. Wolf was not legally authorized to hold the position

11    of Acting Secretary.

12     361.    Under those authorities, Mr. Wolf was not legally authorized to perform the duties

13    and functions of the Secretary of Homeland Security.

14     362.    Because Mr. Wolf was without legal authority to hold his position or to perform its

15    duties or functions, any contributions he made to the Policy or steps he took or is taking to enact

16    or enforce the Policy, or later to ratify the Policy, "shall have no force or effect," 5 U.S.C.

17    § 3348(d)(1), "may not be ratified," *id.* § 3348(d)(2), and must be set aside.

18     363.    Because no lawfully acting Secretary of Homeland Security has taken the necessary

19    steps to properly ratify the Policy, its legal status remains unchanged.

20

**FOURTH CLAIM FOR RELIEF**

21

**(Administrative Procedure Act—In Excess of Authority)**

22

**(Against Defendants Pekoske and DHS)**

23

**(5 U.S.C. § 706(2)(C))**

24     364.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding

25    paragraphs of this First Amended Complaint.

26     365.    Because Mr. Wolf was not legally authorized to hold the position of Acting

27    Secretary, any action he took to contribute to, direct, revise, promulgate, enact, or enforce the

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Policy, or later to ratify the Policy, is "in excess of authority" under the APA and therefore must be held to be unlawful and set aside.

366.    Because no lawfully acting Secretary of Homeland Security has taken the necessary steps to properly ratify the Policy, its legal status remains unchanged.

## FIFTH CLAIM FOR RELIEF

**(Administrative Procedure Act—Not in Accordance with Law)**

**(Against Defendants Pekoske and DHS)**

**(5 U.S.C. § 706(2)(C))**

367.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

368.    Because Mr. Wolf was not legally authorized to hold the position of Acting Secretary, any action he took to contribute to, direct, revise, promulgate, enact, or enforce the Policy, or later to ratify the Policy, is "not in accordance with law" under the APA and therefore must be held to be unlawful and set aside.

369.    Because no lawfully acting Secretary of Homeland Security has taken the necessary steps to properly ratify the Policy, its legal status remains unchanged.

## SIXTH CLAIM FOR RELIEF

**(Anti-Commandeering)**

**(Plaintiff City of Portland Against Defendants Wilkinson and DOJ)**

**(U.S. Const., amend. X)**

370.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

371.    The Tenth Amendment to the United States Constitution preserves the states' historic, sovereign, and fundamental autonomy to regulate their own affairs, including and especially the operations of their state and local governments.

372.    General police powers are among those reserved to the States. "A state's ability to regulate its internal law enforcement activities is a quintessential police power." *United States v.*

*California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019), *cert. denied*, 2020 WL 3146844 (June 15, 2020).

373.    States are permitted to delegate their police powers to their municipalities. "[T]he delegated power of municipalities is as broad as the police power of the state, except as that power may be restricted by terms of the grant or by the state constitution." *D.C. v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953).

374.    Oregon has so delegated its police power to its municipalities, which include the City of Portland. Article XI, section 2 of the Oregon Constitution grants the "legal voters of every city and town . . . power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon." Portland's charter identifies its power and authority to exercise within the City and City-owned property "all the powers commonly known as the police power to the same extent as the State of Oregon has or could exercise said power within said areas, and to make and enforce within said areas all necessary or appropriate . . . police . . . and safety laws and regulations." Portland City Charter § 2-105.

375.    The USMS's refusal to honor the cancellation of the deputation of PPB's officers, by and through then-Attorney General Barr and DOJ, commandeered a key Portland law enforcement agency and unduly interferes with Portland's police functions as delegated to it by the State of Oregon, in violation of the Tenth Amendment. This Practice unconstitutionally infringed on Portland's authority to determine the status and deputation of PPB's officers, and unconstitutionally compelled PPB's officers to continue to serve under the force and guise of federal law.

376.    Defendants DOJ and Wilkinson have violated the authority of Portland to control and direct its own police officers and, in doing so, caused confusion regarding the role and authority of deputized PPB officers and any legal obligations of these officers to execute orders issued under the authority of the United States.

377.    Portland continues to work with the federal government to deputize PPB officers. There is ongoing uncertainty about Portland's ability to terminate such relationships, if desired, going forward and ensure that PPB officers are acting consistent with their obligations to Portland

378.     The violation caused by Defendants DOJ and Wilkinson causes ongoing harm to Portland and its residents.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Judgment Act)

### (Against All Defendants)

### (28 U.S.C. §§ 2201-2202)

379.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

380.     The Policy therefore oversteps the constitutional limitations on the federal police powers, including as enumerated in the Militia Clause, the Republican Form of Government Clause, and the Tenth Amendment, and is not in accordance with and exceeds Defendants' authority under 40 U.S.C. § 1315 because it (a) authorizes the designation of such agents to quell civil protests and surveil and engage with threats to damage or destroy *any* public monument, memorial, or statue, regardless of whether they are owned or leased by the GSA or on land owned or leased by the GSA, and to engage in activity under the pretext of protecting such objects for the purposes of viewpoint discrimination and (b) authorizes the expansion of federal physical boundaries and the take-over of City rights-of-way for the purposes of securing federal property, without the express consent of the City.

381.     Defendants' purported justification for the Policy is wholly pretextual and, thus, arbitrary and capricious under the APA.

382.     In enacting the Policy, Defendants have also acted arbitrarily and capriciously because Defendants did not fully consider the foreseeable harms of their policy and did not adequately explain the decision-making rationale behind the policy change, beyond a pretextual rationale.

383.     Because Mr. Wolf was without legal authority to hold his position or to perform its duties or functions, any contributions he made to the Policy or steps he took or is taking to enact or enforce the Policy "shall have no force or effect," 5 U.S.C. § 3348(d)(1), "may not be ratified," *id.* § 3348(d)(2), and must be set aside.

384.     Because Mr. Wolf was not legally authorized to hold the position of Acting Secretary, any action he took to contribute to, direct, revise, promulgate, enact, or enforce the Policy, or later to ratify the Policy, is "in excess of authority" under the APA and therefore must be held to be unlawful and set aside.

385.     Because Mr. Wolf was not legally authorized to hold the position of Acting Secretary, any action he took to contribute to, direct, revise, promulgate, enact, or enforce the Policy, or later to ratify the Policy, is "not in accordance with law" under the APA and therefore must be held to be unlawful and set aside.

386.     Because no lawfully acting Secretary of Homeland Security has taken the necessary steps to properly ratify the Policy, its legal status remains unchanged.

387.     An actual, present, and justiciable controversy exists between Plaintiffs and Defendants concerning the legality of the Policy and regarding whether Mr. Wolf had legal authority to hold his position or perform its duties or functions.

388.     Plaintiffs seeks a declaratory judgment from this Court that the Policy is not in accordance with law, in excess of statutory authority, contrary to constitutional right, or without observance of procedure required by law pursuant to 5 U.S.C. § 706(2); that the Policy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A); that Mr. Wolf is without legal authority to hold his position or to perform its duties or functions; and that aspects of the Policy promulgated under the purported authority of Mr. Wolf must be set aside and/or enjoined.

389.     Defendants DOJ and Wilkinson have unduly interfered with Portland's police functions as delegated to it by the State of Oregon, in violation of the Tenth Amendment, by refusing to cancel the deputation of the PPB officers at Portland's request.

390.     An actual, present, and justiciable controversy exists between Portland and Defendants DOJ and Wilkinson concerning the constitutionality of Defendants' refusal to cancel the deputation.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

391. Portland seeks a declaratory judgment from this Court that Defendant DOJ's and Defendant Wilkinson's refusal to cancel the deputation of PPB officers is violative of the Tenth Amendment and the anti-commandeering doctrine.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1. Issue an order holding unlawful, vacating, and setting aside Defendants' Policy;

2. Declare that the Policy is not in accordance with law, in excess of statutory authority, contrary to constitutional right, or without observance of procedure required by law pursuant to 5 U.S.C. § 706(2);

3. Declare that the Policy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

4. Declare that the cross-designation of federal agents in June and July 2020 as well as their deployment to Portland pursuant to the Policy was unlawful;

5. Declare that aspects of the Policy promulgated under the purported authority of Mr. Wolf must be set aside and/or enjoined;

6. Declare that Defendant DOJ's and Defendant Wilkinson's commandeering of local law enforcement is unlawful under the Tenth Amendment and order them to immediately cancel the at-issue deputation of PPB officers;

7. Award Plaintiffs costs, expenses, and reasonable attorneys' fees; and

8. Award any other relief the Court deems just and proper.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DATED:  January 21, 2021

Respectfully submitted,

**OFFICE OF THE CITY ATTORNEY**
**CITY OF OAKLAND**

By: */s/ Barbara J. Parker*
Barbara J. Parker, City Attorney
Maria Bee, Chief Assistant City Attorney
Zoe Savitsky, Supervising Deputy City Attorney
Malia McPherson, Deputy City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3601; Fax: (510) 238-6500
bparker@oaklandcityattorney.org
mbee@oaklandcityattorney.org
zsavitsky@oaklandcityattorney.org
mmcpherson@oaklandcityattorney.org
*Counsel for the City of Oakland*

**OFFICE OF THE CITY ATTORNEY**
**CITY OF PORTLAND**

By: */s/ Robert Taylor*
Robert Taylor, Interim City Attorney
Denis Vannier, Senior Deputy City Attorney
Naomi Sheffield, Deputy City Attorney
1221 SW 4th Avenue, Suite 430
Portland, Oregon 97204
Telephone: (503) 823-4047; Fax: (503) 823-3089
robert.taylor@portlandoregon.gov
*Counsel for the City of Portland*

By: */s/ Jonathan B. Miller*
Jill Habig, President
Jonathan B. Miller, Legal Director
LiJia Gong, Counsel
4096 Piedmont Avenue #149
Oakland, California 94611
Telephone: (301) 335-3828
jill@publicrightsproject.org
jon@publicrightsproject.org
lijia@publicrightsproject.org

*Counsel for the Cities of Oakland and Portland*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## FILER'S ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, Jonathan B. Miller, hereby attests that concurrence in the filing of this document has been obtained from all the signatories above.


DATED:  January 21, 2021                                    /s/ *Jonathan B. Miller*
                                                                          Jonathan B. Miller

## CERTIFICATE OF SERVICE

I, Jonathan B. Miller, hereby certify that the foregoing was filed through the CM/ECF system in the Northern District of California and will be sent electronically to the registered participants.


DATED:  January 21, 2021                                    /s/ *Jonathan B. Miller*
                                                                          Jonathan B. Miller